The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.    CR09-209 RAJ |
| Plaintiff, | ) | |
| v. | ) | OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO AMEND CONDITIONS OF RELEASE |
| LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON, | ) | |
| Defendants. | ) | |

The United States of America, by and through Jeffrey C. Sullivan, United States Attorney for the Western District of Washington, and Todd Greenberg and Tessa M. Gorman, Assistant United States Attorneys for said District, files this Omnibus Response to the Motions to Amend Conditions of Release filed by defendants Leroy Richard Christiansen, David Carl Ebert, and Steven Michael Fueston. As set forth more fully below, the government submits that the conditions of release are necessary to reasonably assure the safety of the community and thus should remain in effect.

## I.

## INTRODUCTION

On July 23, 2009, the grand jury returned an Indictment charging six individual defendants, including Leroy Richard Christiansen, David Carl Ebert, and Steven Michael Fueston, and three corporate defendants, with Conspiracy to Commit RICO. Christiansen, Ebert, and Fueston were also charged in the remaining counts of the

Response to Defendants' Motions to Amend Bond/— 1
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Indictment with Conspiracy to Use Interstate Facilities in Aid of Racketeering (Count 2),
Conspiracy to Engage in Money Laundering (Count 3), and Mail Fraud (Counts 4-15).
The charges primarily arise out of the defendants' joint ownership and operation of four
strip clubs in Western Washington, namely "Rick's," "Sugar's," "Honey's," and "Fox's,"
and the strip clubs' related entities, in a manner that permitted, facilitated, and promoted
prostitution.

The Indictment was unsealed on June 30, 2009, and on July 24, 2009, each of the
six individual defendants charged in this matter appeared before the Honorable James P.
Donohue, United States Magistrate Judge, for arraignment and bond hearings.

At the hearings, the Pretrial Services Office recommended conditions of release
that were reasonably necessary to assure the safety of the community, including
prohibiting the defendants from having direct or indirect contact with witnesses and
prohibiting the defendants from employment in the adult entertainment business,
including operation and management of their strip clubs' and related entities. Magistrate
Judge Donohue agreed with the recommendations of the Pretrial Services Office and
imposed the proposed conditions of release for each of the six individual defendants in
this case. Three of the defendants - - Christiansen, Ebert, and Fueston - - have now
asked this Court to review their Bonds and modify the witness and employment
conditions. For the reasons set forth more fully below, the government asks this Court to
leave in place the bonds entered by Magistrate Judge Donohue.

## II.

## LEGAL AUTHORITIES

### A.    Standard of Review.

The standard of review for the district court's review of a magistrate judge's
detention or release order under 18 U.S.C. § 3145(a) is *de novo*. *United States v. Koenig*,
912 F.2d 1190, 1191 (9th Cir. 1990). The *Koenig* Court noted that the term *de novo* had
been subjected to imprecision and thus clarified what "we conceive it to mean in the
context" of a district court's review pursuant to § 3145. Specifically, the Ninth Circuit

1  stated that although a district court was not permitted to review the magistrate judge's

2  findings deferentially under the clearly erroneous standing, it was nevertheless also not

3  "required to start over in every case, and proceed as if the magistrate [judge]'s decision

4  and findings did not exist." *Id.* at 1193. Accordingly, the district court "should review

5  the evidence before the magistrate [judge] and make its own independent determination

6  whether the magistrate [judge]'s findings are correct, with no deference." *Id.* Moreover,

7  in making its own determination of the facts, whether different from or an adoption of the

8  findings of the magistrate judge, the district court may take in additional evidence. *Id.*

9  **B.    Considerations for Conditions of Pretrial Release.**

10         In deciding whether to detain or release a defendant before trial, the court must

11  evaluate several enumerated factors to determine "whether there are conditions of release

12  that will reasonably assure the appearance of the person as required and the safety of any

13  other person and the community." 18 U.S.C. § 3142(g). If the court decides the

14  defendant should be released pending trial, it has two options: it may release the

15  defendant on personal recognizance or an unsecured appearance bond, or it may order the

16  defendant released subject to specified conditions. 18 U.S.C. § 3142(a)(1) & (2). If the

17  court decides the second option is appropriate, the court must exercise its discretion and

18  impose the "least restrictive" set of conditions that will "*reasonably assure* the

19  appearance of the [defendant] as required and the safety of any other person and the

20  community." 18 U.S.C. § 3142(c)(1)(B) (emphasis added). The statute not only

21  delineates numerous options for conditions of release, but it also explicitly states that the

22  court may impose "any other condition that is *reasonably necessary* to assure the

23  appearance of the person as required and to assure the safety of any other person and the

24  community." 18 U.S.C. § 3142(c)(1)(B)(xiv) (emphasis added).[1] In the present case, the

25

26         [1] This is a lesser standard than the one required when the government seeks pretrial
    detention. In those cases, the government bears the burden of showing by a preponderance of
27  the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the
    defendant poses a danger to the community. *United States v. Motamedi,* 767 F.2d 1403, 1406-07
28  (9th Cir. 1985).

Response to Defendants' Motions to Amend Bond/— 3
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

government is seeking the conditions at issue not to assure the defendants' appearance, but rather to assure the safety of the community.

### III.

### ARGUMENT

**A.     The Witness Restriction is Reasonably Necessary to Assure the Safety of the Community.**

*1.     The Evidentiary Basis for the No Contact Condition.*

The Bail Reform Act sets forth a variety of special conditions of release that may be appropriate in certain cases, including the condition that the defendant "avoid all contact . . . with a potential witness who may testify concerning the offense." 18 U.S.C. § 3142(c)(1)(B)(v). This no-contact condition "should be imposed whenever the circumstances are such that the judge believes any form of victim or witness intimidation may occur." Hon. John L. Weinberg, *Federal Bail and Detention Handbook*, 6-7 (2008) (citations omitted).

Many of the pleadings and affidavits previously filed in this matter contain facts and allegations sufficient to establish circumstances giving rise to a serious and reasonable concern about the potential for witness tampering in this case. This evidence is found in the Indictment, the wiretap affidavits and related pleadings, the search warrant affidavit, and the government's application for a Temporary Restraining Order. Collectively, these materials establish that the defendants engaged in obstructionist conduct during the investigation of this matter, and that they have exhibited the proclivity to improperly influence witnesses. Thus, there is a strong evidentiary basis for the imposition of the condition prohibiting the defendants from contacting witnesses.

*a.     The Grand Jury's Indictment.*

The Indictment returned by the grand jury contains multiple allegations that the defendants attempted to obstruct the federal investigation by destroying incriminating evidence and coaching dancers into having exculpatory conversations. Magistrate Judge

Response to Defendants' Motions to Amend Bond/— 4
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Donohue cited to these allegations in support of the no-contact condition.  The Indictment is attached hereto as Exhibit A.

With respect to the destruction of evidence, the Indictment alleges that as part of the RICO Conspiracy alleged in Count 1, "the defendants took efforts to destroy and prevent the creation of incriminating records, including directing the destruction of the managers' notes detailing the acts of prostitution occurring at the clubs."  Indictment ¶ 45. A specific example of this obstructionist conduct is described later in the Indictment:

> As part of their duties, managers sent notes to Talents West detailing sex acts they observed the dancers performing.  On or about April 2, 2008, FRANK FRANCIS COLACURCIO JR. was telling LEROY RICHARD CHRISTIANSEN that he had spend the previous day talking with dancers who were "in trouble."  CHRISTIANSEN asked COLACURCIO JR., "Did you tear the notes up that were in there?"  COLACURCIO JR. responded, "I had [an office worker] shred them. . . .  We need a better shredder." CHRISTIANSEN added, "I agree.  We can't get a good enough one."

Indictment ¶ 52(d).  It is notable that during this conversation, Colacurcio Jr. and Christiansen referred to directing one of their Talents West office employees to destroy the incriminating evidence.  The Magistrate Judge's order prohibiting contact with witness, including the defendants' current and former employees, is certainly reasonable and necessary in light of the defendants' history of directing these same employees to destroy evidence.

The Indictment also alleges that the defendants attempted to instruct and coach the dancers into having facially exculpatory conversations with them, and it contains one vivid example of such conduct:

> 41.    It was further part of the conspiracy that the defendants would direct and encourage the dancers not to share with them the details of the acts of prostitution they performed in the clubs, in an effort to create a defense of plausible deniability regarding knowledge of the sex acts in the clubs.

> * * * * *

> 44.    It was further part of the conspiracy that the defendants would attempt to manufacture exculpatory conversations with dancers and managers to make it appear as if they were intolerant of prostitution in the clubs, when, in fact, they permitted, facilitated, and promoted prostitution.

> * * * * *

Response to Defendants' Motions to Amend Bond/— 5
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

52(c).  On or about March 21, 2008, FRANK FRANCIS COLACURCIO
JR. met with a dancer who had been sent to the Talents West office after
having been caught in a sex act at Honey's.  COLACURCIO JR. began the
conversation by asking, "Do I dare ask?"  The dancer replied, "It wasn't the
bad bad bad," meaning sexual intercourse, but she was "giving some guy
[oral sex]."  COLACURCIO JR. stated that oral sex was considered
prostitution and that the dancer's disclosure to him of the sex act put him in
jeopardy because law enforcement could hold him responsible for the act.
COLACURCIO JR. explained that sex acts were allowed at the Talents
West office, but not at the clubs.  COLACURCIO JR. then attempted to
manufacture an exculpatory conversation by telling the dancer she had been
"too truthful," directing her, "Don't be honest with me" and then stated, "So
I ask you again, what happened?"  This time the dancer answered,
"Nothing.  [The manager] thought I was being dirty, but I wasn't."
COLACURCIO JR. allowed the dancer to return to work at the club.

Indictment ¶¶ 41, 44, 52(c).

### b.    The Wiretap Affidavits and Related Pleadings.

The investigation that led to the charges in the Indictment included a 90-day Title

III wiretap authorized by the Honorable Ricardo S. Martinez, United States District

Judge.  Between March 10, 2008, and June 6, 2008, law enforcement agents monitored

and recorded hundreds of conversations occurring in the Talents West office through a

remote microphone ("bug").[2]

[REDACTED PURSUANT TO PROTECTIVE ORDER]

### c.    The Search Warrant Affidavit.

On May 29, 2008, FBI Special Agent Cory Cote filed a 99-page affidavit in

support of the search warrants that were executed on June 2, 2008.  The relevant portions

of the Affidavit are attached as Exhibit F.[3]  Agent Cote's affidavit contains further

evidence of the defendants' obstructionist conduct.  Specifically, several portions of the

affidavit describe incidents during which the defendants directed their employees to

---

[2]  Pursuant to a Protective Order entered by Judge Martinez, all wiretap recordings,
wiretap pleadings, and transcripts or summaries of wiretap recordings are considered "Protected
Material" and shall be filed under seal in connection with pre-trial motions or other matter
before the Court.  *See* MS08-87RSM, Doc. 40, Protective Order at ¶¶ 1-2.  Pursuant to the
Protective Order, and because this pleading references protected wiretap materials, the
government will file this pleading under seal.  The government will publically file a redacted
version of this pleading, omitting all references to protected wiretap materials.

[3]  The entire affidavit is attached to the Application for Search Warrants, filed in case
number MJ08-256.

Response to Defendants' Motions to Amend Bond/— 6
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

conceal the unlawful prostitution activities at the clubs. For example, in the Spring of 2007, a dancer met with defendant Fueston in the manager's office at Fox's. Fueston instructed the dancer that if she was ever arrested for prostitution, she needed to *"keep her mouth shut"* and the first thing she should do is call Talents West's lawyer and he would get her out of jail. Exhibit F at 58, lines 19-26 (emphasis added).

The search warrant affidavit describes similar conduct on the part of Christiansen and Colacurcio Jr. *See, e.g.,* Exhibit F at page 52, lines 7-15 (an undercover detective ("UC") who was working as a manager at Rick's caught a dancer engaging in an act of prostitution; Christiansen, who was at the club, scolded the UC and told her to be "more discrete in these situations"); Exhibit F at page 58, lines 7-13 (Colacurcio Jr. instructed a dancer who was caught engaging in an act of prostitution, "If you're going to speed, look around for cops.").

> ### d. The Colacurcios' History of Obstructionist Criminal Conduct Related to the Management of the Talents West Strip Clubs.

On June 2, 2008, contemporaneous with the execution of search warrants, the government filed an Application for a Temporary Restraining Order ("TRO"), seeking the restraint of four parcels of real property that would be forfeitable upon the defendants' conviction for a RICO offense. Judge Martinez entered the TRO that same day. The relevant portions of the Application are attached hereto as Exhibit G.

As part of the showing for why the TRO was necessary, the government's Application documented the Colacurcios' extensive history of committing crimes involving corruption, fraud, dishonesty, and deceit. *See, e.g.,* Exhibit G at 15 (Colacurcio Sr. convicted of racketeering in 1971, and tax evasion in 1973, and noting that the racketeering conviction involved paying for police protection); Exhibit G at 15-16 (Colacurcio Sr. twice convicted of tax evasion "skimming" offenses related to Talents West clubs in 1981 and 1991; Colacurcio Jr. also convicted in the 1991 case).

Most recently, in January 2008, three of the codefendants in the instant case, Colacurcio Sr., Colacurcio Jr., and John Conte, pleaded guilty to the Washington State

Response to Defendants' Motions to Amend Bond/— 7
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

misdemeanor offense of Conspiracy to Offer a False Instrument or Record for Filing. *See* Exhibit G at 17. These convictions arose out of the highly publicized campaign-finance investigation known as "Strippergate," involving the concealment ("funneling") of illegal campaign contributions to members of the Seattle City Council in 2003, in an effort to corruptly influence the Council's vote on a proposed zoning ordinance that would have expanded the parking lot capacity at Rick's. *See State v. Conte, et al.*, 159 Wash.2d 797, 801-03, 154 P.3d 194, 196 (2007) (en banc).

Although defendants Ebert, Christiansen, and Fueston were not personally convicted in the above-referenced cases, this criminal activity has a bearing on these defendants because the majority of the Colacurcios' past crimes were committed as part of operating adult entertainment clubs owned by Talents West. Tellingly, the Indictment in the instant case alleges that each of the defendants, including Ebert, Christiansen, and Fueston, operated Talents West, along with the Colacurcios, in a nearly identical manner. For example, Counts 4-15 of the Indictment allege that the defendants engaged in a mail fraud scheme centered around the "skimming" of cash proceeds generated from Rick's strip club. Moreover, as noted above, Count 1 (RICO Conspiracy) and Count 2 (Interstate Prostitution Conspiracy) of the Indictment allege that, as part of the charged conspiracies, the defendants jointly operated Talents West through, among other things, conduct designed to thwart and obstruct law enforcement investigations.

### 2. The Condition Requiring No Contact with Witnesses is Reasonable and Necessary in Light of the Evidence Presented.

The evidence cited above that the defendants attempted to thwart the law enforcement investigation by destroying evidence, and by manipulating their dancers into exculpatory conversations, is more than sufficient to justify the imposition of a condition of release requiring the defendants to refrain from contacting witnesses. Ebert's Motion to Amend cites several cases in which courts entered pretrial *detention* orders based on evidence of more severe forms of witness tampering. *See* Motion (Doc. 48) at 8-9. Although the evidence presented in the instant case may not rise to that same level, and

Response to Defendants' Motions to Amend Bond/— 8
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  thus may not warrant pretrial detention, the remedy sought by the government here –

2  pretrial release with a no-contact condition – is commensurately much less drastic.

3        The concern for potential witness tampering and obstruction of justice is even

4  greater now that the grand jury has returned the Indictment.  The defendants' incentive to

5  meddle with witnesses is far greater now that they are facing federal RICO and other

6  serious charges, as well as the potential forfeiture of several valuable properties and at

7  least $25,000,000 in criminal proceeds.  *See* Indictment ¶ 71.  Moreover, the allegations

8  in the Indictment will likely signal to the defendants that some of the club managers and

9  dancers are cooperating with the investigation.  *See, e.g.,* Indictment ¶¶ 52(j) and 52(k).

10  Therefore, the defendants now have a new incentive to discover which dancers are the

11  "rats," to use their own words.[4]  The defendants make too much of the fact that the

12  government is not currently alleging that any specific incidents of witness tampering have

13  occurred since the execution of search warrants on June 2, 2008.  As noted above, the

14  defendants already have displayed their proclivity to engage in obstructionist conduct

15  prior to the search warrants, and they now have an even greater incentive to do so.

16        Adding to the concern in this case is the fact that the work environment at Talents

17  West is alarmingly conducive to potential witness tampering.  If the defendants were to

18  continue operating Talents West, not only would they be in daily – virtually minute-by-

19  minute –  contact with witnesses, including the dancers, club managers, and office

20  employees, but they would exercise a dominant position within the business with respect

21  to these witnesses.  For example, the defendants collectively maintain sole discretion over

22  the hiring, firing, scheduling, and salaries of the club managers and office employees.

23  The dancers' livelihoods are even more directly controlled by the defendants.  The

24  dancers are referred to as "independent contractors," who actually pay "rent" to the

25  defendants to work at their clubs (*see* Indictment ¶ 28), but the defendants make all

26  hiring, termination, and scheduling decisions with respect to the dancers (*see* Indictment

27

28        [4]  This will become an even graver concern when, at some point during this litigation, the
government discloses witness statements through the discovery process.

Response to Defendants' Motions to Amend Bond/— 9
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

¶ 27).  Moreover, many of the dancers owe large sums of money to the defendants, through the accrual of "back rent" or cash loans from the defendants.  *See* Indictment ¶ 28.  Thus, a large majority of the witnesses in this case – the Talents West dancers, managers, and office employees – are reliant upon remaining in the good graces of the defendants for their livelihoods.  As one club manager put it to the UC manager, "You don't say 'no' to the people that sign your paycheck, and when the owners want you to do something, you just have to do it."  Exhibit F, page 53, lines 19-21.[5]

### 3.    *The No Contact Condition is Practical, Effective, and Easy to Enforce.*

As the government noted in the proceedings below, the vast majority of the witnesses in this case will fall into three categories: (a) current and former dancers; (b) current and former Talents West employees, including club managers and office staff; and (c) current and former club customers.  These are well-defined categories of people, and the individuals at issue, although numerous, should be well known to the defendants. This case is much different from most, where defendants often times have little reason to know who the government's witnesses will be.  Here, the defendants have employed most of the witnesses themselves; there is no need for the government to provide a witness list. The defendants' claims that they simply do not know with whom they are to avoid contact are baseless.

Equally unconvincing are the defendants' arguments that somehow the no-contact condition would interfere with their counsel's ability to prepare a defense.  Nothing in the condition, as drafted by Magistrate Judge Donohue, would prohibit contact between witnesses and defense counsel.  To the extent the Court believes this issue should be clarified in the bond, the government has no objection to the addition of the defendants' proposed sentence: "This condition does not prevent your defense counsel or their representatives from contacting witnesses."  The condition would have no effect upon the

---

[5]  Perhaps because of this dynamic at Talents West, where the defendants control everything, many of the witnesses in this case have stated that when they were served with grand jury subpoenas, they felt compelled to report that fact to the defendants at the Talents West office.  This only adds to the concern over potential witness tampering and obstruction of justice.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    preparation of the defense; counsel will be free to interview witnesses outside the

2    presence of the defendants.  Indeed, this is precisely the procedure that counsel for

3    defendant Fueston have been employing voluntarily during the past year.  *See* Declaration

4    of Patrick Preston (Doc. 58) at ¶¶ 2-3.  There is simply no prejudice to the defendants in

5    this regard.  *See United States v. Vasilakos*, 508 F.3d 401, 411 (6th Cir. 2007) ("[T]he

6    defendants have not shown any harm stemming from their inability to contact government

7    witnesses personally.  The district court did not restrict defense counsel's ability to

8    interview any potential witnesses, and the defendants failed to provide any evidence that

9    their attorney's preparation was inhibited by a lack of specialized knowledge of the

10   operations of [defendants' employer].").

11          The condition imposed by Magistrate Judge Donohue, a blanket no-contact order,

12   is clearly understood and easy to enforce.  The defendant are simply prohibited from

13   contacting witnesses for any reason.  This stands in marked contrast to the watered-down

14   condition proposed by the defendants, one that would permit them to have non-case

15   related contacts with witnesses.  From the standpoint of the Pretrial Services Office, it

16   would be virtually impossible to determine whether a particular contact between a witness

17   and one of the defendants was case related.  Thus, the condition proposed by the

18   defendants cannot be enforced effectively.  Moreover, given the defendants'

19   demonstrated inclination to obstruct justice, and the *per se* coercive work environment at

20   Talents West, anything less than a blanket no-contact prohibition will likely be ineffective

21   at preventing witnesses tampering.  *See* 18 U.S.C. § 3142(c)(1)(B)(v) (court may consider

22   imposing condition that defendant "avoid *all contact* . . . with a potential witness who

23   may testify concerning the offense") (emphasis added).  As the Second Circuit has

24   recognized, merely "[p]rohibiting a defendant from committing a crime or intimidating a

25   witness does not at all impede his ability to do so, and requires no more of him than that

26   which the law already demands from a defendant and every other citizen."  *United States*

27   *v. Ferranti*, 66 F.3d 540, 544 (2d Cir. 1995).  A more complete prohibition against

28   witness contacts is necessary and reasonable in this case.

Response to Defendants' Motions to Amend Bond/— 11
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

At the hearing before Magistrate Judge Donohue, and again in their various Motions to Amend, the defendants argue that the no-contact condition should be stricken in its entirely because some of their family members are current or former employees of the businesses at issue, and thus they would be barred under the condition from having contact with these family members. This is obviously not the intent of the no-contact provision, and the government is willing to agree to certain appropriate exceptions from the condition, to allow non-business related contact with close family members. Indeed, at the request of Colacurcio Sr. and Colacurcio Jr., the government agreed to certain family member exceptions at the bond hearing.

**B.**    **The Employment Restriction is Reasonably Necessary to Assure the Safety of the Community.**

    *1.*    ***Evidentiary Basis for The Employment Restriction Condition.***

        *a.*    ***The Defendants Committed Their Crimes Through Use of their Business Entities.***

The defendants have been involved in the adult entertainment business and the operation and management of Rick's, Sugar's, Honey's, and Fox's for years. The defendants formed and used corporations and limited liability companies to own and manage the businesses that operated the strip clubs, and formed and used other corporations and limited liability companies to own the real properties on which these strip clubs are located. As discussed more fully above, the extensive years-long investigation has revealed that since at least 2000, the defendants jointly and collectively managed and operated their strip clubs and related entities in a manner that permitted, facilitated, and promoted prostitution. *See, e.g.,* Indictment ¶¶25-46. Indeed, the defendants and their strip club-related entities constituted a Racketeering Enterprise, whose primary purpose was to financially enrich the individual defendants, including Christiansen, Ebert, and Fueston, through the commission of crimes. Indictment ¶¶21-22.

Christiansen, Ebert, and Fueston each were listed managers in the entities that operate Rick's, Honey's, and Fox's. Indictment ¶¶8, 12, 13. Christiansen and Ebert, at various times, managed the day-to-day affairs of the northern-based clubs, and Fueston, at

all times, managed the day-to-day affairs of Fox's. Indictment ¶¶8, 12, 13 17-19. These
defendants also collectively made decisions that made the clubs conducive to prostitution,
including the installation of VIP rooms with high-sided booths, and the installation of
condom machines. Indictment ¶¶32-33. As a result, prostitution was rampant in the
defendants' strip clubs. For example, during undercover operations at each of the clubs
over a period of approximately three years, more than 120 dancers offered to engage in
acts of prostitution with undercover officers on approximately 155 occasions. Exhibit F
at pages 27-50.

To maximize profits and to keep customers coming to their clubs, the defendants
continued to employ dancers caught in acts of prostitution. Indictment ¶¶36-37, Exhibit F
at pages 50-65. Indeed, each of these defendants -- Christiansen, Ebert, and Fueston --
regularly allowed dancers who had been caught engaging in prostitution at the clubs to
return to work at the clubs. Indictment ¶¶17-19. The defendants established a price
structure that made it easier for dancers to make money by engaging in acts of
prostitution. Indictment ¶¶28, 34. The defendants' own words, as set forth in the
Indictment, underscore their knowledge, permission, and promotion of the prostitution at
their clubs. *See* Indictment ¶¶52(b), (d), (e), (I), (j), and (k). The defendants then used
the entities' bank accounts to launder the significant proceeds of the prostitution.
Indictment ¶38.

The crimes for which the defendants have been charged are inextricably
intertwined with the entities they managed and operated. Indeed, the defendants
committed their crimes through the use of their entities. Accordingly, to assure the safety
of the community, it is reasonably necessary to untangle the defendants from these
entities and prohibit them from managing or operating them as a condition of their pretrial
release.

In their motions, the defendants assert that the government, in seeking the
employment restriction, is improperly treating them as a group and not considering each
defendant's individual set of circumstances. This argument is misplaced in this case

Response to Defendants' Motions to Amend Bond/— 13
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

because the relevant factors that support the employment condition are the ways in which the defendants, as a group, *collectively* operated and managed the strip clubs. Indeed, the charges themselves make clear that each defendant *agreed* that they would operate their businesses -- the Enterprise -- through a pattern of racketeering activity. Accordingly, although their roles alternated over time, each participated in the decisions that governed the affairs of the entities in a manner that permitted, facilitated, and promoted prostitution. Indictment ¶3. As a result, it did not matter which individual defendant was responsible at any given time for the day-to-day operations of the clubs because the defendants collectively had decided how the entities would be managed and operated. These collective business practices allowed each of the owners to profit handsomely from the operation of the clubs.

### b.    The Prostitution Continued After the Investigation Became Public & Continues Currently, and thus the Criminal Use of the Entities is Ongoing.

The searches conducted on June 2, 2008, caused the government's investigation of the defendants to become public. Although the prostitution at the clubs diminished for a brief period following the execution of the search warrants, it resumed a shortly thereafter and is currently ongoing at the clubs. As the government told the Pretrial Services Agency and also proffered at the July 24, 2009, bond hearing, "the very same criminal activity alleged in the Indictment continues today." Declaration of Amanda Lee, Exhibit A, at page 16, lines 10-11. The prosecutor expounded upon this further in the bond hearings when he stated:

> We would also submit, Your Honor, and as noted in the report, uh, many witnesses have reported to the Government, and we will proffer to this court, that in the month or two after the search warrants, and those were executed on June 2nd, 2008, the clubs cleaned up, the prostitution diminished, uh, to a great extent. But that over time, uh, it just came back. And so even within the last year when it was post-search warrant, the defendant's knew they were under investigation, they have not been able to run these clubs lawfully. And it has, it's just necessary to divorce them from these businesses, uh, because they're not being run lawfully.

*Id.* at page 8, lines 14-22. There were some protestations from counsel at the bond hearing and in their pleadings about the government's method of offering proof in this

Response to Defendants' Motions to Amend Bond/— 14
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  matter. *See, e.g., id.* at page 19, lines 24-26 ("[The two or three sentences in the Pretrial

2  Services Agency report] isn't evidence of what's going on at the club today. This is a

3  unsupported, an unsubstantiated statement by a prosecutor that hasn't been verified about

4  what's going on  at the clubs."); Ebert's Motion to Amend (Doc. 48) at 4 ("The

5  government presented no witnesses or affidavits and relied exclusively on the language of

6  the indictment" and the prosecutor's proffer.). However, it is well settled that the

7  government may proceed at a detention hearing by proffer or hearsay. *United States v.*

8  *Winsor*, 785 F.2d 755 (9th Cir. 1986) (citations omitted).

9         In addition to the proffer made at the hearing before Judge Donohue, the

10  government further proffers the following information to this Court: The government has

11  interviewed several witnesses - both customers and dancers -- who have stated that they

12  have engaged in acts of prostitution at the clubs after the search warrants were executed,

13  including engaging in acts of prostitution in 2009. Indeed, as recently as July 30, 2009, a

14  dancer told law enforcement officers that the current incidents of prostitution at Rick's

15  had returned to pre-search levels. Because of the ongoing criminal activity occurring at

16  the clubs, the defendants, still responsible for these clubs and their management, should

17  be divorced from operating or managing the clubs and related entities.

18         **2.    *The Employment Restriction is Commonly Imposed in Cases Where the***
        ***Nature of the Crime and the Employment are Linked.***

19         It is common in this District for pretrial defendants to be prohibited, as part of their

20  conditions of pretrial release, from engaging in any business that is related, in any way, to

21  the nature of the alleged crimes. The logic behind the condition is clear, namely, when a

22  defendant runs a business illegally, or engages in a type of business in an illegal manner,

23  that defendant should be severed from the business in order to assure the safety of the

24  community and protect its members from further crime.[6]

25

26  _____

27         [6] There does not seem to be any caselaw addressing pretrial release conditions regarding
    employment restrictions. As to be expected, there is a dearth of caselaw, generally, related to
28  conditions of release, as most of the cases involve an appeal of a detention order.

Response to Defendants' Motions to Amend Bond/— 15
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

A survey of the United States Attorney's Office in this District revealed numerous cases in which an employment restriction was imposed as a condition of pretrial release:

*United States v. Edward Asatoorians*, MJ09-138, 09-111MJP: Defendant was charged with bank fraud for allowing his sham car company to be used to obtain automobile loans. The defendant's bond directed that he "shall not be employed in any capacity in the automobile sales or loan industry."

*United States v. Humberto Reyes-Rodriguez*, 09-160JLR. Defendant was charged with conspiracy to commit bank and wire fraud for his role in a mortgage fraud scheme. The defendant's bond directed that he have "[n]o employment in any capacity of the Real Estate, loan brokerage, mortgage, lending or escrow fields."

*United States v. Micah Buitron*, 09-133RAJ: The defendant owned website businesses and used his customers' credit card numbers to commit wire fraud. The defendant's bond prohibited him from employment with "any business using the Internet."

*United States v. Bydovskiy et al.*, 09-84MJP. Seven defendants were charged with conspiracy to commit bank, mail, and wire fraud for their involvement in a mortgage fraud scheme. Four were released on bond. The bonds of two of the defendants (the Sobols) directed "[n]o employment in any facet of the mortgage, loan, brokerage, or real-estate business" and the bond of one of the defendants (Byron) stated "[t]he defendant shall not be employed in the mortgage industry in any capacity."

*United States v. Anderson et al.*, 08-212RAJ: Six defendants were charged with wire fraud for their roles in obtaining mortgages loans under false pretenses. All of the defendants were released on bond. The bonds of four of the defendants (Namie, Brandt, Khosraw, and Palmer) directed that they "shall not be employed in any capacity in the real estate business, loan business, banking industry, mortgage industry or be self employed in any capacity."

*United States v. Harry Skeins & David Hawkins*, 06-210M, 06-280RSM: Defendants were charged with conspiracy to commit wire fraud for fraudulently obtaining home loans. Attorney-defendant Skeins was directed to "[r]efrain from any real estate transactions or practice of law that may have any relationship with the State of Washington or with the co-defendant." Defendant Hawkins was "prohibited from engaging in or initiating any real estate transactions."

*United States v. Tuan Dung Tran*, 06-217RSL: The defendant, charged with money laundering as it related to his job as an accountant, was"prohibited from working in any capacity preparing tax documents or performing bookkeeping services for any individuals, businesses or other entities other than himself, his spouse, and TBS Bookkeeping." The bond was later amended to state that "Defendant may otherwise work at TBS Bookkeeping for the limited purpose of preparing the business for sale and selling the business, for a period of up to May 22, 2006."

*United States v. George Kabacy*, 06-5344M, 07-5021FDB: Doctor charged with possession of child pornography was directed to "IMMEDIATELY CEASE CURRENT EMPLOYMENT AS PHYSICAL AT SOUND CHOICE HEALTH CENTER P.S., AND DO NOT PRACTICE MEDICINE IN THE FUTURE WITHOUT PRIOR APPROVAL OF PRETRIAL SERVICES."

Response to Defendants' Motions to Amend Bond/— 16
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

*United States v. Le et al.*, 03-074RSL: Eleven defendants were charged with operating an illegal gambling business, namely sports bookmaking. Each of their bonds prohibited them from even entering any establishments known for gambling.

The above-referenced bonds have been attached hereto as Exhibit H.[7]  As this survey makes clear, Courts in this District have imposed employment conditions when the nature of the crime necessitated a severance of the defendant from any employment that could allow the defendant to continue to commit the crime. Similarly, in the present case, the government has demonstrated that the defendants used their businesses to commit crime, namely prostitution, money laundering, and fraud. Moreover, the government has shown that criminal activity has continued at these businesses. Accordingly, these defendants, like others who are similarly situated, should be prohibited in engaging in the same businesses which facilitated, and were essential for commission of, their crimes.[8]

### 4.    The Employment Restriction is Practicable, Allows the Defendants to Pursue their Livelihoods, and is the Appropriate Condition in this Case.

The defendants argue that the condition is impracticable because there is "no ready supply of qualified management personnel." Ebert's Motion to Amend (Doc. 48) at 13. Contrary to this assertion, the defendants have employed for years many individuals whom they have put into positions they consider to be of significant responsibility. Indeed, as one example, the defendants employ a "head manager" who is responsible for overseeing all of the Seattle-area clubs, and who has worked with the Enterprise for more than twenty years. Similarly, there is a manager at Fox's in Tacoma that has worked at that club for nearly twenty years. In addition, there are several other employees in managerial and other sensitive positions who have been associated with the Enterprise and the defendants for decades.

The defendants also claim that in this highly regulated business it is unrealistic and too onerous to ask them to find replacements in only one month's notice without further

[7]  Copies of the bonds for the *Le* case were at archives and thus not available at the Clerk's Office. However, a copy of the docket sheet showing the bond conditions is attached.

[8]  It is also worth noting that of the fifteen bonds mentioned in the above list, nine of them also included conditions that the defendants have no contact with witnesses.

Response to Defendants' Motions to Amend Bond/— 17
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

ability to have contact with the replacements.   Again, as stated above, the defendants

have employees who have worked for them for years and whom the defendants have

previously placed in positions of trust.  The government further submits that this

perceived "impracticability" should not militate against imposition of the condition.

Many defendants, including the doctors, lawyers and business people specified above,

have had to immediately extricate themselves from their businesses to comply with

pretrial conditions.  If a defendant is unable to meet the condition that a court has deemed

to be reasonably necessary to assure the safety of community, then the alternative would

be detention.

     The defendants also argue that the employment condition harms their abilities to

pursue their livelihoods.  It is worth underscoring that the condition in no way prevents

the defendants from earning money from the entities.  It does not divest them of their

interests, but rather prevents them from operating or managing the entities.  As a result,

they will still be able to realize the profits from them.

     In arguing that the restriction is too severe, the defendants further claim,

erroneously, that the pretrial restrictions "resemble in their nature and scope the type of

remedy a court would impose *after* a RICO conviction." Ebert's Motion to Amend (Doc.

48) at 8.  Quite to the contrary of this assertion, there is, in fact, a staggering difference

between the limited pretrial employment restraints at issue and the extensive remedies the

government will pursue upon conviction in this case.  The pretrial condition only

prohibits the defendants from operating or managing the entities or from gaining

employment in any adult establishment business.  It neither divests them of the interests

nor prevents them from enjoying the profits from the businesses.

     In contrast, upon conviction, the government's forfeiture and divestiture rights, as

set forth in paragraphs 69 through 78 of the Indictment, are comprehensive and vast.

Indeed, RICO forfeiture provisions authorize the forfeiture of not only proceeds and

interests obtained by the defendants from any racketeering activity but also all of the

defendants' various interests in the charged "Enterprise."  As a result, upon conviction in

Response to Defendants' Motions to Amend Bond/— 18
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

this matter, the government will not only seek the real properties on which the clubs are located, but will seek forfeiture of all rights and interest in all of the entities named as part of the Enterprise (which are also the entities named in the bond as part of the employment prohibition), and will also seek a money judgement of no less than $25 million. Accordingly, the limited pretrial employment condition and the vast post-conviction forfeitures are simply not comparable.

Finally, the defendants claim since the government could have, and did not, seek civil remedies under 18 U.S.C. § 1964 to restrict the defendants' employment, it must not have deemed such relief "appropriate." Ebert's Motion to Amend (Doc. 48) at 11. This argument is entirely misplaced.

First of all, the government obviously believes the condition is appropriate because it sought it as a condition of the defendants' bond. Moreover, section 1964 is a *civil RICO statute*, and the government's actions in this case have always been in the pursuit of *criminal* remedies, namely criminal prosecution, criminal conviction, and criminal forfeiture. The preliminary injunctions sought and obtained by the government in this case are listed as "criminal penalties," and are the mechanisms by which the government is able to preserve property prior to the filing of a *criminal* Indictment. *See* 18 U.S.C. § 1963. The defendants' argument on this point -- that the government should be required to first pursue civil remedies under 18 U.S.C. § 1964 before proceeding in the criminal case -- would, by extension, make the pursuit of any criminal case, and the corresponding conditions of release, contingent upon the government first pursing all available civil remedies.

Furthermore, the remedies available under 18 U.S.C. § 1964 are akin to the extensive criminal remedies available post-conviction -- namely disgorgement of unlawful proceeds, divestiture, dissolution, reorganization, removal from positions in an entity, and appointment of court officers to administer and supervise the affairs and operations of entities - - and thus are incomparable to the limited employment condition Magistrate Judge Donohue has imposed in the current case.

Response to Defendants' Motions to Amend Bond/— 19
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**5.      *The Employment Restriction is Necessary to Ensure Compliance With the Witness Condition.***

If the Court upholds Magistrate Judge Donohue's imposition of the condition prohibiting contact with the witnesses in this case, the employment condition necessarily follows.  The operation and management of the clubs and related entities involves constant contact with the witnesses in this case, whether they be dancers or managers or waitresses or office personnel.  Accordingly, if the Court prohibits the defendants from having contact with the witnesses in this case, they will be, in effect, unable to operate or manage their businesses.

## IV.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court impose the same conditions of pretrial release as imposed by Magistrate Judge Donohue.

DATED this 5th day of August, 2009.

Respectfully submitted,

JEFFREY C. SULLIVAN
United States Attorney

/s/ Todd Greenberg
/s/ Tessa M. Gorman

TODD GREENBERG
TESSA M. GORMAN
WSBA #35908
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone: (206) 553-4994
Fax:  (206) 553-2502
E-mail: Todd.Greenberg4@usdoj.gov
E-mail:Tessa.Gorman@usdoj.gov

Response to Defendants' Motions to Amend Bond/— 20
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing  to the attorney(s) of record for the defendant(s).  I hereby certify that I have served the attorney(s) of record for the defendant(s) that are non CM/ECF participants via telefax.

s/JANET K. VOS
Janet K. Vos
Paralegal Specialist
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: (206) 553-5041
FAX:   (206) 553-0755
E-mail:  Janet.Vos@usdoj.gov

Response to Defendants' Motions to Amend Bond/— 21
*United States v. Christiansen, Ebert, & Fueston*, 09-209 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970