# EXHIBIT A

Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED In The U.S.
DISTRICT COURT at Seattle, Washington.

JUNE 23, 20 09
....................................................
BRUCE RIFKIN,   Clerk
By _____ Deputy

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CR09  0209 RAJ

UNITED STATES OF AMERICA,

                              Plaintiff,

          v.

FRANK FRANCIS COLACURCIO SR.,
FRANK FRANCIS COLACURCIO JR.,
LEROY RICHARD CHRISTIANSEN,
DAVID CARL EBERT,
STEVEN MICHAEL FUESTON,
JOHN GILBERT CONTE,
D.C.E. INC.,
MM MR RM CORPORATION, and
LLC EVERETT I,

                              Defendants.

NO.

INDICTMENT

THE GRAND JURY CHARGES THAT:

## COUNT 1

**(Conspiracy to Commit RICO – Racketeer Influenced and Corrupt Organizations)**

**A.    Introduction.**

At all times material to this Indictment:

1.      FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS
COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and
STEVEN MICHAEL FUESTON [hereinafter "the defendants"] jointly owned and
collectively managed and operated four strip clubs, and their related corporations and

INDICTMENT – 1
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

limited liability companies, in the Western District of Washington, in a manner that permitted, facilitated, and promoted prostitution.

2.    FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON operated these strip clubs, and their related corporations and limited liability companies, under an umbrella management business known as "Talents West." The Talents West business office was located at 8600 Lake City Way NE, in Seattle, Washington, on a property owned by FRANK FRANCIS COLACURCIO SR.

3.    The roles played by FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON within Talents West and related to the operation of the strip clubs alternated over time, but each participated in the decisions that governed the affairs of Talents West and the strip clubs in a manner that permitted, facilitated, and promoted prostitution in the clubs.

4.    The collective practices of FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON in operating Talents West and in permitting, facilitating, and promoting prostitution in the strip clubs, generated significant profits for each of them.

**B.    Members of the Racketeering Enterprise.**

5.    Talents West Inc. was a Washington corporation that operated "Talents West," the umbrella business responsible for the operations of the strip clubs known as "Rick's," "Sugar's," "Honey's," and "Fox's," including hiring, firing, and disciplining of club managers and dancers; paying the employees; producing work schedules for the managers, dancers, and other employees; maintaining and reviewing dancer "rent" and loan payment records; and conducting the financial affairs of the strip clubs. Talents West Inc. was incorporated in 1984 and, since 1988, FRANK FRANCIS

INDICTMENT – 2
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  COLACURCIO JR. has been listed as the president and registered agent. The listed

2  address for the Talents West Inc. was 8600 Lake City Way NE, Seattle, Washington.

3        6.    Talents West II LLC was a Washington limited liability company also

4  responsible for operating the business "Talents West" in the same manner described

5  above. Talents West II LLC was formed in 1999 and, since that time, FRANK FRANCIS

6  COLACURCIO JR., DAVID CARL EBERT, and STEVEN MICHAEL FUESTON have

7  been listed as the LLC's managers. COLACURCIO JR. has been listed as the LLC's

8  registered agent. The listed address for the Talents West II LLC was 8600 Lake City

9  Way NE, Seattle, Washington.

10        7.    D.C.E. INC. was a Washington corporation that owned the real property

11  located at 11332 Lake City Way NE, Seattle, Washington. The strip club known as

12  "Rick's" was located in the building on this property. D.C.E. INC. was incorporated in

13  1988 and both DAVID CARL EBERT and FRANK FRANCIS COLACURCIO JR. have

14  been its president. Moreover, since 1996, COLACURCIO JR. has been the corporation's

15  registered agent.

16        8.    LLC Lake City, d/b/a Rick's was a Washington limited liability company

17  that operated the strip club known as "Rick's," located in Seattle, Washington. LLC Lake

18  City was formed in 2000 and, since then, FRANK FRANCIS COLACURCIO JR.,

19  LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN

20  MICHAEL FUESTON have been listed as the LLC's managers, and COLACURCIO JR.

21  has been the LLC's registered agent.

22        9.    MM MR RM CORPORATION was a Washington corporation that owned

23  the real property located at 16743 Aurora Avenue N, Shoreline, Washington. The strip

24  club known as "Sugar's" was located in the building on this property. MM MR RM

25  CORPORATION was incorporated in 1987 in Washington State and, since incorporation,

26  FRANK FRANCIS COLACURCIO JR. has been the president and registered agent.

27        10.    Club 21 LLC, d/b/a Sugar's was a Washington limited liability company

28  that operated the strip club known as "Sugar's," located in Shoreline, Washington.

INDICTMENT – 3
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  Club 21 LLC was formed in 2006 and, since then, John Gilbert Conte has been listed as

2  the LLC's manager and L.J. has been listed as the registered agent. Members of the

3  Enterprise, through Talents West, have operated "Sugar's" since at least 1982.

4      11.    LLC EVERETT I was a Washington limited liability company that owned

5  the real property located at 12902 Highway 99, Everett, Washington. The strip club

6  known as "Honey's" was located in the building on this property. LLC EVERETT I was

7  formed in 2000 in Washington State and, since then, FRANK FRANCIS COLACURCIO

8  JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN

9  MICHAEL FUESTON, and P.M. have been listed as the LLC's managers and

10  COLACURCIO JR. has been listed as the registered agent.

11      12.    P.D. & M.K. I LLC, d/b/a Honey's was a Washington limited liability

12  company that operated the strip club known as "Honey's," located in Everett,

13  Washington. P.D. & M.K. I LLC was formed in 2000 and, since 2001, FRANK

14  FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL

15  EBERT, STEVEN MICHAEL FUESTON, and P.M. have been listed as the LLC's

16  managers and P.M. has been listed as the registered agent.

17      13.    LLC Foxes II, d/b/a Fox's was a Washington limited liability company that

18  operated the strip club known as "Fox's," located in Tacoma, Washington. LLC Foxes II

19  was formed in 2001 and, since its formation, FRANK FRANCIS COLACURCIO JR.,

20  LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN MICHAEL

21  FUESTON, and D.R. have been listed as the LLC's managers and EBERT has been listed

22  as the registered agent.

23      14.    Accurate Bookkeeping Service Inc. was a Washington corporation

24  responsible for bookkeeping, including the payment of employees' payroll, taxes, and

25  capital distributions, for each of the legal entities named above, as well as for FRANK

26  FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY

27  RICHARD CHRISTIANSEN, and DAVID CARL EBERT. Accurate Bookkeeping

28  Service Inc. was incorporated in 1987 and, since the date of incorporation,

INDICTMENT – 4
*United States v. Colacurcio, et al.*

1  COLACURCIO JR. has been listed as the corporation's president and registered agent.

2  The listed address for Accurate Bookkeeping Service Inc. was 8600 Lake City Way NE,

3  Seattle, Washington.

4      15.    FRANK FRANCIS COLACURCIO SR. has been operating adult

5  entertainment clubs in the Western District of Washington for decades. COLACURCIO

6  SR. was the founder of "Talents West." COLACURCIO SR. maintained a leadership role

7  in the affairs of Talents West and the strip clubs. The other named defendants sought

8  COLACURCIO SR.'s consultation and approval on all significant decisions, including

9  financial matters; the hiring and firing of club managers; the disciplining of dancers; as

10  well as determining how to respond to law enforcement activities. COLACURCIO SR.

11  regularly engaged in sex acts with the dancers from the strip clubs, and allowed dancers

12  who engaged in prostitution at the strip clubs to continue working at the clubs, sometimes

13  in exchange for committing sex acts with him.

14      16.    FRANK FRANCIS COLACURCIO JR. is the son of FRANK FRANCIS

15  COLACURCIO SR. and was one of the owners of the limited liability companies and

16  corporations that operated Rick's, Honey's, Fox's, and Talents West, and that owned the

17  real properties on which Rick's, Sugar's, and Honey's were located. COLACURCIO JR.

18  managed the day-to-day business affairs of Talents West and the four strip clubs,

19  including making regular trips to the strip clubs; hiring, firing and disciplining managers

20  and dancers; and meeting with dancers who had been sent to Talents West for disciplinary

21  reasons, including engaging in prostitution at the strip clubs. COLACURCIO JR.

22  regularly allowed dancers who had been caught engaging in prostitution at the strip clubs

23  to return to work at the clubs. COLACURCIO JR. also engaged in sex acts with the

24  dancers from the strip clubs.

25      17.    LEROY RICHARD CHRISTIANSEN is the nephew of FRANK FRANCIS

26  COLACURCIO SR. and was one of the owners of the limited liability companies and

27  corporations that operated Rick's, Honey's, and Fox's, and that owned the real properties

28  on which Rick's, Sugar's, and Honey's were located. Along with FRANK FRANCIS

1  COLACURCIO JR., CHRISTIANSEN managed the day-to-day business affairs of

2  Talents West and the four strip clubs, including making regular trips to the strip clubs;

3  hiring, firing and disciplining managers and dancers; and meeting with dancers who had

4  been sent to Talents West for disciplinary reasons, including engaging in prostitution at

5  the clubs. CHRISTIANSEN regularly allowed dancers who had been caught engaging in

6  prostitution at the strip clubs to return to work at the clubs.

7      18.    DAVID CARL EBERT was one of the owners of the limited liability

8  companies and corporations that operated Rick's, Honey's, Fox's, and Talents West, and

9  that owned the real properties on which Rick's, Sugar's, and Honey's were located.

10  Before FRANK FRANCIS COLACURCIO JR. and LEROY RICHARD

11  CHRISTIANSEN took over the daily operations of Talents West and the strip clubs, it

12  was EBERT who managed the Talents West office and the business affairs of the strip

13  clubs, including making regular trips to the strip clubs; hiring, firing and disciplining

14  managers and dancers; and meeting with dancers who had been sent to Talents West for

15  disciplinary reasons, including engaging in prostitution at the clubs. EBERT regularly

16  allowed dancers who had been caught engaging in prostitution at the strip clubs to return

17  to work at the clubs. EBERT also assumed primary responsibility for purchasing and

18  maintaining the real properties used to permit, facilitate, and promote the prostitution.

19      19.    STEVEN MICHAEL FUESTON was one of the owners of the limited

20  liability companies and corporations that operated Rick's, Honey's, Fox's, and Talents

21  West, and that owned the real properties on which Rick's, Sugar's, and Honey's were

22  located. FUESTON managed the day-to-day business affairs of Fox's, including hiring,

23  firing and disciplining managers and dancers, and meeting with dancers who had been

24  sent to him for disciplinary reasons, including engaging in prostitution at the strip clubs.

25  FUESTON regularly allowed dancers who had been caught engaging in prostitution at

26  Fox's to return to work at the club.

27      20.    John Gilbert Conte was responsible for overseeing the day-to-day business

28  activities at Sugar's and Honey's, including making daily visits to the clubs, as well as

INDICTMENT – 6
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   collecting cash proceeds and business paperwork for delivery to the Talents West office.

2   Conte maintained close contact with the clubs' managers and dancers, and reported about

3   the clubs' activities to the other defendants.  Conte allowed dancers who had been caught

4   engaging in prostitution at Sugar's and Honey's to return to work at the clubs.

5   **C.**   **The Racketeering Enterprise.**

6    21. FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS

7   COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT,

8   STEVEN MICHAEL FUESTON, John Gilbert Conte, Talents West Inc., Talents West II

9   LLC, Accurate Bookkeeping Service Inc., D.C.E. INC., LLC Lake City, d/b/a Rick's,

10   MM MR RM CORPORATION, Club 21 LLC, d/b/a Sugar's, LLC EVERETT I, P.D. &

11   M.K. I LLC, d/b/a Honey's, and LLC Foxes II, d/b/a Fox's constituted an "enterprise," as

12   that term is defined in Title 18, United States Code, Section 1961(4), that is a group of

13   individuals and legal entities associated in fact, which was engaged in, and the activities

14   of which affected, interstate commerce [hereinafter "the Enterprise"].  The Enterprise

15   constituted an ongoing organization whose members functioned as a continuing unit.

16   **D.**   **Purpose of the Enterprise.**

17    22. The primary purpose of the Enterprise was to enrich FRANK FRANCIS

18   COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD

19   CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON by

20   (a) permitting, facilitating and promoting prostitution at Rick's, Sugar's, Honey's and

21   Fox's; (b) laundering the proceeds derived from the prostitution, through deposits of

22   funds from credit card and ATM transactions, payment of club operating costs and

23   salaries, and distribution of profits to the defendants themselves; and (c) underpaying

24   admission taxes owed to the City of Seattle.

25   **E.**   **The Racketeering Conspiracy.**

26    23. Beginning in or before 2000 and continuing to on or about June 6, 2008, in

27   the Western District of Washington, and elsewhere, FRANK FRANCIS COLACURCIO

28   SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN,

INDICTMENT – 7
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

DAVID CARL EBERT, STEVEN MICHAEL FUESTON, D.C.E. INC., MM MR RM CORPORATION, and LLC EVERETT I, being persons employed by and associated with an enterprise engaged in, and the activities of which affected, interstate commerce, namely, the Enterprise as identified in paragraph 21, above, did conspire with each other and others known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity involving acts indictable under the following provisions of federal law:

      a.    18 U.S.C. § 1952 (Use of Interstate Facilities in Aid of Racketeering – Prostitution)

      b.    18 U.S.C. § 1956(a)(1)(A)(i) (Money Laundering)

      c.    18 U.S.C. § 1341 (Mail Fraud)

24.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

**F.**    **Manner and Means of the Conspiracy.**

25.    It was part of the conspiracy that the defendants formed and used corporations and limited liability companies to own and manage the businesses that operated the strip clubs Rick's, Sugar's, Honey's, and Fox's, as well as the business Talent's West, and also formed and used corporations and limited liability companies to own the real properties on which Rick's, Sugar's, and Honey's were located.

26.    It was further part of the conspiracy that the business entities D.C.E. INC., MM MR RM CORPORATION, and LLC EVERETT I, through the defendants, allowed their real properties to be used for Rick's, Sugar's, and Honey's, respectively, in a manner that permitted, facilitated, and promoted prostitution.

27.    It was further part of the conspiracy that the defendants hired dancers to work as strippers at Rick's, Sugar's, Honey's, and Fox's, and set up work schedules for each of the dancers, which were delivered to and enforced daily at the clubs.

INDICTMENT – 8
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

28.    It was further part of the conspiracy that the defendants charged dancers a fee for each shift they worked, ranging from $75.00 at Sugar's to $130.00 at Rick's. These fees were known as "rent." If the dancer missed her assigned shift or could not make the "rent" payment at the end of her shift, she owed "back rent" to the defendants. Dancers were expected to make money, and thus pay "rent," by giving private dances to the customers.

29.    It was further part of the conspiracy that the defendants hired and employed managers to supervise the dancers and oversee the operations at the clubs, including collecting the dancers' "rent" payments and keeping track of, collecting, and reporting the "back rent" owed by each dancer.

30.    It was further part of the conspiracy that the defendants directed the managers to provide them with a daily accounting of the dancers' attendance and payments.

31.    It was further part of the conspiracy that the defendants charged an admission fee of $10.00 per customer to enter the clubs and also required that each customer purchase at least one $5.00 beverage.

32.    It was further part of the conspiracy that the defendants caused to be installed "VIP sections" in their strip clubs where dancers offered customers private dances. The defendants caused to be installed in the VIP sections high-sided booths that offered the seclusion and privacy for prostitution. The VIP sections and the booths made it more difficult for the managers and others to observe, without being detected, the acts of prostitution occurring in those sections.

33.    It was further part of the conspiracy that the defendants caused to be installed condom machines in each of the strip clubs, which contributed to the permitting, facilitating, and promotion of prostitution at the clubs.

34.    It was further part of the conspiracy that the defendants were aware that the dancers could more readily afford to pay their "rent" by engaging in, and receiving payment for, acts of prostitution.

INDICTMENT – 9
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

35.    It was further part of the conspiracy that the defendants caused to be installed credit card and ATM machines at the four strip clubs, through which customers could pay for a variety of services at the clubs, including prostitution. The clubs received a 10% fee for all credit card and ATM transactions.

36.    It was further part of the conspiracy that the defendants sought to maximize the flow of customers and dancers to the clubs because the defendants' revenues increased with greater numbers of customers and/or dancers in the clubs.

37.    It was further part of the conspiracy that, although managers sent dancers caught in prostitution to Talents West for discipline, the defendants nevertheless continued to employ these dancers in order to maximize the flow of dancers, and thus customers, to the clubs, for the purposes of generating maximum revenue and profits.

38.    It was further part of the conspiracy that the defendants laundered the proceeds derived from the prostitution at the clubs by depositing the funds from the credit card and ATM transactions into the clubs' bank accounts, by paying the club operating costs and salaries from the strip clubs' bank accounts, and by paying profits to themselves from the strip clubs' bank accounts.

39.    It was further part of the conspiracy that the defendants under-reported the Rick's customer counts and cover charge revenues to the City of Seattle, thereby reducing the taxes owed to the City of Seattle, and retaining more money for themselves.

40.    It was further part of the conspiracy that the defendants, in anticipation of or in response to law enforcement actions, engaged in efforts, described more fully below, to make it appear as though they did not tolerate prostitution in the clubs when, in fact, they permitted, facilitated, and promoted prostitution.

41.    It was further part of the conspiracy that the defendants would direct and encourage the dancers not to share with them the details of the acts of prostitution they performed in the clubs, in an effort to create a defense of plausible deniability regarding knowledge of the prostitution in the clubs.

INDICTMENT – 10
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

42. It was further part of the conspiracy that the defendants would at times send dancers caught in acts of prostitution to work at one of the other clubs in an effort to appear as if they were disciplining the dancers. The defendants knew that the dancers continued to engage in prostitution at the other clubs.

43. It was further part of the conspiracy that the defendants would at times "terminate" dancers caught in acts of prostitution in an effort to appear as if they were disciplining the dancers, only to rehire them shortly thereafter.

44. It was further part of the conspiracy that the defendants would attempt to manufacture exculpatory conversations with dancers and managers to make it appear as if they were intolerant of prostitution in the clubs, when, in fact, they permitted, facilitated, and promoted prostitution.

45. It was further part of the conspiracy that the defendants took efforts to destroy and prevent the creation of incriminating records, including directing the destruction of the managers' notes detailing the acts of prostitution occurring at the clubs.

46. The factual allegations contained in Counts 2-15 are hereby realleged and reincorporated into Count 1.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT 2

**(Conspiracy to Use Interstate Facilities in Aid of Racketeering – Prostitution)**

47. Beginning in or before 2003 and continuing to on or about June 6, 2008, in the Western District of Washington, and elsewhere, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN MICHAEL FUESTON, and JOHN GILBERT CONTE did knowingly conspire with each other and others known and unknown to the Grand Jury, to use facilities in interstate commerce, that is, the interstate and intrastate telephone wires, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of any unlawful activity, to wit: prostitution, promoting prostitution, and permitting prostitution, in violation of RCW

9A.88.030(1) & (2), RCW 9A.88.080, and RCW 9A.88.090, and thereafter to perform and attempt to perform acts in furtherance of those intents, in violation of Title 18, United States Code, Section 1952.

A.  **Purpose of the Conspiracy.**

48.    The purpose of the conspiracy was to enrich FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN MICHAEL FUESTON, and JOHN GILBERT CONTE by permitting, facilitating, and promoting prostitution at Rick's, Sugar's, Honey's and Fox's.

B.  **Manner and Means of the Conspiracy.**

49.    The manner and means described in paragraphs 25 through 45, above, are hereby incorporated by reference and re-alleged as if fully set forth herein.

C.  **Overt Acts.**

50.    In furtherance of the conspiracy, and to accomplish its purposes, the defendants committed and caused to be committed the following representative overt acts, among others, in the Western District of Washington, and elsewhere:

51.    From in or before 2004 through June 6, 2008, the defendants caused to be constructed and maintained VIP sections in the strips clubs, that provided the seclusion and privacy for prostitution and that helped to conceal the prostitution from detection.

52.    From in or before 2003 through June 6, 2008, the defendants, on a nearly daily basis, met at the Talents West office with dancers who had been caught engaging in prostitution. Many of these conversations furthered the conspiracy to facilitate, permit, and promote prostitution. Representative examples include:

a.    On or about March 12, 2008, two dancers met with FRANK FRANCIS COLACURCIO JR. at the Talents West office to complain about the rampant sex occurring at Rick's, including complaints regarding a dancer who told customers, "I'll give you every part of my body, and you can stick your fingers all inside me." COLACURCIO JR. responded by saying, "My type of girl."

b.      On or about March 19, 2008, LEROY RICHARD CHRISTIANSEN and JOHN GILBERT CONTE discussed a dancer at Honey's who had been caught in a sex act. CONTE stated, "I had just got through reading this fucking thing [manager's note] about her, giving this guy [oral sex] or something. And she was honest –" CHRISTIANSEN replied, "She had his hands where it didn't belong." CONTE added, "He actually had his hand – he stuck his finger up her ass or something." CHRISTIANSEN told CONTE he already met with the dancer and allowed her to continue working at Honey's.

c.      On or about March 21, 2008, FRANK FRANCIS COLACURCIO JR. met with a dancer who had been sent to the Talents West office after having been caught in a sex act at Honey's. COLACURCIO JR. began the conversation by asking, "Do I dare ask?" The dancer replied, "It wasn't the bad bad bad," meaning sexual intercourse, but explained she was "giving some guy [oral sex]." COLACURCIO JR. stated that oral sex was considered prostitution and that the dancer's disclosure to him of the sex act put him in jeopardy because law enforcement could hold him responsible for the act. COLACURCIO JR. explained that sex acts were allowed at the Talents West office, but not at the clubs. COLACURCIO JR. then attempted to manufacture an exculpatory conversation by telling the dancer she had been "too truthful," directing her, "Don't be honest with me" and then stated, "So I ask you again, what happened?" This time the dancer answered, "Nothing. [The manager] thought I was being dirty, but I wasn't." COLACURCIO JR. allowed the dancer to return to work at the club.

d.      As part of their duties, managers sent notes to Talents West detailing sex acts they observed the dancers performing. On or about April 2, 2008, FRANK FRANCIS COLACURCIO JR. told LEROY RICHARD CHRISTIANSEN that he had spent the previous day talking with dancers who were "in trouble." CHRISTIANSEN asked COLACURCIO JR., "Did you tear the notes up that were in there?" COLACURCIO JR. responded, "I had [an office worker] shred them. . . . We need a better shredder." CHRISTIANSEN added, "I agree. We can't get a good enough one."

INDICTMENT – 13
*United States v. Colacurcio, et al.*

e.    On or about April 10, 2008, LEROY RICHARD CHRISTIANSEN and FRANK FRANCIS COLACURCIO JR. met with a Honey's dancer who had been sent to Talents West. CHRISTIANSEN referred to the manager's note and stated, "It says that you were sitting on top of a guy . . . with his private parts out." CHRISTIANSEN allowed the dancer to continue working for Talents West at Sugar's.

f.    On or about April 16, 2008, FRANK FRANCIS COLACURCIO JR. complained to FRANK FRANCIS COLACURCIO SR. about a dancer who failed to work her full shift at the club, saying "She goes in, works two hours, and leaves," to which COLACURCIO SR. replied, "She goes and turns a trick in there and leaves."

g.    On or about April 16, 2008, a dancer complained to FRANK FRANCIS COLACURCIO SR. about the rampant prostitution at Rick's, stating, "Rick's has been bad lately, it's getting really dirty in there again . . . . I think a couple girls are bad, but . . .they do the real dirty stuff, like [oral sex] and stuff like that . . . ." COLACURCIO SR. interrupted her and said, "Where are they? I need one [oral sex]!"

h.    On or about April 16, 2008, JOHN GILBERT CONTE was at Sugar's and FRANK FRANCIS COLACURCIO SR. was at the Talents West office. A Talents West employee attempted to call CONTE at Sugar's, but CONTE was unavailable. COLACURCIO SR. asked the Talents West employee, "What is [CONTE] doing, getting jerked-off in the office?" Later that day, CONTE arrived at Talent's West. COLACURCIO SR. asked CONTE, "Did the girls treat you alright? . . . Did you get a [oral sex] or anything?" CONTE replied, "No, I didn't."

i.    On or about April 28, 2008, FRANK FRANCIS COLACURCIO JR. and DAVID CARL EBERT met at the Talents West office with a dancer who had been caught engaging in a sex act at Rick's. During the conversation, COLACURCIO JR. read aloud from the manager's note documenting the incident: "Customer had his penis out, she was kneeling in front of him, and said she didn't see it." After reading the note, COLACURCIO JR. joked: "It must have been a tiny penis." EBERT stated: "Was he oriental?" Later in the conversation, the dancer admitted she used her "breasts a lot as a

INDICTMENT – 14
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   prop." EBERT responded: "You use your breasts as a prop? . . . I want a demonstration.

2   I'll even pay for a demonstration. I want to see the props." COLACURCIO JR. and

3   EBERT allowed the dancer to return to work at Rick's.

4           j.      At a time unknown but after the installation of the VIP section at

5   Fox's, a Fox's manager caught several dancers engaging in sex acts and other illegal

6   dances during a short period of time. The manager sent each of the dancers to meet with

7   STEVEN MICHAEL FUESTON for discipline. FUESTON allowed each of the dancers

8   to continue working, and he scolded the manager for being so vigilant, by stating words to

9   the effect: "You guys [the managers] need to back off a little bit, slow down."

10          k.      At a time unknown but after the installation of the VIP section at

11  Fox's, a Fox's dancer witnessed another dancer engaging in a sex act. The dancer

12  reported the incident to STEVEN MICHAEL FUESTON, and also told him that sex acts

13  had become rampant at Fox's. FUESTON responded with words to the effect: "Dancers

14  are going to do different things. Butt out."

15  53.     From in or before 2003 through June 6, 2008, the defendants, on a nearly

16  daily basis, allowed dancers who engaged in acts of prostitution to continue working at

17  the clubs. Representative examples include:

18          a.      On or about April 29, 2005, February 22, 2006, and April 7, 2006, a

19  dancer was caught engaging in sex acts at the strip clubs. Nevertheless, on every

20  occasion, the defendants allowed her to continue to work at the clubs.

21          b.      On or about March 21, 2008, a dancer was caught engaging in oral

22  sex at Honey's and was sent to Talents West. FRANK FRANCIS COLACURCIO JR.

23  met with her and allowed her to continue working at Honey's. On or about March 27,

24  2008, although a manager wrote a note to the Talents West office reporting that the

25  dancer "was giving [oral sex] in VIP . . . . again," the dancer nevertheless continued to

26  work at Honey's. On or about May 27, 2008, the dancer was again sent to Talents West

27  for being on her knees in front of an exposed customer. Again, COLACURCIO JR. met

28  with her and allowed her to continue working at Honey's.

54.    From in or about 2004 through June 6, 2008, the defendants caused telephone calls to be made from the Talents West office to the strip clubs on a daily basis regarding the status of dancers who had been sent to Talents West for discipline.  The purpose of many of these telephone calls was to inform the managers of the clubs that dancers who had been caught in acts of prostitution were allowed to continue working.

55.    From in or before 2003 through June 6, 2008, the defendants caused to be installed credit card and ATM machines at the four strip clubs.  The defendants allowed customers to pay for services in the club, including prostitution, by using their credit and ATM cards.  For example, on or about April 28, 2008, a dancer performed oral sex on a customer at Rick's and, afterwards, the customer paid through a credit card transaction.

All in violation of Title 18, United States Code, Section 371.

## COUNT 3

### (Conspiracy to Engage in Money Laundering)

56.    Beginning in or before 2003 and continuing to on or about June 6, 2008, in the Western District of Washington, and elsewhere, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN MICHAEL FUESTON, and other persons known and unknown to the Grand Jury, knowing that the property involved in financial transactions represented the proceeds of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, Use of Interstate Facilities in Aid of Racketeering (Prostitution), in violation of Title 18, United States Code, Section 1952, did knowingly and intentionally combine, conspire, and agree to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, to wit, (1) the deposit of funds from credit card and ATM transactions at the strip clubs into the clubs' bank accounts; (2) the payment of club operating costs and salaries from the strip clubs' bank accounts; and (3) the payment of profits to themselves from the strip clubs' bank

//

//

INDICTMENT – 16
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

accounts; with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

All in violation of Title 18, United States Code, Section 1956(h).

### COUNTS 4-15

### (Mail Fraud)

**A.    Introduction.**

At all times relevant to this Indictment:

57.    The City of Seattle imposed an "admissions tax" on adult entertainment establishments, at a rate of five percent of the revenues from door cover charges, to be paid on a monthly basis.

58.    As part of the obligation under the "admissions tax," adult establishments were required by the City of Seattle to maintain records of admissions, commonly referred to as "customer count" records.

59.    The City of Seattle required that the cover charge revenues and corresponding tax due be reported on a form called "Tax on Admission Charges," to be submitted monthly to the Seattle Revenue and Consumer Affairs Department. The form required the preparer to swear or affirm that the information on the form was "full and true." The form was to be accompanied by a remittance of the tax due for the month being reported.

60.    Rick's was an adult establishment located within Seattle City limits. Accordingly, each month, LLC Lake City, d/b/a Rick's, was required to submit a "Tax on Admissions Charges" form, and corresponding tax remittance, to the Seattle Revenue and Consumer Affairs Department.

**B.    The Scheme and Artifice to Defraud.**

61.    Beginning in or before 2003 and continuing to on or about June 30, 2008, within the Western District of Washington, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON knowingly devised and intended to

INDICTMENT – 17
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  devise a scheme and artifice to defraud the City of Seattle of tax revenues and to obtain

2  money and property by means of false and fraudulent pretenses, representations, and

3  promises.

4      62.    The essence of the scheme and artifice to defraud was for the defendants to

5  under-report the number of customers patronizing Rick's and the resulting cover charge

6  revenues, and thus to underpay the City of Seattle's admissions tax.

7  **C.**    **Manner and Means of the Scheme.**

8      63.    It was part of the scheme and artifice to defraud that the defendants directed

9  Rick's managers to maintain an accurate count of customers.  The defendants wanted the

10  accurate count for their business purposes, including ensuring that employees were not

11  stealing from them.

12      64.    It was further part of the scheme and artifice to defraud that the defendants,

13  despite knowing the accurate customer counts, provided deflated and thus false customer

14  counts to the employees of Accurate Bookkeeping Service Inc. who were responsible for

15  preparing the "Tax on Admissions Charges" forms.

16      65.    It was further part of the scheme and artifice to defraud that the defendants

17  directed the employees of Accurate Bookkeeping Service Inc. to sign the forms and

18  "swear or affirm" that the information on the form was "full and true," when, in fact, the

19  defendants knew the cover charges on the forms were under-reported.

20      66.    It was further part of the scheme and artifice to defraud that the defendants

21  caused to be submitted, by United States Mail, the "Tax on Admissions Charges" forms

22  containing the false statements and the corresponding inadequate tax remittance, to the

23  Seattle Revenue and Consumer Affairs Department.

24      67.    It was further part of the scheme and artifice to defraud that the defendants,

25  by under-reporting the customer counts, paid less taxes to the City of Seattle, and thereby

26  retained for themselves hundreds of thousands of dollars of unreported income per year.

27  //

28  //

INDICTMENT – 18
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**D.     Execution of the Scheme and Artifice to Defraud.**

68.     On or about the below-listed dates, within the Western District of Washington, for the purpose of executing this scheme and artifice to defraud the City of Seattle and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON knowingly placed in any post office and authorized depository for mail matter and caused to be sent and delivered by the Postal Service and any private and commerce interstate carrier, the following mail matter, each of which constitute a separate count of this Indictment:

| Count | Date | Sender | Addressee | Item Mailed |
|-------|------|--------|-----------|-------------|
| 5 | August 18, 2006 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for July 2006 |
| 6 | September 20, 2006 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for August 2006 |
| 7 | October 18, 2006 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for September 2006 |
| 8 | November 20, 2006 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for October 2006 |
| 9 | February 20, 2007 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for January 2007 |

INDICTMENT – 19
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

| Count | Date | Sender | Addressee | Item Mailed |
|-------|------|--------|-----------|-------------|
| 10 | March 20, 2007 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for February 2007 |
| 11 | April 16, 2007 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for March 2007 |
| 12 | January 16, 2008 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for December 2007 |
| 13 | February 19, 2008 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for January 2008 |
| 14 | March 17, 2008 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for February 2008 |
| 15 | June 30, 2008 | LLC Lake City | Revenue and Consumer Affairs 700 5th Avenue Suite 4250 PO Box 34214 Seattle, WA 98124-4214 | Tax on Admission Charges form for May 2008 |

All in violation of Title 18, United States Code, Section 1341.

### NOTICE OF FORFEITURE

A.    **Conspiracy to Commit RICO (Count 1).**

69.    The allegations contained in Count 1 of this Indictment are hereby realleged and incorporated by reference herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1963.

70.    Pursuant to Title 18, United States Code, Section 1963, upon conviction of an offense in violation of Title 18, United States Code, Section 1962(d), FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY

INDICTMENT – 20
*United States v. Colacurcio, et al.*

1  RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN MICHAEL

2  FUESTON, D.C.E. INC., MM MR RM CORPORATION, and LLC EVERETT I shall

3  forfeit to United States:

4        a.    any interest acquired and maintained in violation of Title 18, United

5  States Code, Section 1962, which interests are subject to forfeiture to the United States

6  pursuant to Title 18, United States Code, Section 1963(a)(1);

7        b.    any interest in, security of, claim against, and property and

8  contractual right of any kind affording a source of influence over the Enterprise named

9  and described herein, which the defendants established, operated, controlled, conducted

10  and participated in the conduct of, in violation of Title 18, United States Code, Section

11  1962(d), and which are subject to forfeiture to the United States pursuant to Title 18,

12  United States Code, Section 1963(a)(2); and

13        c.    any property constituting and derived from any proceeds that the

14  defendants obtained, directly and indirectly, from the racketeering activity, in violation of

15  Title 18, United States Code, Section 1962, which property is subject to forfeiture to the

16  United States pursuant to Title 18, United States Code, Section 1963(a)(3).

17      71.    The interests of the defendants subject to forfeiture to the United States

18  pursuant to Title 18, United States Code, Sections 1963(a)(1), (a)(2) and (a)(3), include,

19  but are not limited to, the following:

20        a.    a money judgment of at least $25,000,000, representing the proceeds
              derived from the offense in Count 1;

21

22        b.    Real property located at
              8600 Lake City Way NE, Seattle, Washington 98115
              Parcel # 5101400387

23                (location of the Talents West office building);

24        c.    Real property located at
              11332 Lake City Way NE, Seattle, Washington 98125

25                Parcel #8902500145
              (location of Rick's strip club);

26

27        d.    Real property located at
              16743 Aurora Ave N., Shoreline, Washington 98133
              Parcel #9372300092

28                (location of Sugar's strip club);

INDICTMENT – 21
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

e.   Real property located at
     12902 Highway 99, Everett, Washington 98204
     Parcel #003809004000600
     (location of Honey's strip club);

f.   All right, title, and interest in, including all stock or other ownership
     interest in, and all assets held by, the following:

     i.     Talents West Inc.;

     ii.    Talents West II LLC;

     iii.   Accurate Bookkeeping Service Inc.;

     iv.    D.C.E. INC.;

     v.     LLC Lake City, d/b/a Rick's;

     vi.    MM MR RM CORPORATION;

     vii.   Club 21 LLC, d/b/a Sugar's;

     viii.  LLC EVERETT I;

     ix.    P.D. & M.K. I LLC, d/b/a Honey's; and

     x.     LLC Foxes II, d/b/a Fox's.

All pursuant to Title 18, United States Code, Section 1963.

**B.   <u>Conspiracy to Use Interstate Facilities in Aid of Racketeering (Count 2).</u>**

72.   The allegations contained in Count 2 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

73.   Upon conviction of the offense set forth in Count 2 of this Indictment, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, STEVEN MICHAEL FUESTON, and JOHN GILBERT CONTE shall forfeit to the United States of America, pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offense, including a money judgement of at least $25,000,000, representing the proceeds derived from the offense in Count 2.

INDICTMENT – 22
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**C.    Conspiracy to Engage in Money Laundering (Count 3).**

74.    The allegations contained in Count 3 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1).

75.    Upon conviction of the offense set forth in Count 3 of this Indictment, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property, including but not limited to, all right, title, and interest in, including all stock or other ownership interest in, and all assets held by, the following:

        a.    Talents West Inc.;

        b.    Talents West II LLC;

        c.    Accurate Bookkeeping Service Inc.;

        d.    LLC Lake City, d/b/a Rick's;

        e.    Club 21 LLC, d/b/a Sugar's;

        f.    P.D. & M.K. I LLC, d/b/a Honey's; and

        g.    LLC Foxes II, d/b/a Fox's.

**D.    Mail Fraud (Counts 4-15).**

76.    The allegations contained in Counts 4-15 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

77.    Upon conviction of the offenses set forth in Counts 4-15 of this Indictment, FRANK FRANCIS COLACURCIO SR., FRANK FRANCIS COLACURCIO JR., LEROY RICHARD CHRISTIANSEN, DAVID CARL EBERT, and STEVEN MICHAEL FUESTON shall forfeit to the United States of America, pursuant to Title 28,

INDICTMENT – 23
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses, including a money judgement equal to the amount of the proceeds of the offenses alleged in Counts 4-15.

E.    **Substitute Assets.**

78.    If any forfeitable property, as a result of any act or omission of the defendants,

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be divided without difficulty;

        it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), to seek the forfeiture of any other property of the defendants up to the value of the above-described forfeitable property.

//
//
//
//
//
//
//
//
//
//
//

INDICTMENT – 24
*United States v. Colacurcio, et al.*

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    79.    The defendants are jointly and severably liable for the forfeiture allegations

2   alleged above.

3                                        A TRUE BILL    YES

4                                        DATED:  06 . 23 . 09

5                                        Signature of Foreperson redacted pursuant to
                                         the policy of the Judicial Conference of the
6                                        United States

7                                        FOREPERSON

8

9

10  _____
    JEFFREY C. SULLIVAN
11  United States Attorney

12

13  _____
    TODD GREENBERG
14  Assistant United States Attorney

15  _____

16
    TESSA M. GORMAN
17  Assistant United States Attorney

18

19  _____
    RICHARD E. COHEN
20  Assistant United States Attorney

21

22

23

24

25

26

27

28

INDICTMENT – 26
*United States v. Colacurcio, et al.*

# EXHIBIT F

# **A F F I D A V I T**

1

2  STATE OF WASHINGTON            )
                                                        )
3  COUNTY OF KING                      )

4       I, Cory L. Cote, Special Agent, U.S. Department of Justice, Federal Bureau of

5  Investigation ("FBI"), being duly sworn under oath, state as follows:

6  ## **AFFIANT'S TRAINING AND EXPERIENCE**

7       I am an "investigative or law enforcement officer" within the meaning of Section

8  2510(7) of Title 18, United States Code, that is, an officer of the United States who is

9  empowered by law to conduct investigations of, and to make arrests for, offenses

10  enumerated in Section 2516 of Title 18, United States Code.

11       I have been a Special Agent of the FBI for twelve years. I am currently assigned

12  in Seattle, Washington, and have been so assigned for the past eight years. In connection

13  with my official duties, I investigate criminal violations of the United States Code as

14  found in Titles 18 and 21. I have investigated organized crime, kidnaping, drug

15  trafficking, gang crimes, and violent crimes for the last eight years. Prior to that, I

16  worked on an International Terrorism squad for approximately four years.

17       I am familiar with and have participated in a variety of investigative techniques,

18  including, but not limited to, analysis of documentary evidence, financial investigation,

19  visual surveillance, the questioning of witnesses, the use of informants, the purchase of

20  drug evidence, the use of pen registers, the implementation of undercover operations, and

21  the execution of scores of search warrants.

22       For purposes of conducting this investigation and drafting this affidavit, I have

23  spoken to other agents, law enforcement officials, and other interested individuals about

24  this investigation, and have read reports concerning the progress of the investigation. The

25  statements contained in this affidavit are based on my personal knowledge or on

26  information that has been provided to me directly or indirectly by other investigating

27  agents/officers, and on my experience and training. I also have reviewed files and reports

28  provided by other law enforcement agencies, and public databases and records.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   services.[16]  In addition, the undercover officers found that, unlike at Rick's, Deja Vu did

2   not have a secluded "VIP area" or a condom machine.

3        A comparison between the profitability of Rick's and Deja Vu is telling.  First,

4   based on physical surveillance observations, the number of customers at Rick's is four or

5   five times greater than at Deja Vu.  For example, on numerous occasions investigators

6   counted customer cars in the parking lots of the two clubs.  On each occasion, Rick's had

7   at least four times the number of cars.  Second, based on observations by the undercover

8   officers, it appears that Rick's has approximately four times more dancers working per

9   shift than Deja Vu; on a typical night, Rick's will have approximately forty dancers

10  working, while Deja Vu usually has about ten dancers.  Third, financial analysis has

11  established that the reported business revenues for Rick's are significantly higher than for

12  Deja Vu.  According to Washington State Department of Revenue records, the combined

13  gross revenues during 2006 and 2007 for Rick's were $10,338,035.  During the same time

14  period, however, Deja Vu's combined gross revenues were only $3,165,352.

15      **2.      Prostitution At Rick's.**

16      Undercover officers began posing as customers at Rick's on October 7, 2005.  The

17  investigation has documented that extensive prostitution occurs at Rick's.  To date,

18  dancers have offered to engage in acts of prostitution with undercover officers on

19  approximately seventy occasions.  These prostitution offenses involved more than fifty

20  different dancers.  In addition, the undercover officers consistently observed used

21  condoms and empty condom wrappers littered in the "VIP area" at Rick's.  The SPD Vice

22  Unit also conducted undercover operations inside Rick's in October 2006, December

23  2006, July 2007, and April 2008, resulting in the arrests of more than ten dancers for

24  prostitution violations.  A representative number of the undercover operations at Rick's

25  are summarized below.

26

27

28      [16]  In fact, several Deja Vu dancers referred the officers to Rick's because the club
    is so notorious for prostitution.

Affidavit of Cory Cote - 27

1    On October 13, 2005, UC#3 observed dancer C.P. performing oral sex on a

2    customer in the VIP area.[17]  UC#3 obtained a dance from H.P.  During the dance, she

3    offered to "go further," suggesting a sex act.  When asked how much it would cost, she

4    stated, "A hand job (manual manipulation of the penis) is forty ($40.00)."  UC#3 then

5    asked, "How much for a blow job (oral sex)?"  H.P. replied, "I don't do that.  Some of the

6    girls here do, but I don't."  Later that night, UC#3 received a dance from A.B.  She asked

7    whether he wanted a "hand job" for the price of $100.00.  When UC#3 stated that was too

8    expensive, she lowered the price to $70.00 and then to $50.00.  A few days later, on

9    October 17, 2005, UC#3 observed multiple dancers in the VIP area performing hand jobs

10   on customers.  At the same time, the club manager walked through the VIP area, observed

11   the sex acts taking place, and looked down and laughed.

12   On August 5, 2006, UC#2 observed a dancer kneeling down in front of a customer.

13   The dancer unzipped the customer's pants and moved in closer to his legs.  The dancer

14   then appeared to perform oral sex on the customer.

15   On August 31, 2006, UC#3 observed a dancer in the VIP area performing a hand

16   job on a customer's naked penis while he inserted his fingers inside her vagina.  Several

17   minutes later, the customer paid the dancer and then left the club.  That same night, UC#3

18   observed dancer S.W. engaging in sexual intercourse and oral sex with a customer in the

19   VIP area.  UC#3 saw the customer pay S.W. in cash after the sex acts.

20   On September 26, 2006, UC#3 observed dancer A.J. engaging in what appeared to

21   be anal sex with a customer in one of the VIP booths.  CI#1 previously had reported that

22   A.J. is known to engage in anal sex at Rick's.  UC#3 observed the customer pay A.J. after

23   the sex act.  Similarly, on December 8, 2006, UC#3 observed a dancer known as "Anna"

24   and a customer engaging in what appeared to be sexual intercourse in one of the VIP

25   booths.  When they were finished, UC#3 observed that both of them had no clothing on

26   below the waist.

27

28        [17]  Throughout this affidavit, where known, we use the dancers' first and last
initials to protect their identities.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1       On December 14, 2006, dancer B.D. was arrested after she offered to perform a

2  sex act on a SPD undercover officer in exchange for payment. B.D. provided a statement

3  to officers following her arrest. Among other things, she stated that between twenty-five

4  percent and thirty-three percent of all dances at Rick's involve illegal sex acts. B.D.

5  explained that she felt pressure to engage in prostitution because only the dancers who do

6  so are profitable.

7       On May 23, 2007, UC#3 observed dancers engaging in acts of prostitution in the

8  VIP area, similar to the sex acts described above. He also was propositioned for a hand

9  job by dancer M.G.

10       On October 11, 2007, UC#2 asked Rick's manager Ryan McLeod whether he

11  could use a credit card at the club. McLeod stated that customers use credit cards "all the

12  time." UC#2 handed McLeod the card and asked for $100.00. McLeod ran the card

13  through the credit card machine and handed UC#2 a receipt to sign. McLeod then handed

14  UC#2 $100.00 in tokens. Later that night, UC#2 received a dance in the VIP area from

15  M.C. During the dance, M.C. offered to perform a sex act on UC#2 for $60.00. M.C.

16  stated that if UC#2 paid with tokens, however, she would charge $70.00 because the club

17  would charge her a ten percent exchange fee.

18       On October 15, 2007, dancer D.M. offered to perform a hand job for UC#4 in

19  exchange for $40.00. UC#4 asked whether he could pay with a credit card. D.M. and

20  UC#4 went to the manager's station, and the manager stated that he could use the card.

21  The manager ran the card through the machine and provided UC#4 with $50.00 in tokens.

22  UC#4 later told D.M. that he just wanted a basic dance without a sex act.

23       On October 24, 2007, dancer H.P. offered to perform a sex act on UC#3. UC#3

24  stated that he needed to get tokens first. UC#3 provided a credit card to manager Nick

25  Furfaro and received $60.00 in tokens. H.P. then took UC#3 into the VIP area and stated,

26  "You paid for me to play with your penis." UC#3 told her that he wanted to get a condom

27  first. H.P. told UC#3 to go the bathroom and get a condom so she could give him a "hand

28  job." UC#3 then parted ways with H.P. A few minutes later, dancer C.S. asked UC#3 to

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  go to the VIP area with her. UC#3 stated, "All I have is a credit card." C.S. took UC#3

2  to the manager's station. UC#3 asked C.S. whether he could "get off" (orgasm) for

3  $50.00. She agreed. UC#3 handed his credit card to Nick Furfaro and asked for $50.00

4  in tokens. Furfaro processed the card and provided the tokens. C.S. then escorted UC#3

5  to the VIP area, where she offered to give him a hand job for the $50.00 in tokens.

6       On February 11, 2008, UC#3 was in the Rick's VIP area with dancer S.M. UC#3

7  asked S.M. how much she charged for dances. S.M. stated that there was a "thirty-dollar

8  dance" and a "fifty-dollar dance." UC#3 asked whether the "thirty-dollar dance" included

9  a "hand job." S.M. replied, "No, that's the fifty." She further stated, "It doesn't make any

10 difference if you come or not, if I rub your dick it will cost fifty dollars."

11      On March 18, 2008, SPD vice officers conducted an undercover operation at

12 Rick's. Based on the following circumstances, SPD officers arrested dancers A.B., R.B.,

13 and H.Y. on prostitution charges and dance code violations. A dancer named A.B. took

14 UC#7 into the VIP area. A.B. stated that UC#7 could touch here anywhere except her

15 "cookie" (vagina). During the dance, A.B. rubbed UC#7's groin area over his pants,

16 rubbed her breasts on his face, and placed his hands on her breasts. UC#7 asked for oral

17 sex. A.B. refused, but stated she would use her hand and "make you come." She further

18 stated that she would put her hands inside UC#7's pants and "rub your friend until you

19 come." A.B. stated the hand job would cost an additional $40.00. UC#7 declined.

20 Shortly thereafter, UC#7 entered the VIP area with dancer R.B., who stated that her

21 dances cost $30.00, $40.00, or $50.00. UC#7 asked for a $40.00 dance. Among other

22 things, R.B. rubbed UC#7's groin area and pushed her breasts into his face. UC#7 then

23 asked what he would get for a $50.00 dance. R.B. stated that he would be "satisfied," and

24 later clarified that she would provide a "hand job" and immediately tried to undo UC#7's

25 belt buckle. UC#7 paid R.B. and then departed the VIP area. On his way out, UC#7

26 observed a customer and a dancer who appeared to be engaging in sexual intercourse; the

27 customer's pants were down at his knees and the dancer was straddling him gyrating her

28 hips.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1        Also on March 18, 2008, another undercover officer was approached by a dancer

2 named H.Y.  When asked, H.Y. gave a variety of prices for her dances, including a

3 $50.00 dance.  The officer asked what he would get for $50.00.  H.Y. replied that she

4 would "finish off with a hand job."  H.Y. started the dance by rubbing the officer's groin

5 area and pushing her breasts into his face.  The officer paid H.Y. $40.00 and then

6 attempted to leave the VIP area.  H.Y. said she thought he wanted to "come."  The officer

7 told her he wanted to "wait a little while."

8        On April 2, 2008, SPD vice officers conducted an undercover operation at Rick's.

9 Based on the following circumstances, SPD officers arrested dancer T.L. for a

10 prostitution offense, three other dancers for dance code violations, and manager Julie

11 McDowell for recklessly permitting the violations to occur.  UC#8 entered Rick's at

12 approximately 8:45 p.m.  He observed McDowell overseeing the activities in the club.

13 Dancer T.L. asked UC#8 if he wanted a "dirty dance."  He accepted and they went to the

14 VIP area.  During the dance, T.L. exposed her buttocks and her vagina, and inserted her

15 finger in her vagina.  UC#8 told T.L. he wanted a "happy ending" (sex act).  T.L. stated

16 he would have to pay an additional $30.00 for a hand job.  UC#8 stated he first wanted to

17 watch a few more dances.  While he was in the VIP area, UC#8 observed McDowell

18 looking into the area.  McDowell observed nearly ten dances that violated the City of

19 Seattle dance code ordinances, but took no actions to stop the dances.  UC#6 also was at

20 Rick's on the night of April 2, 2008.  He received dances from three dancers; each dancer

21 rubbed their buttocks into his groin.  One of the dancers, C.L., placed UC#6's hands on

22 her breasts and rubbed her breasts against his groin area. These actions constituted clear

23 violations of the dance code ordinances, as well as mild forms of prostitution under

24 Washington State law.  McDowell observed each of the dances, but did not intercede.

25        On April 28, 2008, UC#3 was inside the VIP area at Rick's, accompanied by CI#1.

26 UC#3 observed several acts of prostitution in the VIP booths.  For example, dancer R.B.

27 had her hand down a customer's pants, performing a hand job.  Another dancer named

28 "Sammie" appeared to be performing oral sex for a customer; UC#3 observed her

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   kneeling in between the customer's legs with her head moving up and down in a motion

2   consistent with oral sex. UC#3 also clearly observed dancer B.W. performing oral sex on

3   a customer; afterwards, the customer paid through a credit card transaction at the

4   manager's desk. Later that day, UC#3 observed dancer J.B. sitting on a customer's lap

5   with her back facing him; the customer had two of his fingers inserted inside her vagina.

6           On April 29, 2008, UC#3 was inside the VIP area at Rick's, accompanied by CI#1.

7   UC#3 observed multiple acts of prostitution in the VIP booths. For example, dancer J.M.

8   allowed two separate customers to insert their fingers in and out of her vagina while she

9   performed dances. UC#3 also observed dancer D.S. rubbing a customer's naked penis.

10          On May 5, 2008, UC#3 spoke with dancer D.R. at Rick's. D.R. stated she had

11  worked at Rick's since before the installation of the VIP booths. UC#3 asked whether the

12  club was "as dirty" then as it is now. D.R. said the club was "much dirtier" now, but that

13  sex acts did occur previously on a row of benches she referred to as "perv row." D.R.

14  said it was obvious why the owners installed the VIP booths – so that the dancers "can do

15  anything back there and no one can see you." D.R. further stated it would be easy for the

16  owners to turn the booths around to face the managers, so the managers could see into the

17  booths. While inside the VIP area with D.R., UC#3 observed dancer K.L. performing a

18  dance for a customer. K.L. pushed her naked breasts into the customer's face as he

19  moved his fingers in and out of her vaginal area.

20          On May 6, 2008, UC#3 was inside the VIP area at Rick's, accompanied by CI#1.

21  UC#3 witnessed several acts of prostitution in the VIP booths. CI#1 pointed out dancer

22  J.B., who was having sexual intercourse with a customer. UC#3 observed J.B. straddling

23  the customer and moving up and down. The customer's pants were open and J.B. had her

24  hand in a position that was consistent with holding the customer's penis inside her. This

25  sex act was captured on video by CI#1. Later that afternoon, UC#3 spoke with dancer

26  D.R., who stated that the VIP booths made it easier for dancers to give "hand jobs."

27  UC#3 commented that it looked like there were a lot of dancers who gave hand jobs.

28  D.R. replied, "Yes, there are." As he was speaking with D.R., UC#3 looked into another

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  booth and observed dancer E.S. rubbing a customer's penis.  UC#3 stated, "Look right
2  there – she's giving him a hand job."  D.R. rolled her eyes and stated, "Yep."

3       On May 8, 2008, UC#2 observed multiple acts of prostitution occurring in the VIP
4  area at Rick's.  For example, UC#2 saw dancer J.B. escort a customer to one of the
5  booths.  Shortly thereafter, UC#2 lost site of J.B.'s head as she lowered herself into the
6  booth toward the customer's crotch; only the customer's head was visible.  At that time,
7  another dancer approached UC#2 and asked whether he wanted a dance.  UC#2 said he
8  was waiting for J.B.  The dancer said she did not think J.B. was working that night.
9  UC#2 pointed to the booth and stated, "Yes she is, she's there in the front row."  The
10  dancer replied, "Oh, she must be giving head (oral sex)."  UC#2 then approached the
11  booth and observed J.B.'s head in the customer's lap, moving up and down in a motion
12  consistent with oral sex.  That same night, UC#2 witnessed another dancer performing
13  what appeared to be a hand job for another customer.  Throughout the evening, UC#2
14  also observed several used condoms in the men's bathroom.

15       Also on May 8, 2008, UC#3 was in the VIP area at Rick's, accompanied by CI#1.
16  When dancer H.P. started heading toward a VIP booth with a customer, CI#1 stated,
17  "This will be a good one."  UC#3 and CI#1 positioned themselves in a nearby booth.
18  Using a hidden video recording device, CI#1 recorded footage of H.P. performing a hand
19  job for the customer.

20       On May 12, 2008, UC#2 and UC#3 visited Rick's.  Several dancers approached
21  UC#2 and aggressively offered private dances; many of the dancers rubbed UC#2's
22  crotch over his pants.  UC#2 told the dancers he was "sick" and did not want any private
23  dances.  Dancer M.G. twice stated she would make UC#2 "feel better," implying sexual
24  favors.  M.G. said for $50.00 she would "rub" UC#2 "down there," looking toward his
25  crotch.  UC#2 declined.  Later that night, UC#2 and UC#3 separately entered the VIP
26  area, accompanied by CI#1.  Using a hidden video recording device, they captured
27  footage of dancers C.P. and D.H. performing hand jobs for two customers; dancer R.B.
28  allowing a customer to insert his fingers into her vaginal area; and dancer M.G. providing

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    oral sex to another customer. Throughout the evening, UC#2 and UC#3 also observed

2    several used condoms and open condom wrappers in the men's bathroom.

3         On May 15, 2008, UC#2 and UC#3 visited Rick's. Julie McDowell was working

4    as the head manager. UC#2 asked dancer T.N. how her night was going. T.N. said she

5    was "pissed" because there were too many dancers working, so she would not be able to

6    pay her "house money" (referring to the $130.00 "rent" payment per shift). T.N. further

7    stated she "hated" working at Rick's because she would have to spend "all night jacking

8    guys off" (performing hand jobs). UC#2 asked, "Every guy that comes in here gets a

9    hand job?" T.N. replied, "Pretty much. Guys expect to get jacked off when they come

10   here, that's what happens here." UC#2 asked whether it was different at other clubs.

11   T.N. said she also works at the Deja Vu strip club in downtown Seattle, and "it was

12   different there" (no prostitution). T.N. complained about the prostitution at Rick's, and

13   said it was exactly the same at the other three other clubs owned by Talents West

14   (Sugar's, Honey's, and Fox's). During the conversation, T.N. offered to provide UC#2 a

15   hand job for $50.00. He declined, but said he may be interested later that night.

16        Also on May 15, 2008, UC#3 spoke to dancer R.P. at Rick's. UC#3 said it looked

17   like there were a lot of new dancers working at the club. R.P. said that management was

18   on a "big push" to get "more girls." UC#3 said the owner were good businessmen, trying

19   to attract more customers with new girls. R.P. replied with words to the effect: "They're

20   good businessmen. Every girl in here is $130.00 ("rent"), and the more girls here makes

21   it hard for us (the dancers) to make any money." UC#3 pointed to McDowell and said,

22   "Well, Julie's still here." R.P. stated that McDowell was just promoted to being "the

23   head manager over all of Frank's clubs." As always, UC#3 observed used condoms and

24   condom wrappers in the men's bathroom.

25        On May 27, 2008, at approximately 9:00 p.m., UC#4 and UC#5 visited Rick's.

26   McDowell was the lead manager on duty that night. Colacurcio Jr. also was present at

27   Rick's. The undercover officers observed Colacurcio Jr. talking with McDowell at the

28   manager's station, and conducting business in the manager's office. UC#4 was

Affidavit of Cory Cote - 34

1   approached in the main club area by a dancer named "Autumn," who offered to perform a

2   hand job in the VIP area for $50.00. UC#4 agreed, but said he needed to pay with a credit

3   card. He then approached the manager's station and purchased $60.00 in tokens from

4   McDowell, using his credit card. At that point, UC#4 entered the VIP area with Autumn.

5   He observed numerous flagrant dance code violations, with topless dancers grinding into

6   customers' crotches. After a short time, UC#4 told Autumn that he needed to get a

7   condom, and they parted ways. A dancer named S.M. also offered UC#5 a hand job in

8   exchange for $80.00; UC#5 declined the offer and departed the club. At no time during

9   the night did McDowell or any other manager walk through the VIP area, or otherwise

10  intercede in the illegal activities. In addition, the undercover officers observed numerous

11  used condoms and condom wrappers in the men's bathroom.

12          On May 28, 2008, UC#3 and UC#4 visited Rick's. Once again, McDowell was

13  the lead manager on duty; manager Ryan McLeod also was working that night.

14  Colacurcio Jr. was present at the club, and was observed speaking with McDowell near

15  the manager's station. At one point, UC#3 overheard Colacurcio Jr. and McDowell

16  discussing dancers who did not show up for work. UC#3 observed numerous sex acts and

17  dance code violations in the VIP area, including customers touching dancers' breasts and

18  inserting their fingers into dancer's vaginal areas. UC#3 told one of the dancers that he

19  would "keep a lookout" for the manager. The dancer said not to worry about it. UC#3

20  asked whether the managers were "coming down on" the dancers lately. She said no, and

21  again assured him not to worry about it. UC#4 was offered a hand job by another dancer

22  for the price of $60.00. During the entire time the undercover officers were inside the

23  club, McDowell entered the VIP area on only one occasion; even then, she did not

24  attempt to stop any of the illegal conduct. The undercover officers also observed several

25  used condoms and condom wrappers in the VIP area and in the men's bathroom.

26  //

27  //

28  //

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

### 3. Prostitution At Sugar's.

Undercover officers began posing as customers at Sugar's on December 6, 2005. The investigation has documented that extensive prostitution occurs at Sugar's. To date, dancers have offered to engage in acts of prostitution with undercover officers on approximately twenty-five occasions. These prostitution offenses involved more than twenty different dancers. In addition, the undercover officers consistently observed used condoms and empty condom wrappers littered in the "VIP area" at Sugar's. The King County Sheriff's Office also conducted undercover operations inside Sugar's in September 2006, December 2006, and December 2007, resulting in the arrests of more than twenty dancers for prostitution and "dance code" violations. A representative number of the undercover operations at Sugar's are summarized below.

On December 6, 2005, dancer A.H. offered to provide oral sex to UC#3 in exchange for $50.00. A.H. stated that she would perform the sex act in one of the VIP booths. Later that night, dancer E.A. offered UC#3 a hand job for $40.00. On August 2, 2006, E.A. again offered a sexual favor to UC#3 in exchange for $100.00. E.A. promised that UC#3 would reach orgasm.

On August 2, 2006, dancer C.C. offered oral sex to UC#3 in exchange for $40.00. UC#3 stated that he did not have a condom. C.C. told UC#3 that she would wait for him to get a condom from the bathroom. They then parted ways. A few minutes later, another dancer named "Nancy" offered UC#3 a hand job in exchange for $40.00. Similarly, on September 17, 2006, four dancers offered to perform "hand jobs" for UC#2 and UC#3 for prices varying between $40.00 and $150.00.

On February 14, 2007, dancer A.R. offered to "rub" UC#2's penis until he ejaculated in exchange for $100.00. She instructed UC#2 to get a condom from the bathroom. Later that night, in the VIP area, dancer A.C. asked UC#2, "Do you want to come, or are we going to have sex?" UC#2 asked, "You can do it right there in the booth, right in the open? Aren't you afraid of getting in trouble with the manager?" A.C. replied, "She (the manager) knows what you guys are coming in here for. She knows

Affidavit of Cory Cote - 36

1   what we do, she used to be a dancer." Similarly, on March 7, 2007, a dancer named

2   "Savannah" told UC#3, "There's sex going on in here all the time. If it wasn't for the

3   sex, most of the guys wouldn't even come in."

4         On June 7, 2007, UC#2 observed dancer G.S. performing oral sex on a customer in

5   one of the VIP booths. When she was finished, G.S. received cash from the customer.

6   The next day, on June 8, 2007, UC#1 (who was working as a waitress at Sugar's)

7   observed dancer M.S. performing a hand job in the VIP area. UC#1 also observed M.S.

8   perform a "hand job" on June 16, 2007. Also on June 16, 2007, UC#1 observed dancer

9   A.S. engaging in what appeared to be sexual intercourse with a customer in one of the

10   booths. Shortly after they were finished, UC#1 observed a used condom in the booth.

11   That same night, UC#2 observed another dancer having intercourse with a customer, as

12   well as additional dancers performing "hand jobs."

13         On July 5, 2007, UC#1 overheard dancer A.C. tell the doorman, named "Chris,"

14   not to let a particular customer leave because he owed her $500.00. Shortly thereafter,

15   UC#1 observed the customer run a card through the ATM machine, and take a printed

16   receipt to the club manager. The customer received a plastic cup full of tokens and

17   handed the cup to A.C. UC#1 later asked "Chris" about the incident. "Chris" stated,

18   "You heard right. She did some pretty nasty stuff for five hundred dollars." Three days

19   later, on July 8, 2007, UC#1 overhead two dancers talking about "hand jobs" they

20   performed earlier that night.

21         On October 30, 2007, in the Sugar's VIP area, dancer E.E. asked UC#3, "Do you

22   want a hand job?" She stated the price was $100.00. UC#3 agreed, but said he only had

23   a credit card. E.E. stated that was fine, but he would have to pay ten percent more

24   because the club would charge her a fee to cash-in the tokens. The same night, dancer

25   A.K. agreed to provide UC#2 a hand job for $50.00. UC#2 stated that he only had a

26   credit card. A.K. then led UC#2 to the manager's station to get tokens. On November

27   11, 2007, an identical event occurred involving UC#2 and dancer A.C. That same night,

28   two dancers offered to perform hand jobs on UC#3 in exchange for tokens obtained with

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    a credit card. One of the dancers told UC#3 that customers pay for "dances" with credit

2    cards "all the time."

3          On December 28, 2007, the King County Sheriff's Office conducted an

4    undercover operation at Sugar's. The officers observed numerous used condoms and

5    condom wrappers littered throughout the VIP area. Specifically, the used condoms were

6    found underneath the cup holders in the arm-rests of the VIP booths. Eleven dancers

7    were arrested for dance code violations. Some of the dancers offered to engage in acts of

8    prostitution. For example, one dancer stated that a "regular dance" with no touching

9    would cost $40.00, a dance with mutual touching in erotic areas would cost $60.00, and

10   three dances with mutual touching would cost $150.00; she assured the undercover

11   officer that he would "not leave disappointed," and stated that she could go to jail for

12   what she offered. One dancer offered an "aggressive dance" for $30.00, and a "naughty

13   dance" for $40.00, promising that, "You will be real happy." She then proceeded to use

14   her hand to rub the officer's penis through his pants, and did the same thing with her

15   mouth. Another dancer rubbed an undercover officer's penis over his pants. Several

16   dancers also placed officers' hands over their bare breasts.

17         On January 11, 2008, the King County Sheriff's Office conducted an undercover

18   operation at Sugar's. Once again, the officers observed numerous used condoms and

19   condom wrappers underneath the cup holders on the VIP booths. Twelve dancers were

20   arrested for dance code violations; some of these dancers engaged in mild forms of

21   prostitution under Washington State law, including rubbing their groin area or their

22   breasts against the undercover detectives' groin areas. Two club managers also were

23   arrested for permitting the illegal conduct to take place. In addition, the following two

24   dancers were arrested on prostitution charges. Dancer C.L. offered to perform hand jobs

25   for two undercover officers, and also stated that she "would do anything for money."

26   Dancer T.P. told an undercover officer that she performed dances for $20.00, $40.00, or

27   $100.00 for the "three-dance special." The officer asked whether the $100.00 dance

28   included a "hand finish." T.P. stated that would cost more, and agreed to a price of

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  $120.00.  T.P. escorted the officer into the VIP area and turned one of the booths toward a

2  wall to afford greater privacy.  She then asked whether the officer had a condom, and

3  clarified that the $120.00 was for a one-song dance with a "hand finish."  The officer

4  stated he changed his mind.

5         On February 9, 2008, UC#2 received a private dance in the Sugar's VIP area from

6  "C.J."  During the dance, C.J. began to rub his crotch area with her hands.  UC#2 stopped

7  her and said he was going to "get messy" (ejaculate) if she continued.  C.J. replied, "Isn't

8  that what you want?"  UC#2 then explained he would have to pay with a credit card.  C.J.

9  led him to the manager's station, and UC#2 obtained $50.00 in tokens with a credit card.

10        On May 21, 2008, UC#2, UC#3, and UC#5 visited Sugar's.  Dancer A.K. offered

11  to perform a hand job for UC#3.  She stated the price would be "three dances for

12  $100.00," and then another $250.00 for the hand job.  UC#3 said that sounded expensive,

13  and that the other dancers only charged $50.00 for a hand job.  A.K. replied, "And you

14  get a disease with them."  UC#3 requested a "clean dance," and paid A.K. $20.00.  A.K.

15  complained about being paid only for a clean dance, stating that she needed the extra

16  money.  Later that night, a dancer named A.C. approached UC#5 and offered a private

17  dance.  She said her dances cost either $20.00 or $40.00.  When asked what the difference

18  was, she explained, "For forty dollars, I'll take my top off and touch you more, and you

19  can touch me."  A.C. was unwilling to further discuss the nature of the $40.00 dance

20  without first receiving payment.  The undercover officers observed several opened

21  condoms wrappers in the men's bathroom.

22        Also on May 21, 2008, UC#2 observed a dancer named "Jessica" performing what

23  appeared to be oral sex on a customer in the VIP area; she was kneeling in front of the

24  customer and moving her head up and down in his lap.  The customer handed Jessica cash

25  when they stood up from the booth.  Another dancer named "Cali" offered to perform a

26  private dance for UC#2.  She said for $30.00, UC#2 could touch her vagina "over the

27  clothes" and she would perform a hand job over his pants.  She agreed to perform these

28  sex acts, but insisted that "everything has to stay in and clothes stay on."

Affidavit of Cory Cote - 39

1    **4.    Prostitution At Honey's.**

2    Undercover officers began posing as customers at Honey's on January 24, 2006.

3    The investigation has documented that extensive prostitution occurs at Honey's. To date,

4    dancers have offered to engage in acts of prostitution with undercover officers on

5    approximately fifty occasions. These prostitution offenses involved approximately forty

6    different dancers. In addition, the undercover officers consistently observed used

7    condoms and empty condom wrappers littered in the "VIP area" at Honey's. A

8    representative number of the undercover operations at Honey's are summarized below.

9    On January 24, 2006, dancer L.A. approached UC#3 and stated, "I really want to

10    rub your dick." She explained that it cost $50.00 and that she would make sure he

11    ejaculated. UC#3 declined the offer. A few minutes later, a dancer named "Chrissie"

12    asked UC#3 whether he wanted a "hand job" in exchange for $50.00. UC#3 stated that

13    was expensive, to which she replied, "That's how much all the girls charge." Later that

14    night, dancer J.J. offered UC#3 a hand job for $100.00. Two days later, on January 26,

15    2006, UC#3 was offered a hand job by two separate dancers.

16    On March 2, 2006, dancer H.L. told UC#2, "If you want, I give hand jobs for fifty

17    dollars." He asked, "Where would we do that?" She replied, "Back in the VIP room."

18    Later that night, dancer C.H. also offered UC#2 a hand job for $50.00.

19    On August 4, 2006, dancer S.L. was performing a private dance in the VIP area for

20    UC#3. In the middle of the dance, she attempted to perform a hand job. UC#3 stopped

21    her and asked what she was doing. S.L. replied, "I told you I was going to show you what

22    a $40.00 dance was." UC#3 declined, stating that he did not have a condom. S.L.

23    replied, "You don't even need one. I do this all day. You just come right here and then

24    go into the bathroom and clean yourself off." Again, UC#3 declined the offer and they

25    parted ways. Later that night, dancer E.O. told UC#2 that for $60.00 she would provide a

26

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    "very dirty dance."[18]  She stated, "You might get a blow (oral sex) for $60.00."

2         On August 17, 2006, UC#2 was offered sex acts by two dancers.  "Whisper"

3    offered him a hand job for $50.00 and guaranteed that he would ejaculate.  She also

4    recommended that he get a condom from the bathroom vending machine.  Dancer H.R.

5    offered him a hand job for $50.00 and stated that she would perform oral sex for "a little

6    more" money.  H.R. also offered to meet UC#2 "in the parking lot for whatever you

7    want" for a price of $150.00.  During the same night, other undercover officers at

8    Honey's observed dancers performing hand jobs and oral sex in the VIP area.

9         On November 15, 2006, police officers arrested several dancers at Honey's for

10   prostitution and dance code violations.  Later that night, dancer K.M. told UC#2 and

11   UC#3 about the arrests.  She stated that the police officers "busted" one of the dancers

12   having sexual intercourse with a customer.  K.M. explained that the club managers

13   generally "look the other way" (allow prostitution) so that the customers can "get what

14   they want" and the dancers can make "good money."  K.M. further stated words to the

15   effect, "The more customers at the club, the more money the owners make."

16        On January 12, 2007, UC#3 and UC#4 were offered "hand jobs" by five different

17   dancers at Honey's.  The dancers were charging varying prices between $40.00 and

18   $60.00.  On January 14, 2007, UC#3 was offered a hand job from another dancer.  On

19   January 20, 2007, dancer M.S. told UC#2, "You know, anything goes back here (in the

20   VIP area)."  He asked, "Anything?"  Sterling replied, "It depends, are you a cop?"  He

21   assured her that he was not.  She then offered to perform a hand job until he ejaculated in

22   exchange for $50.00.  On January 27, 2007, UC#3 observed a dancer named "Belle"

23   performing a hand job on a customer in the VIP area.

24        On March 4, 2007, dancer A.P. told UC#2 that for $50.00 he could place his

25   fingers inside her vagina.  That same night, UC#3 was offered a hand job by another

26   dancer for $50.00.  On other occasions during March 2007, UC#2 observed multiple

27   _____

28        [18] UC#1, who worked in an undercover capacity at Sugar's and Rick's, came to
     learn that when dancers use the terms "dirty" or "dirty dance," they are referring to a
     dance that typically involves illegal sexual activity.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    dancers performing hand jobs on customers in the VIP area of Honey's.

2    　　　On November 5, 2007, dancer A.G. offered to take UC#3 into the VIP area. UC#3

3    said he needed to use his credit card. They walked to the manager's station, UC#3

4    handed the manager a credit card, and the manager provided him with tokens. A.G. then

5    took UC#3 into the VIP area. After a "clean" dance, A.G. stated that he would have to

6    "pay another $50.00" if he wanted a "hand job." UC#3 stated that he would rather "have

7    sex (intercourse)." A.G. agreed and stated, "Let's figure around $200.00." UC#3

8    declined, stating that it was too expensive.

9    　　　On November 11, 2007, dancer S.B. asked UC#2 whether he wanted a private

10   dance in the VIP area. UC#2 asked how much the dance cost. S.B. replied, "$30.00,

11   $40.00, or $50.00, depending on what you want." UC#2 stated that he wanted to "get his

12   money's worth." S.B. replied, "I'll make you come." UC#2 agreed, but stated that he

13   was out of cash and needed to use a credit card. S.B. said, "Go get tokens now." UC#2

14   went to the manager's station and used his credit card to obtain tokens. S.B. then led

15   UC#2 into the VIP area and offered to give him "the $50.00 (dance)." UC#2 declined the

16   offer. Later that night, dancer B.D. offered UC#2 a "$50.00 dance." UC#2 mentioned

17   that dancer S.B. also offered to give him the same type of "dance," and B.D. replied,

18   "She's a dirty girl just like me, I do everything she does." They went to the VIP area and

19   B.D. stated, "I'll rub you off for $50.00." UC#2 declined the offer.

20   　　　On February 8, 2008, a dancer named "Candice" approached UC#2 at Honey's.

21   He asked how much she charged for a dance. She said a "dance" in the VIP area cost

22   $40.00 and a "hand job" cost $50.00. Shortly thereafter, UC#2 asked another dancer,

23   H.M., how much a dance would cost. She replied, "Forty or fifty dollars." UC#2 asked,

24   "How good are your fifties?" H.M. whispered, "I'll give you a hand job." Later that

25   night, UC#3 spoke with dancer M.S. in the Honey's VIP area. He asked what "the rules"

26   were for her dances. M.S. replied, "Well, you can't touch my (pubic area) at all." She

27   further stated that she would rub his penis "outside the underwear" for $40.00. UC#3

28   asked, "For forty dollars, do I get to come?" She replied, "No, if you want to come that

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    will be fifty dollars."

2    On April 6, 2008, SPD vice officers conducted an undercover operation at

3    Honey's. Based on the following circumstances, deputies of the Snohomish County

4    Sheriff's Office arrested dancers H.R. and D.W. for prostitution violations, and manager

5    Merrilee Whidby for permitting the illegal activities at the club. UC#7 entered Honey's

6    and observed Whidby working at the manager's station. In plain view of Whidby, dancer

7    H.R. approached UC#7 in the VIP area, sat on his lap, and began rubbing his groin area.

8    H.R. asked what type of dance UC#7 wanted. He asked, "How much for a hand job?"

9    H.R. stated, "Sixty dollars." UC#7 asked for a $50.00 dance instead. H.R. then exposed

10   her breasts and rubbed his groin area over his pants. UC#7 paid H.R. $50.00 and then left

11   the VIP area. UC#7 noticed that Whidby was looking into the VIP area and observing

12   several dancers engaging in similar conduct with other customers. Whidby took no

13   actions to stop the prostitution activity.

14   Shortly thereafter, UC#7 was approached by dancer D.W., who stated she was the

15   "nastiest" nineteen-year-old he would ever meet, and that her dances cost $50.00,

16   $100.00, or $170.00. UC#7 asked, "Which one is the blow job?" D.W. stated that was

17   the $100.00 dance. UC#7 asked for the $50.00 dance. D.W. exposed her breasts and

18   vagina, and rubbed the groin area over UC#7's pants. UC#7 paid D.W. $50.00 and then

19   left the club. Another undercover officer, UC#6, was also at Honey's on April 6, 2008.

20   Dancer D.W. approached UC#6 and stated (again) that she was the "nastiest" nineteen-

21   year-old he would ever meet. She offered to perform a "hand job" for $50.00. UC#6

22   stated he would be back in a few minutes and then left the club.

23   On August 18, 2008, UC#3 was inside the Honey's VIP area, accompanied by

24   CI#1. UC#3 observed dancer C.F. kneeling between a customer's legs and stroking his

25   naked penis; the customer looked at UC#3 and smiled. At the same time, a dancer in

26   another booth was kneeling in front of a customer performing oral sex.

27   On April 30, 2008, UC#5 visited Honey's. While in the VIP area, he observed

28   multiple acts of prostitution, including two dancers performing hand jobs for customers.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   One dancer performed the sex act while straddling the customer; the other dancer rubbed

2   the customer's groin area and simultaneously pressed her bare breast in the customer's

3   mouth. Two dancers named "Karma" and "Surreal" engaged in mild forms of

4   prostitution during dances with UC#5. Both dancers rubbed their groin areas against

5   UC#5's crotch and rubbed his groin area over his pants. Another dancer named "Latera"

6   also approached UC#5. He said he recognized Latera from Rick's. Latera explained that

7   she moved to Honey's because she could "do more in the VIP," due to the managers

8   being "really relaxed."

9           On May 3, 2008, UC#2 and UC#3 were inside Honey's for approximately three

10  hours. According to UC#2, the illegal activity at the club was more prevalent and blatant

11  than he had ever witnessed before. Every dance UC#2 observed in the VIP area was in

12  violation of the dance code ordinances and/or the prostitution laws. As always, condom

13  wrappers littered the men's bathroom floor, and used condoms were observed in the trash

14  cans and throughout the VIP area. UC#2 recognized at least eight dancers from prior

15  undercover operations. Each of these dancers previously had offered to perform acts of

16  prostitution for UC#2; obviously, they also were still employed by Talents West.

17          During the evening, two dancers agreed to perform sex acts for UC#2. A dancer

18  named "Jersey"asked UC#2 whether he was "ready to have some fun." UC#2 stated he

19  already had his "fun" that night, and he was too old to do "it" again. Jersey laughed and

20  replied with words to the effect, "I can get you to do it again." UC#2 asked how much

21  the dance cost, and Jersey stated $50.00. UC#2 declined, stating that one dance was

22  enough for him. Jersey replied, "I'll make sure you come again, I promise." She

23  attempted to lead UC#2 into the VIP room, but he declined, stating that he needed to rest.

24          Later that night, a dancer named "Rebel" approached UC#2 and asked if he wanted

25  a dance. UC#2 stated he recognized "Rebel" from Sugar's. Rebel stated she had been

26  sent to Sugar's for being "naughty," but now she was back at Honey's. UC#2 asked

27  whether she was still "naughty." Rebel said she was the "naughtiest girl in the club," and

28  that she wanted "to get naughty" with UC#2. Rebel stated her dances cost $30.00 and

Affidavit of Cory Cote - 44

1    $50.00.  UC#2 asked whether the $50.00 dance was "still the same" (included a hand

2    job).  Rebel answered in the affirmative.  UC#2 asked whether Rebel was afraid "to get

3    caught."  Rebel said the "cops" rarely come into the clubs, and they did "not have to

4    worry about" the club managers.  Rebel told UC#2 that if he was ready for the dance, she

5    would "bring [him] to a happy place."  When asked by UC#2, Rebel confirmed that she

6    would perform a hand job until UC#2 climaxed.  UC#2 stated that he would "pass"

7    because he was getting old.

8            While inside the VIP area with Rebel, UC#2 observed multiple acts of prostitution.

9    A dancer named "Paula" straddled a customer's lap and appeared to be performing a hand

10   job; during a prior undercover operation, "Paula" had offered to perform a hand job for

11   UC#2.  In the booth next to where UC#2 and Rebel were seated, it appeared as though a

12   dancer and customer were engaging in sexual intercourse.  UC#2 commented that it

13   seemed like "business as usual in the VIP area."  He then asked Rebel if business was

14   good.  Rebel gestured toward the dancer in the next booth and stated, "It's hard to

15   compete with *that*."  UC#2 asked what was going on in the booth.  Rebel replied that she

16   was "99.9% sure" the dancer and customer were "having sex."  Rebel explained that the

17   amount of sex acts occurring in the VIP booths was "crazy" and "things were out of

18   control."  When asked, Rebel stated if the owners really wanted to "clean things up," all

19   they had to do was turn the booths around to face the club, and then all of the sex would

20   stop.  She acknowledged, however, that if the owners put a stop to the sex in the club, she

21   would not be able to make as much money.  UC#2 asked why the club was this way

22   (referring to the prevalence of sex acts).  Rebel stated that the dancers needed to provide

23   "extras" (sex acts) to compete with each other.  She further said the managers want as

24   many customers in the clubs as possible, and that the owners are "just greedy."

25           While he was inside Honey's on May 3, 2008, UC#2 paid careful attention to the

26   conduct of the club managers.  McDowell was the lead manager on duty that night; also

27   on duty were managers known to UC#2 as "Jimmy" and "Loren."  None of the managers

28   attempted to interfere with or stop the illegal activities in the club.  UC#2 observed Loren

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  walk through the VIP area on only one occasion; Loren ignored the dance code violations

2  and the sex acts that were occurring openly at the time. McDowell also walked through

3  the VIP area once. However, prior to entering the area, she first stood nearby with her

4  back facing the booths, she then turned and looked into the VIP area for about one

5  minute, and only then did she walk through the booths. According to UC#2, it appeared

6  as though McDowell was issuing a tacit warning to the dancers before entering the VIP

7  area, so that the dancers had time to cease any sex acts before McDowell walked through.

8  Moreover, even when she walked through the VIP area, McDowell stopped short of the

9  booths against the walls, that are notorious for prostitution because they afford the most

10 privacy. For much of the night, McDowell and manager "Jimmy" were outside the club

11 in the parking lot smoking and drinking bottled beer with a group of unknown people.

12 UC#2 periodically stepped outside of the club to observe their conduct.

13         Also on May 3, 2008, UC#3 witnessed multiple acts of prostitution in the VIP

14 booths. For example, UC#3 observed a dancer named "Austin" leaning over a customer

15 and rubbing his penis with her right hand. UC#3 also observed a dancer named "Payton"

16 straddling a customer's lap and rubbing his penis with her hand. Later that night, UC#3

17 observed a dancer kneeling between a customer's legs and stroking his penis; UC#3 also

18 observed this dancer grinding her buttocks into the customer's groin area.

19         On May 15, 2008, UC#4 visited Honey's. A dancer named T.A. approached UC#4

20 and offered to give him a private dance in the VIP area. During the dance, T.A. exposed

21 her breasts and vagina, and told UC#4 he could touch her in those places. She attempted

22 to unzip his pants, but UC#4 stopped her. T.A. stated that for $50.00, she would "wet"

23 UC#4's penis and rub it against her breasts. He said he would come back the next day.

24         On May 20, 2008, UC#2 and UC#3 were offered sexual services by several

25 dancers at Honey's. One dancer said she charged "$30.00 and up." UC#2 asked, "How

26 far could I go?" The dancer replied, "We can do everything but fuck. I don't fuck."

27 Another dancer named "Jersey" told UC#2 she would give him a hand job in the VIP area

28 for $50.00. As they were talking, manager Whidby walked through the VIP area. UC#2

Affidavit of Cory Cote - 46

1  asked whether Jersey was worried about getting caught by the manager. Jersey said the
2  managers only bother "the new girls." A dancer named A.J. told UC#3 that she was
3  moving to California in a week. UC#3 asked whether she was going to "dance" in
4  California. A.J. said she hoped to, but was not sure if she could "do it" there. UC#3
5  asked, "You mean hand jobs?" A.J. replied, "Yes, all I do are hand jobs. I don't really
6  give dances, and I think they probably expect the girls to dance (in California)." A.J. led
7  UC#3 into the VIP area, where she started to take off his pants. UC#3 stopped her and
8  said he did not want a hand job today. A.J. gave a blank stare and said, "You're kidding.
9  You know that's all I do." Again, she tried to open his pants. UC#3 said he only wanted
10 a "clean dance."
11      Also on May 20, 2008, UC#3 had a lengthy conversation with Honey's manager
12 Whidby. UC#3 approached Whidby as she was leaning against the wall outside the VIP
13 area, looking into the area. UC#3 told Whidby that he travels a lot for business, and he
14 found Honey's to be the most "liberal" club anywhere. He further stated, "I can get a
15 hand job any time I want." Whidby replied, "Pretty much." UC#3 continued by stating,
16 "Don't get me wrong. I'm still a guy. I don't see anything wrong about hand jobs and
17 blow jobs, but in a strip club? A lot of clubs I've been in, if I was to touch the dancer I
18 would be bounced out on my head. Here, I have to dodge nipples from my mouth."
19 Whidby pointed to the VIP area and stated, "Look at those girls. All of those girls are
20 breaking the law. . . . It's not like they're doing the nasty. . ." She then corrected herself
21 by stating, "Except for 'Jersey.' Jersey is doing the nasty to her customer right now."
22 She pointed to Jersey, who was kneeling in front of a customer, apparently performing
23 oral sex. UC#3 asked, "Don't you stop that sort of thing?" Whidby replied, "No. Jersey
24 is a good girl. Plus, what can I do? It brings in customers." UC#3 said he has no
25 problem with "girls offering sex," and he thought prostitution should be legal. Whidby
26 replied with words to the effect: "Oh, I agree. It would make my job a lot easier. If
27 prostitution was legal, the girls would have a place to take their customers for sex, and the
28 strip club could just be a strip club, where dancers could just be dancers. Then the girls

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   wouldn't have to do it here." UC#3 commented that many of the Honey's dancers

2   regularly offer sex acts; he told her about dancer A.J. who said "all she does" is give hand

3   jobs. Whidby stated, "If they do the nasty to you, then they probably have done it to a

4   dozen guys that night." UC#3 ended the conversation by telling Whidby it was nice

5   talking to her, and "be careful with the cops."

6       **5.     Prostitution At Fox's.**

7           Undercover officers began posing as customers at Fox's in September 2006. The

8   investigation has documented that extensive prostitution occurs at Fox's. To date,

9   dancers have offered to engage in acts of prostitution with undercover officers on

10  approximately ten occasions. These prostitution offenses involved approximately ten

11  different dancers. In addition, the undercover officers consistently observed used

12  condoms and empty condom wrappers littered in the "VIP area" at Fox's. A

13  representative number of the undercover operations at Fox's are summarized below.

14          On August 3, 2006, the Pierce County Sheriff's Office conducted an undercover

15  operation at Fox's. Dancer K.M. offered to perform a hand job on an undercover officer

16  for $100.00. Dancer T.K. told another officer that for $200.00 she would perform a hand

17  job and allow him to "play with" her breasts and vagina. The Pierce County Sheriff's

18  Office conducted similar undercover operations at Fox's in March 2007 and April 2007.

19  During these operations, a total of seven dancers offered to engage in acts of prostitution.

20          On September 5, 2007, dancer H.Y. told UC#2 that it cost $100.00 to go into the

21  VIP area. She assured him, "Anything goes back there. I will make you happy." Another

22  dancer told UC#2 that the private dances had to take place in the VIP area because "cops"

23  would not spend the $100.00 to go there. Later that night, UC#3 received a private dance

24  in the main club area. He asked the dancer whether he could "touch" her. She replied

25  that "the owners" want to keep that sort of activity (prostitution) in the VIP area only.

26          On November 9, 2007, a dancer told UC#3 that she wanted to take him into the

27  VIP room and "molest" him. UC#3 said he had no cash, and needed to use a credit card.

28  UC#3 provided a credit card to the club manager and asked for $100.00 in tokens. The

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  manager processed the card, and stated that he would give the chips directly to the dancer.

2  The dancer then escorted UC#3 into the VIP area. UC#3 asked what the "rules" were.

3  The dancer replied, "I'll rub you, I'll suck you, but I won't fuck you." UC#3 asked if she

4  had any condoms, and she told him to go get one in the bathroom.

5      On November 11, 2007, three different dancers offered to perform sex acts for

6  UC#2 in exchange for money. They each indicated that they would accept tokens as

7  payment (UC#2 had purchased the tokens by using his credit card). One dancer stated she

8  would be "naughty" during the dance. She said it was $100.00 to go back into the VIP

9  area, and another $200.00 to "suck your cock" (oral sex). UC#2 declined the offer.

10     On December 12, 2007, a dancer named "Sarah" told UC#2 that for $100.00 she

11  would take him into the VIP area and "satisfy your every need." UC#2 said he only had

12  "one need," and she replied, "I can take care of that." Sarah performed a "clean" dance

13  and then stated, "I go further . . . I'll do anything you want." After further discussions,

14  she agreed to provide a hand job for $50.00. UC#2 said he would have to pay with a

15  credit card. Sarah walked with him to the manager's station and UC#2 provided his

16  credit card to the manager for processing. UC#2 asked the manager whether most

17  customers paid in cash or with credit cards. The manager said most people used credit

18  cards because they did not carry enough cash. UC#2 then parted ways with Sarah.

19     On May 14, 2008, UC#3, UC#4, and UC#5 visited Fox's. UC#3 was approached

20  by dancer H.G. UC#3 recognized her as a dancer who previously worked at Rick's. They

21  went into the VIP area and H.G. performed a few dances that violated the dance code

22  ordinances (she exposed her breasts and removed her underwear). UC#3 asked whether

23  she would perform a hand job for additional money. H.G. agreed, and went to open

24  UC#3's pants. He said he needed to get a condom from the bathroom first, and they

25  parted ways. Later that night, H.G. asked UC#3, "Are you ready for me to take care of

26  you?" He declined the offer. The undercover officers also observed several used

27  condoms and opened condom wrappers in the men's bathroom.

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   Also on May 14, 2008, a dancer named "Alazade" approached UC#4 and offered

2   to perform three dances in the VIP area for $100.00.  UC#4 said that sounded expensive.

3   Alazade promised he would be "satisfied."  UC#4 asked whether he could "pull it out"

4   and "get off" (ejaculate).  Alazade said they would "not be disturbed" if they went to the

5   far corner booth in the VIP area.  Again, she "guaranteed" he would be "satisfied."  UC#5

6   declined, stating it was too expensive.  A while later, Alazade again approached UC#4

7   and asked, "Are you ready?"  Again, he declined.  That same night, a dancer named

8   "Foxy" approached UC#5 and offered four dances for $100.00.  UC#5 asked what he

9   would get for that much money.  Foxy reached down, grabbed his penis through his pants,

10  and stated, "I'll take care of you."  UC#5 said he may be interested later that night.

11  **E.**    **Talents West Business Practices That Promote Prostitution At The Strip Clubs.**

12  As noted above, the subjects promote and facilitate prostitution at the four strip

13  clubs through several Talents West business practices, including: (1) permitting

14  prostitution at the four strip clubs by knowingly employing dancers who engage in

15  frequent acts of prostitution, and failing to make reasonable efforts to enforce the

16  prostitution laws at the clubs; (2) moving dancers who are caught engaging in acts of

17  prostitution between the four strip clubs to conceal the criminal activities; and (3) causing

18  the dancers to incur debts owed to Talents West, thereby making it necessary for dancers

19  to engage in prostitution to earn enough money to pay back the debts.  Evidence of each

20  of these Talents West business practices is summarized below.

21  **1.**    **Evidence That The Subjects Permit Prostitution At The Four Strip Clubs
         By Knowingly Employing Dancers Who Engage In Prostitution, And By**
22       **Failing To Enforce The Prostitution Laws At The Clubs.**

23       **a.**    **Undercover Investigation By UC#1.**

24  In her role as a manager at Rick's, UC#1 documented evidence that the subjects

25  and their club managers permit prostitution at the four strip clubs by knowingly

26  employing dancers who engage in frequent acts of prostitution, and failing to make

27  reasonable efforts to enforce the prostitution laws at the clubs.  Moreover, the subjects

28  continue to employ dancers even after the dancers have been arrested for prostitution

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   violations or caught engaging in acts of prostitution by club managers.

2        Some of this evidence relates to the Talents West business practice of requiring

3   dancers who are caught engaging in prostitution, either by the police or club managers, to

4   report to Talents West to discuss the incident with one of the owners (typically

5   Colacurcio Jr. or Christiansen).  While working as a Rick's manager, UC#1 sent dancers

6   to the Talents West office after they were caught engaging in sex acts.  According to

7   UC#1, when a dancer is caught in a sex act, the club manager makes a notation about it

8   on the "Total Back Rent" report.  The notation would typically read, "Sent to office."

9   The revised "Total Back Rent" report is then delivered to Talents West by one of the

10  managers each night after closing.  The report is reviewed by Marsha Furfaro, Colacurcio

11  Jr., Christiansen, and/or Payton.  A dancer who is sent to Talents West is not permitted to

12  work again until the club manager receives confirmation that the dancer met with one of

13  the subjects at Talents West.  After the meeting takes place, Marsha Furfaro updates the

14  "Total Back Rent" report with a notation such as, "Cleared for work."  In addition, Payton

15  often calls the club manager to confirm the dancer has been cleared.  UC#1 has received

16  these sorts of calls from Payton on multiple occasions.

17       Through this process, the owners of Talents West are routinely informed about the

18  prostitution activities at the four strip clubs, including the specific dancers who engage in

19  the criminal activity.  However, as described further below, the subjects consistently

20  continue to employ the offending dancers, even after they have been caught in the act on

21  multiple occasions.  Examples of this evidence, and other examples of the failure by the

22  subjects and their club managers to make reasonable efforts to enforce the prostitution

23  laws at the clubs, are summarized below.

24       On July 10, 2007, Rick's manager Angela Romano complained to UC#1 about the

25  fact that the owners of Talents West did not want the managers to enforce the prostitution

26  and dance code laws.  Specifically, Romano stated that she was having a "hard time" with

27  the job because "they (the owners of Talents West) really don't want a manager to do

28  anything in Rick's like it is supposed to be done."  Romano also lamented the fact that the

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   dancers felt like they needed to do "the illegal stuff."

2       On July 13, 2007, dancer S.C. complained to UC#1 that other dancers were

3   engaging in sexual intercourse in the VIP booths. UC#1 reported this to head manager

4   McDowell. McDowell replied, "People who live in glass houses shouldn't throw stones,"

5   and explained that S.C. had previously been arrested for prostitution at Rick's.

6   McDowell took no actions at that time with respect to S.C.'s complaint.

7       On July 18, 2007, UC#1 observed dancer Y.H. giving a "hand job" to a customer.

8   UC#1 interceded and told Y.H. to come speak with her at the bar. Instead, Y.H. walked

9   over and spoke with Christiansen, who was in the club. Immediately thereafter,

10  Christiansen called UC#1 over to him. UC#1 told Christiansen that she saw Y.H. giving

11  the customer a hand job. Rather than address the prostitution offense, Christiansen told

12  UC#1 to be "more discrete in these situations." UC#1 told Christiansen that it was Y.H.

13  who caused a scene in an effort to allow the customer to "put his dick back in his pants."

14  Again, Christiansen reprimanded UC#1 to be more discrete. Christiansen allowed Y.H.

15  to continue working at the club that night, with no repercussions.

16      On July 31, 2007, as part of an undercover operation, SPD vice detectives entered

17  Rick's and spoke to UC#1 about the City of Seattle's "Standards of Conduct" laws. The

18  detectives provided UC#1 with a copy of the regulations. Later that day, Christiansen

19  was at Ricks. UC#1 asked Christiansen about one of the provisions of the Standards of

20  Conduct that states: "No manager or operator shall knowingly permit any person upon the

21  premises to touch, caress, or fondle the breasts, buttocks, anus, genitals or pubic region of

22  another person." UC#1 asked Christiansen what she should do as the manager when

23  dancers allow customers to touch their breasts or buttocks, and when dancers touch the

24  customers by "grinding" on them. Christiansen replied, "They (the police) don't really

25  ticket girls for that." UC#1 then asked, "How do you want me to work the floor then?

26  Because this (the Standards of Conduct) pretty much says they (the dancers) can't do a

27  whole lot." Christiansen simply instructed UC#1 to "work the floor as you were trained

28  by Julie (McDowell)." Later, after showing McDowell the Standards of Conduct, UC#1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    asked, "What about when the dancers bounce on the customers' crotch in the VIP area?

2    According to this, that isn't legal." McDowell replied, "They actually have to prove that

3    they are bouncing on their crotch and not their leg. As long as we tell them that what they

4    are doing is legal or illegal, we're doing our job. If we are doing our job, then we have

5    nothing to worry about."

6           During July 2007, Sugar's manager Kathleen Mason offered the following advice

7    to UC#1 with respect to being a manager at Rick's: Mason explained how UC#1 should

8    handle dancers who engage in acts of prostitution. Mason stated that if UC#1 catches a

9    dancer "giving a hand job or doing some of the other stuff," they should be called to the

10   manager's station and given a warning; if they are caught a second time, they should

11   receive another warning; the third time the dancer is sent home for the night. In that case,

12   the dancer cannot return to work until she visits Talents West to "clear things up" with

13   either Christiansen or Colacurcio Jr. However, Mason explained that sometimes "the

14   owners" intercede and prevent managers from sending dancers home. She provided an

15   example involving a dancer named "Devlin." Mason said "Devlin" gets sent to "the

16   office" (Talents West) frequently for engaging in acts of prostitution. One night, Mason

17   caught "Devlin" engaging in a sex act and she kicked "Devlin" out of the club. Later that

18   night, however, Mason received a telephone call from Colacurcio Sr. He told Mason to

19   allow "Devlin" back to work. Mason advised UC#1: "You don't say 'no' to the people

20   that sign your paycheck, and when the owners want you to do something, you just have to

21   do it."

22          On August 4, 2007, Colacurcio Jr. was at Rick's. He was standing near the VIP

23   area and looking inside the area occasionally. Suddenly, Colacurcio Jr. hurried over to

24   UC#1 and said, "Quick, three cops just came in the door! Go clean up the VIP area! Go

25   through the VIP. The cops just got here! Make sure the girls are clean." UC#1 then

26   walked through the VIP area. Shortly thereafter, Colacurcio Jr. told UC#1 that it was a

27   "false alarm," because the men he saw entering the club were not actually police officers.

28   Colacurcio Jr. said he was worried because he saw several dancers in the VIP area with

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    their tops off and their heads below the booths (suggesting that sex acts were occurring in

2    the booths).

3        Also on August 4, 2007, UC#1 asked Colacurcio Jr. about the Standards of

4    Conduct. UC#1 asked Colacurcio Jr. what she should do when customers put their hands

5    on the dancers' breasts and buttocks. Colacurcio stated that "they" (the police) did not

6    want the dancers doing that. UC#1 asked whether that was something she should give a

7    "verbal warning" for, or whether the dancer should be sent to "the office" (Talents West)

8    to meet with one of the owners. Colacurcio Jr. said with "stuff like that," a verbal

9    warning is good enough. UC#1 also asked what she should do about dancers physically

10   grinding on top of customers' crotches. Colacurcio Jr. said that "wasn't a big deal

11   either," and a verbal warning was good enough. Colacurcio further stated that the club

12   owners did not care about anything that did not involve "sexual contact" and neither did

13   the SPD.

14       On August 7, 2007, Rick's manager Ryan McLeod told UC#1 that he gets "angry"

15   at the owners of Talents West because they allow dancers who engage in frequent acts of

16   prostitution to continue working at the club. McLeod said when he catches the dancers in

17   sex acts, he sends them to Talents West; usually, they just return to work the following

18   day with no adverse consequences. McLeod lamented, "What's the point of us

19   (managers) being here if they (the owners) aren't going to do anything? Then I realized

20   the money the girls made was good for business."

21       On August 5, 2007, UC#1 caught a dancer named "Jelena" engaging in a sex act at

22   Rick's. Specifically, she observed a customer inserting his fingers inside Jelena's vagina.

23   UC#1 pulled Jelena from the floor and instructed her to visit Talents West. UC#1

24   documented the incident in two ways. First, she made a notation on the "Total Back

25   Rent" report. Second, she wrote a note on a separate piece of paper describing the sex act

26   in explicit detail. UC#1 addressed the note to Colacurcio Jr. and attached it to the "Total

27   Back Rent" report, ensuring it would be delivered to Talents West later that night. The

28   following day, however, Jelena returned to work at Rick's without any apparent

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  repercussions. UC#1 overheard Jelena tell manager Larissa Shearer that she met with

2  Colacurcio Jr. at Talents West earlier that morning and he cleared her for work.

3      Six days later, on August 11, 2007, UC#1 discussed Jelena with Colacurcio Jr. at

4  Rick's. UC#1 told Colacurcio Jr. she was surprised to see Jelena working so soon after

5  she was caught "doing what she was doing." UC#1 asked whether she (UC#1) had done

6  something wrong as the manager, and whether that was the reason Jelena was back so

7  soon. Colacurcio Jr. replied, "Don't worry about it. I took care of it. Just do your job

8  like Julie (McDowell) taught you."

9      On August 14, 2007, UC#1 and Colacurcio Jr. again discussed Jelena. A day or

10 two before, another club manager caught a dancer named "Tessa" engaging in oral sex

11 with a customer. The manager wrote a note to Colacurcio Jr. that read, "Regarding Tessa:

12 Caught with cock in mouth." When she subsequently saw Colacurcio Jr. at Rick's, UC#1

13 told him she felt "stupid" because the note she wrote about Jelena's sex act was long and

14 detailed, whereas the note about Tessa was so short and direct. UC#1 apologized, and

15 explained she was just trying to be "professional about it." Colacurcio Jr. acknowledged

16 receiving the note about Jelena, and told UC#1 words to the effect, "We're all guys here,

17 so you can just be brief and to the point." McDowell also participated in this

18 conversation. McDowell instructed UC#1 to just write comments like, "fucked a guy" or

19 "giving a blow job" instead of more descriptive accounts. Colacurcio Jr. stated he agreed

20 with McDowell. Colacurcio Jr. and McDowell then discussed whether Tessa

21 "swallowed" when she was giving "head" (oral sex) to the customer.

22      **b.    Evidence Gathered By The Undercover Customers About The
           Knowing Employment Of Dancers Who Engage In Prostitution.**

23

24 Statements made by dancers to the undercover officers who posed as customers

25 further reveal that the subjects knowingly employ dancers who engage in prostitution, and

26 fail to enforce the prostitution laws at the four strip clubs.

27      For example, on January 10, 2007, dancer R.B. agreed to perform a sex act for

28 UC#3 at Rick's. He asked whether she would get in trouble with the management at the

   club. She replied, "Not really," and explained that when she gets caught she just goes to

Affidavit of Cory Cote - 55

1    "the office" (Talents West), apologizes to the owners, they laugh, and then they let her

2    continue working.  Similarly, on January 31, 2007, at Rick's, UC#3 asked dancer B.D.

3    (who had recently been arrested for dance code violations) what happens when she gets

4    caught doing a "dirty dance."  B.D. explained that she just goes to "the office" (Talents

5    West), apologizes to the owners, and then comes back to work the next day.

6         On March 19, 2007, UC#3 spoke with dancer S.B. at Rick's.  Colacurcio Sr. and

7    Christiansen also were at the club.  UC#3 nodded towards them and asked whether S.B.

8    could get away with a "dirty dance."  She said that she could, as long as she kept it all

9    "below the booth."  S.B. explained that she had been sent to "the office" (Talents West)

10   before, and the owners just told her to "keep it below the top of the booths."  S.B. further

11   stated that the owners told her they understand the dancers have to make money, and that

12   if Rick's loses dancers, then the owners lose money.

13        On February 8, 2008, UC#2 spoke to a dancer named "Luna" at Honey's.  Luna

14   stated that another dancer was recently "caught" giving a customer a "blow job" at

15   Honey's.  Luna explained that the dancer was sent home for the night and had to visit "the

16   office" (Talents West) the next day.  UC#2 asked whether the dancer was fired.  Luna

17   replied, "Are you kidding?  She was back the next night!"

18           **c.**     **Information Provided By CIs, CWs, And Other Sources About**
                    **The Knowing Employment Of Dancers Who Engage In Prostitution.**

19

20   <u>Information from CI#1</u>: According to CI#1, the VIP area at Rick's is "full of hand

21   jobs, blow jobs, and full-on sex."  Colacurcio Sr. has told CI#1 that the VIP booths were

22   installed so the dancers could "give head" (oral sex).  CI#1 stated that the number of

23   customers at Rick's substantially increased after the booths were installed, and since then

24   most of the customers expect dancers to participate in sex acts.

25        CI#1 has discussed the prostitution at the clubs directly with some of the subjects.

26   For example, in August 2005, CI#1 complained to Christiansen about a dancer named

27   C.P. who is one of the most prolific prostitutes at Rick's.  According to CI#1, C.P.

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  regularly engages in sex acts, including intercourse, at the club.[19]  When CI#1 complained

2  to Christiansen about C.P.'s prostitution, he replied that he did "not want to hear about

3  it." Christiansen subsequently took no actions to stop C.P.'s prostitution.

4         In 2005, CI#1 had a similar conversation with Ebert at Rick's. The night before,

5  no customers hired CI#1 for a private dance. According to CI#1, her reputation as a

6  "clean dancer" was the reason she had no business; other dancers who engaged in

7  prostitution were consistently busy with customers. CI#1 complained about this to Ebert.

8  Specifically, she told Ebert all of her regular customers had left her because they want to

9  be with the dancers who are willing to have sex. Ebert said nothing in response, and just

10  looked at CI#1.

11        In early February 2007, CI#1 spoke to Colacurcio Sr. at Rick's. CI#1 asked about

12  the parameters for dances at the club. Colacurcio Sr. stated that the dancers were allowed

13  to "flash" the customers (expose their breasts) and let the customers "touch them."

14  However, under the Washington State prostitution laws, this sort of touching is a form of

15  prostitution.

16        Information from CI#2:  According to CI#2, she has complained to the subjects on

17  multiple occasions about the rampant prostitution at the clubs. For example, on

18  September 30, 2005, CI#2 spoke to Ebert at Rick's. She complained that her business

19  with customers was slow and she was not making any money. Ebert replied that if he

20  were a woman, he would be doing "whatever it took to make money," and that he would

21  do "anything and everything" he could. CI#2 asked Ebert what he meant by that, and he

22  replied, "You know what I'm talking about." According to CI#2, Ebert was encouraging

23  her to engage in prostitution at Rick's.

24        Information from CI#3:  According to CI#3, the amount of prostitution at the clubs

25  increased dramatically after the installation of the VIP booths. Since then, the customers

26  expect dancers to engage in sex acts, and dancers who refuse cannot make much money.

27

28        [19] As described above, this was corroborated on several occasions by undercover
investigation at Rick's.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   CI#3 often cannot earn enough money to pay the "rent" because she refuses to engage in

2   sex acts. On one occasion, she complained to Christiansen about this situation.

3   Specifically, she told Christiansen that other dancers were "having sex" in the club and

4   she could not "compete" with them. Christiansen responded with words to the effect,

5   "Well, honey, you've got to get in there and compete." According to CI#3, Christiansen

6   was encouraging her to participate in prostitution at Rick's.

7       CI#3 confirmed that when dancers are caught engaging in acts of prostitution at

8   the clubs, they are required to go to "the office" (Talents West) and speak with

9   Colacurcio Jr. or one of the other owners. On one such occasion when she was sent to

10  Talents West, Colacurcio Jr. told her, "If you're going to speed, look around for cops."

11  Based on my training and experience, and on my discussions with CI#3, I believe

12  Colacurcio Jr.'s statement was intended to communicate that he condoned illegal

13  activities at the clubs as long as the dancers do not get caught.

14      Information from CI#5:  CI#5 reported that on one occasion a club manager sent

15  her to Talents West for performing a "dirty dance." She spoke with Colacurcio Jr. in the

16  "main office" at Talents West. According to CI#5, Colacurcio Jr. was not overly

17  concerned about the incident. Colacurcio Jr. advised her to return to work and not to "do

18  it again."

19      Information from CW#1:  CW#1 worked at Fox's during 2001 and 2002, and then

20  stopped working at the club. In the Spring of 2007, she returned to the job. According to

21  CW#1, she met with Fueston in the manager's officer at Fox's. Fueston stated that if

22  CW#1 is arrested for prostitution, she needs to "keep her mouth shut." Fueston further

23  explained that the first thing she should do is call Talents West's lawyer and he would get

24  her out of jail. On her second day of work, CW#1 complained to the club manager that a

25  customer propositioned her for sex. The manager stated that if she did not like it, she

26  could just leave the club. She quit the following day.

27  //

28  //

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    <u>Information from CW#2</u>: CW#2 also confirmed that the owners of Talents West

2    know about and permit prostitution at the four strip clubs. CW#2 specifically stated: "A

3    dancer is not going to get into trouble with the owners if she is involved in prostitution ...

4    If they get into trouble with law enforcement for prostitution, then they have an attorney

5    that'll bail them out." According to CW#2, the subjects encourage the dancers to engage

6    in sex acts so that more customers would attend the clubs. For example, she described an

7    employee meeting that took place at Sugar's during the Summer of 2006. Both

8    Colacurcio Sr. and Colacurcio Jr. were present for the meeting. According to CW#2,

9    Colacurcio Sr. told the dancers words to the effect, "If you give a hand job, charge for it.

10   If you give a blow job, charge for it. If you don't charge for it, then you'll be fired."

11   Colacurcio Jr. also reiterated the same thing during the meeting.

12   　　　　<u>Information from other dancers</u>: During the course of this investigation, officers

13   have interviewed numerous dancers after they were arrested for prostitution or dance code

14   violations. Several dancers provided information indicating that the subjects knowingly

15   permit the extensive prostitution at the clubs. Some examples are described below.

16   　　　　On December 7, 2006, dancer H.H. provided a statement following her arrest for

17   prostitution at Rick's. H.H. had been dancing at Rick's for three years. H.H. stated that

18   the prostitution at Rick's increased dramatically after the installation of the VIP booths.

19   H.H. further stated that some of the dancers complain about the sex at the club.

20   According to H.H., Christiansen is usually the owner who deals with these sorts of

21   complaints. H.H. stated that Christiansen's usual response is to acknowledge he is

22   "aware of the problem," but Christiansen does not take any actions to address it.

23   　　　　On December 14, 2006, dancer C.M. provided a statement following her arrest for

24   prostitution at Rick's. C.M. had been dancing at Rick's for three years. According to

25   C.M., approximately one month prior to her arrest she complained to Christiansen about

26   the fact that customers wanted her to perform oral sex. Christiansen replied that he never

27   saw that happening, and that "guys will be guys." C.M. stated she has made numerous

28   similar complaints to Christiansen, but "nothing ever changes," referring to the fact that

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 | Christiansen takes no action to stop the prostitution at Rick's.

2 |      On February 15, 2008, dancer T.N. provided information to SPD detectives. She

3 | voluntarily contacted the SPD following a dispute with Colacurcio Jr. (he forced her to

4 | return money to a customer who overpaid for dances). T.N. has worked as a dancer at

5 | Rick's, Honey's, and Sugar's for the past seven years. According to T.N., she has had

6 | numerous conversations with Colacurcio Jr. and Christiansen about prostitution at the

7 | Talents West strip clubs. During several conversations, T.N. complained that it was

8 | difficult to make money at the clubs because dancers were "handing out blow jobs and

9 | hand jobs." The typical response from Colacurcio Jr. and Christiansen was to deny that

10 | sex acts occurred in the clubs. A few months ago, T.N. met with Christiansen in the

11 | "back office" to discuss her recent arrest for a dance code violation. T.N. complained

12 | that she was caught when other dancers were "right next to [her] giving blow jobs and

13 | hand jobs." Christiansen got angry and said it was her own fault because "you got

14 | caught." He then kicked T.N. out of the office.

15 |     **2.**    **The Movement Of Dancers Between The Four Strip Clubs.**

16 |      The dancers' work schedules are created in such a way that they are moved or

17 | scheduled between the four strip clubs to minimize detection by law enforcement of the

18 | more flagrant prostitution activities. As noted above, the subjects require dancers who

19 | are caught in acts of prostitution, either by the police or club managers, to report to

20 | Talents West and discuss the matter with one of the owners. During these meetings, the

21 | subjects either tacitly condone the prostitution, or they take limited "disciplinary" actions

22 | that are, in fact, designed to allow the prostitution to continue undetected by law

23 | enforcement. The subjects rarely, if ever, discipline the dancers in a manner consistent

24 | with a genuine effort to prevent or eliminate the prostitution (i.e., firing the offending

25 | dancers). Typically, dancers merely are moved from one club to another, where they

26 | continue to engage in prostitution. Some examples of this practice are summarized

27 | below.

28 |

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

### a. Information Provided By CIs, CWs, And Other Sources About The Movement Of Dancers Between The Four Strip Clubs.

On February 15, 2007, CI#1 spoke to Colacurcio Jr. at Rick's. CI#1 asked why several of the "dirty dancers" (dancers that engage in prostitution) were moved from Rick's to Honey's. Colacurcio Jr. explained that the dancers got greedy and were charging outrageous prices, and "the sex was out of control."

On November 14, 2007, at the direction of investigating agents, CI#1 went to Talents West to speak with Christiansen. Christiansen brought CI#1 into the "main office." They discussed a dancer who had recently been arrested for prostitution at Rick's and had been moved to Honey's. CI#1 stated that she assumed the dancer would be returning to Rick's soon because "they all do." Christiansen replied, "We don't let girls with prostitution charges come back to Rick's. Once the charges are gone they can come back." According to CI#1, it is widely believed that Rick's is policed more heavily by law enforcement than the other three strip clubs; that is why the owners temporarily move dancers out of Rick's who have pending prostitution cases.

In September 2006, CI#2 met at Talents West with Colacurcio Sr., Colacurcio Jr., Christiansen, and Ebert. CI#2 complained about five dancers at Rick's who were engaging in the most prostitution. CI#2 had complained to the subjects about these same dancers on several prior occasions. The following day, the dancers were moved to Honey's. Approximately one month later, the dancers returned to Rick's, where they continued to engage in prostitution.

On December 5, 2007, at the direction of investigating agents, CI#5 went to Talents West to speak with Christiansen. She met with Christiansen in the "main office." CI#5 told Christiansen that she had recently been arrested for prostitution at Rick's. Christiansen said she could continue working at Rick's until charges were filed, and then she may be moved temporarily to a different club. CI#5 complained that "other girls do a lot worse" (engage in more acts of prostitution). Christiansen replied, "Don't worry about other girls, just go back and do your job."

In addition, after she was arrested for prostitution at one of the clubs, dancer B.D.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  informed police officers that: "If a girl is caught doing sex, she will get kicked out (of the

2  club). She will have to go to the office (Talents West) and talk to Leroy (Christiansen) or

3  Colacurcio Jr. Usually the girl is just moved to another club for thirty days or so."

**b.    Evidence Obtained By The Undercover Officers About**
**The Movement Of Dancers Between The Four Strip Clubs.**

The undercover officers have documented evidence that the subjects move dancers

who engage in prostitution from club to club; and that thereafter, the dancers continue to

engage in prostitution. Some examples are summarized below.

On September 22, 2006, dancer T.N. was arrested by King County Sheriff's

deputies for engaging in dance code violations at Rick's. Immediately thereafter, she was

moved to Sugar's. On October 19, 2006, T.N. told UC#3 that she had been moved from

Rick's to Sugar's because she "got caught giving a dirty dance." She also offered to

engage in sex acts with UC#3 for a fee. On October 31, 2006, while still working at

Sugar's, T.N. told UC#3 that she recently had been caught by a club manager giving a

"hand job." T.N. said she was sent to "the office" (Talents West) and that Colacurcio Sr.

told her to work at Sugar's for a while until things "cool off at Rick's."

On December 7, 2006, dancers H.H. and D.P. were arrested by SPD officers for

prostitution violations at Rick's. The club manager was advised of the arrests and stated

that she would, in turn, notify the owners of the club. H.H. and D.P. subsequently were

moved to Honey's, where they each offered to perform a sex act for undercover

detectives.

On December 13, 2006, dancer S.C. was arrested by SPD officers for prostitution

violations at Rick's. Colacurcio Jr. was present at the club, and was advised of the

violations. S.C. was subsequently moved to Honey's. On January 20, 2007, UC#4

observed S.C. engaging in a sex act at Honey's. Thereafter, S.C. was moved back to

Rick's. On August 21, 2007, S.C. was arrested for prostitution at Rick's by King County

Sheriff's deputies. Again, Colacurcio Jr. was at Rick's and was made aware of the

prostitution violation. S.C. was then moved to Honey's. Shortly thereafter, at Honey's,

S.C. offered to perform a sex act for UC#4 in exchange for money. At the present time,

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    S.C. is employed as a dancer at Rick's.

2         On February 1, 2007, UC#3 spoke with dancer A.K. at Sugar's. A.K. said there

3    had recently been a prostitution raid at Rick's, and that the "dirty dancers" had been

4    moved to Sugar's. On June 13, 2007, UC#5 spoke to dancer Y.C. at Sugar's. She

5    explained that "at Sugar's you can do anything (sex acts)" without being caught by law

6    enforcement, and that as a result, the dancers who "get in trouble" (for prostitution) at

7    other clubs are able to "keep doing the same things" at Sugar's.

8         On March 9, 2007, UC#2 spoke to dancer A.S. at Sugar's. UC#2 recognized A.S.

9    as a dancer who usually worked at Honey's. He asked why she was at Sugar's, and A.S.

10   explained that she was caught at Honey's giving a "dirty dance." She complained that the

11   new manager at Honey's was overly strict, but the regular managers are "cool with dirty

12   dances." A.S. further stated that "everyone knows the dirty dances bring in the

13   customers." A.S. explained that she was supposed to go to the "office" (Talents West) to

14   talk with the owners, but she was nervous about doing so. UC#2 asked why she would be

15   nervous. A.S. said that she previously had been sent to Talents West for giving a

16   customer a hand job, so this was her second time getting in trouble. UC#2 asked, "The

17   owners found out (about the hand job) and just gave you a warning?" She replied, "Yes,

18   they really didn't care, but I don't want to face them again." Thereafter, A.S. agreed to

19   perform a hand job for UC#2 in exchange for $45.00.

20        On May 25, 2007, dancer C.P. agreed to perform a sex act on UC#3 at Rick's, in

21   exchange for a fee. During their conversation, C.P. stated that she had been moved to

22   Honey's because she got "into trouble" at Rick's, referring to a past incident when she

23   was caught engaging in prostitution. In response to inquiries by UC#3, C.P. explained

24   that "it wasn't punishment (moving to Honey's), it's just what they (the owners) do."

25        On July 20, 2007, Christiansen told UC#1 he received police reports documenting

26   that two dancers, S.C. and J.N., had been arrested for prostitution at Rick's. Christiansen

27   stated that, as a result, the dancers were on "no work status" at Rick's. Shortly thereafter,

28   however, undercover detectives observed both S.C. and J.N. dancing at Honey's. On July

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

31, 2007, J.N. agreed to perform a sex act for an undercover officer at Honey's; S.C. did
the same on August 7, 2007.

Also on February 8, 2008, UC#3 spoke to dancer J.D. at Honey's. He recognized
J.D. as a dancer who typically works at Rick's, and asked why she was working at
Honey's. J.D. laughed and said she was "kicked out of Rick's for thirty days for being
dirty." J.D. asked, "So does that mean you're not dirty any more?" J.D. replied, "No, my
dances are the same. Twenty dollars for a dance out here (the main club area); thirty
dollars in the VIP area; for forty dollars you can touch me anywhere; and fifty dollars for
a hand job."

### 3.    The Collection Of Debts From The Dancers.

As noted above, the subjects engage in business practices that result in many
dancers incurring financial debts in the form of "back rent" owed or "interest free loans."
These debts, in turn, exert pressure on the dancers to commit acts of prostitution at the
clubs to earn money to satisfy the debts. Some of the dancers have complained to the
undercover officers about this. For example, on July 25, 2007, a Rick's dancer named
"Champagne" told UC#1 that she engaged in an act of prostitution because she owed
"back rent" to the owners and had to make enough money to pay them back.
"Champagne," a dancer who did not regularly engage in prostitution, expressed disgust
over the situation.

In her capacity as a manager at Rick's, UC#1 became familiar with the methods
the subjects use to keep track of the debts owed by dancers. According to UC#1, a daily
report is compiled at Talents West by Marsha Furfaro entitled, "Total Back Rent." This
report is delivered each day to the four clubs by either Colacurcio Jr., Christiansen,
Fueston, or one of the other subjects. The report contains an accounting for each dancer,
including columns for "back rent," "loans," and "no call - no show" (failure to work an
assigned shift). On January 15, 2008, copies of the "Total Back Rent" reports were
seized during a search of discarded trash outside Talents West, confirming the reports are
prepared at Talents West.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

The subjects instruct the club managers to collect debts owed by the dancers. The "Total Back Rent" report contains notations regarding the manner in which the money should be collected from each dancer, including a specific dollar amount per day. In addition, the subjects meet with the managers to provide additional instruction regarding the collection of money from the dancers. For example, on July 23, 2007, Colacurcio Jr. reviewed the daily report with UC#1 at Rick's. After looking at the paperwork, Colacurcio Jr. stated that it looked "okay," but instructed UC#1 to "make sure they pay today," referring to collecting additional money from the dancers.

UC#1 also observed that the subjects did not take disciplinary actions against dancers who owed Talents West money, ensuring that they would have the means to pay back the debts. For example, on August 5, 2007, UC#1 caught dancer "Jelena" engaging in an act of prostitution at Rick's. This incident is described in further detail above. The following day, Jelena returned to work at Rick's, without any apparent repercussions. When UC#1 inquired about the situation to club manager Larissa Shearer, Shearer stated that the "owners" would never fire Jelena because she just took out a loan and had not yet repaid it.

F.   **Evidence That The Subjects Personally Observed, And Participated In, The Prostitution At Rick's And Elsewhere.**

Undercover officers at Rick's have observed some of the subjects witnessing acts of prostitution. Some of these incidents are summarized below.[20]

On August 5, 2006, UC#3 observed Colacurcio Sr. at Rick's. Colacurcio Sr. was looking into the VIP area. UC#3 walked up and stood next to Colacurcio Sr., and looked into the VIP area. UC#3 observed dancers engaging in numerous acts that constitute prostitution under Washington State law, including two dancers whose nipples were in the mouths of customers while the customers groped them. This took place

---

[20] On several other occasions, undercover officers at Rick's observed some of the subjects, including Colacurcio Sr., Colacurcio Jr., and Conte, witnessing flagrant violations of the Standards of Conduct ordinances. These episodes are not detailed herein, because the conduct, while unlawful, did not rise to the level of prostitution under Washington State law.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1       Wherefore, I respectfully request that the Court issue search warrants for said

2  locations.

3

4

                 CORY COTE

5                 Special Agent, Federal Bureau of Investigation

6

7       SUBSCRIBED AND SWORN to before me this _29_ day of May, 2008,
  by FBI Special Agent Cory Cote.

8

9

                 RICARDO S. MARTINEZ

10             UNITED STATES DISTRICT COURT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

# EXHIBIT G

The Honorable Ricardo S. Martinez

_____ FILED      _____ ENTERED
_____ LODGED    _____ RECEIVED

JUN 02 2008

SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| IN RE: GRAND JURY MATTER | NO. GJ08-36 |
|  | UNITED STATES' *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER PURSUANT TO 18 U.S.C. §1963(d)(2) |
|  | ***FILED UNDER SEAL*** |

The United States of America, by and through Jeffrey C. Sullivan, United States

Attorney for the Western District of Washington, and Todd Greenberg and Richard E.

Cohen, Assistant United States Attorneys for said District, respectfully moves the Court

to enter an *ex parte* temporary restraining order, pursuant to 18 U.S.C. § 1963(d)(2), with

respect to the four real properties described in Attachment A hereto.

## I. **INTRODUCTION**

The federal grand jury is conducting an ongoing investigation into violations of the

RICO and RICO Conspiracy statutes, Title 18, United States Code, Sections 1962(c) and

1962(d). The subjects of the grand jury investigation include Frank Francis Colacurcio Sr.,

Frank Francis Colacurcio Jr., Leroy Richard Christiansen, John Gilbert Conte, Steven

Michael Fueston, and David Carl Ebert (hereinafter collectively referred to as

"the subjects"); and several legal entities that are owned and operated by the subjects,

including Talents West Inc.; Talents West II LLC; Accurate Bookkeeping Service Inc.;

D.C.E. Inc.; LLC Lake City, d/b/a Rick's; MM MR RM Corporation; Club 21 LLC, d/b/a

Sugar's; LLC Everett I; P.D. & M.K. I LLC, d/b/a Honey's; and LLC Foxes II, d/b/a Fox's.

APPLICATION FOR TEMPORARY RESTRAINING ORDER - 1

1    The potential for the properties described in Attachment A to be made unavailable

2  for forfeiture is significantly increased in light of the Colacurcios' extensive history of

3  committing crimes involving corruption, fraud, dishonesty, and deceit. As described

4  below, both Colacurcio Sr. and Colacurcio Jr. have been convicted of such crimes in the

5  past. Notably, some of their prior criminal activities have involved the concealment of

6  financial assets as well as ownership interests in various adult entertainment businesses.

7    For example, in 1971, after a jury trial, Colacurcio Sr. was convicted of five counts

8  of Interstate Transportation in Furtherance of Racketeering, in violation of 18 U.S.C.

9  § 1952. He was sentenced to serve thirty-six months of imprisonment. The Ninth Circuit

10  subsequently affirmed the conviction. *See United States v. Colacurcio*, 499 F.2d 1401

11  (9th Cir. 1974). The case centered on Colacurcio Sr.'s conducting of a bingo racketeering

12  enterprise in Seattle, Washington. *Id.* at 1402. The Ninth Circuit noted that one of

13  Colacurcio Sr.'s roles in the criminal enterprise was to corruptly "secure[] local police

14  protection for it." *Id.*

15    In 1973, after a jury trial, Colacurcio Sr. was convicted of two counts of Income

16  Tax Evasion, in violation of 26 U.S.C. § 7201. He was sentenced to serve thirty-six

17  months in custody, concurrent with the sentence imposed on the above racketeering case.

18  As noted by the Ninth Circuit, at trial "the Government established that [Colacurcio Sr.]

19  earned most of his income during the years in question from *concealed interests* in

20  various night clubs and taverns, interest on loans, and receipts from an unlawful bingo

21  operation [] in Seattle." *United States v. Frank Colacurcio*, 514 F.2d 1, 2-3 (9th Cir.

22  1975) (emphasis added). After Colacurcio had served approximately twenty-five months

23  in prison, the Ninth Circuit reversed the tax convictions based on jury instruction error.

24  *Id.* at 4-8. The court of appeals remanded for a new trial, and the government did not

25  retry the case.

26    Next, in 1981, Colacurcio Sr. was convicted, after a jury trial, of three counts of

27  Tax Fraud and Filing False Tax Returns, in violation of 26 U.S.C. § 7206. He was

28  sentenced to serve forty-eight months of imprisonment. The Ninth Circuit subsequently

APPLICATION FOR TEMPORARY RESTRAINING ORDER - 15

1  affirmed the conviction by unpublished memorandum opinion. *See United States v.*
2  *Frank Colacurcio*, 679 F.2d 902 (9th Cir. 1982). According to documents filed in the
3  district court, in case number CR80-164V (WDWA), the tax offenses involved the
4  "skimming" of a portion of the cash revenues from two adult entertainment clubs in
5  Seattle. Colacurcio Sr. controlled the clubs through the business of Talents West. To
6  accomplish the scheme, Colacurcio Sr. and his coconspirators maintained dual sets of
7  financial records; the false documents were submitted to accountants for tax preparation
8  purposes. The court pleadings further reveal that Colacurcio Sr. concealed his ownership
9  interest in the clubs by having "straw nominees" serve as the apparent managers and
10 owners of the clubs.

11        In 1991, Colacurcio Sr. and Colacurcio Jr. each pleaded guilty to tax fraud
12 offenses, in violation of 26 U.S.C. § 7206. Colacurcio Sr. received a five-year
13 probationary sentence, and Colacurcio Jr. was sentenced to thirty-six months'
14 imprisonment, with all but six months suspended. According to documents filed in the
15 district court, in case number CR90-070C, this case involved a nearly identical
16 "skimming" operation as the 1981 tax prosecution. This time, the offense involved the
17 concealment of cash revenues from two adult entertainment clubs located in Anchorage,
18 Alaska. The clubs were controlled by the Colacurcios through the business of Talents
19 West. In furtherance of the scheme, the Colacurcios again arranged for the production of
20 dual financial records, and submitted the false records to accountants for tax purposes.
21 As before, the Colacurcios concealed their ownership interest in the clubs through the use
22 of straw nominee owners.

23        Colacurcio Sr.'s probationary sentence was later revoked after his commission of
24 multiple probation violations. Specifically, Colacurcio Sr. violated the conditions of
25 probation prohibiting him from participating in the business operations of Talents West,
26 and from committing any new crimes. In violation of the court's orders, Colacurcio Sr.
27 continued to conduct the business affairs of Talents West, and he committed the crime of
28 "indecent liberties" under Washington State law (the victim was an applicant for a

APPLICATION FOR TEMPORARY RESTRAINING ORDER - 16

1    position at one of the Talents West strip clubs).  Based on these violations, the

2    probationary term was revoked and Colacurcio Sr. was sentenced to serve thirty-six

3    months in prison.  *See United States v. Frank Colacurcio Sr.*, 84 F.3d 326 (9th Cir. 1996)

4    (appeal from sentence imposed on probation revocation matter).  On appeal, the Ninth

5    Circuit reversed the sentence on jurisdictional grounds.  *Id.* at 328 (holding that

6    magistrate judge did not have authority to impose sentence).  On remand, the district court

7    reimposed the thirty-six month sentence, and the Ninth Circuit subsequently affirmed by

8    unpublished opinion.  *See United States v. Frank Colacurcio Sr.*, 122 F.3d 1074

9    (9th Cir. 1997).

10        Most recently, in January 2008, Colacurcio Sr., Colacurcio Jr., and John Conte

11    pleaded guilty to the Washington State misdemeanor offense of Conspiracy to Offer a

12    False Instrument or Record for Filing.  These convictions arose out of the highly

13    publicized campaign-finance investigation known as "Strippergate," involving the

14    concealment ("funneling") of illegal campaign contributions to members of the Seattle

15    City Council in 2003, in an effort to corruptly influence the Council's vote on a proposed

16    zoning ordinance that would have expanded the parking lot capacity at Rick's.  *See State*

17    *v. Conte, et al.*, 159 Wash.2d 797, 801-03, 154 P.3d 194, 196 (2007) (en banc).

18        In addition to this long history of fraudulent criminal conduct on the part of the

19    Colacurcios, there is probable cause to believe that the subjects are currently engaged in a

20    scheme to defraud the City of Seattle of admissions tax revenues, in violation of Title 18,

21    United States Code, Section 1341 (Mail Fraud).  As discussed further below, the

22    fraudulent scheme is perpetrated by the filing of false reports with the Seattle Revenue

23    and Consumer Affairs Department; the reports contain false representations under-

24    reporting the number of customers patronizing Rick's.

25        In conclusion, based on (a) the fact that the subjects own the properties described in

26    Attachment A mostly free and clear of security interests; (b) the history of the Colacurcios'

27    participation in fraudulent and corrupt criminal conduct, including the concealment of

28    assets; and (c) the evidence documenting the subjects' involvement in an ongoing scheme

APPLICATION FOR TEMPORARY RESTRAINING ORDER - 17

## VII. CONCLUSION

For the foregoing reasons, the United States submits there is probable cause to believe that the properties described in Attachment A will be subject to forfeiture pursuant to 18 U.S.C. § 1963(a); that there is a substantial probability the United States will prevail on the issue of forfeiture; that failure to enter the requested temporary restraining order will likely result in the properties becoming unavailable for forfeiture; and that the need to preserve the property through entry of the requested Order outweighs any hardship that the affected parties might suffer. Wherefore, the United States respectfully requests that the Court issue the proposed *ex parte* Temporary Restraining Order.

DATED this 2nd day of June, 2008.

Respectfully submitted,

JEFFREY C. SULLIVAN
United States Attorney

TODD GREENBERG
RICHARD E. COHEN
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street
Seattle, Washington 98101
Facsimile: 206-553-4440
Phone: 206-553-2636
E-mail:Todd.Greenberg4@usdoj.gov

# EXHIBIT H

**United States District Court**
*Western District of Washington*

UNITED STATES OF AMERICA,

**APPEARANCE BOND**
**Case No. MJ09-138**

vs.

# EDWARD ASATOORIANS

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, 700 Stewart Street Seattle, Washington, 12TH FLOOR, COURTROOM B, on APRIL 20, 2008, at 10:30 AM and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** I must not travel outside the Continental United States or as directed below under 'Other Conditions'.

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**
✓ Travel is restricted to the Western District of Washington, or as directed by Pretrial Services.
✓ Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.
✓ Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.
✓ Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.
✓ No employment in any positions in which there is actual/potential access to cash or negotiable instruments unless the employer is notified and the employment has been approved by Pretrial Services. The employer shall sign a Third Party Disclosure Form as directed by Pretrial Services.
✓ You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case. The government shall provide the parties with a list of the names by Thursday, April 2, 2009.
✓ The defendant shall not be employed in any capacity in the automobile sales or loan industry. All employment shall be approved in advance by Pretrial Services. Employer disclosure may be required.
✓ Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _(Signature of Defendant)_                    Renton, WA
                                                _(City and State)_

March 31, 2009                          **09-MJ-00138-BOND**

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

March 31, 2009
_(Dated)_                               Brian A. Tsuchida
                                        **UNITED STATES MAGISTRATE JUDGE**

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*

## United States District Court
### Western District of Washington

UNITED STATES OF AMERICA,

vs.

# Humberto Reyes-Rodriguez

# APPEARANCE BOND
## Case No. <u>CR09-160JLR</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the <u>United States Courthouse, 700 Stewart Street Seattle, Washington</u>, on <u>August 10, 2009</u> at <u>1:30pm</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**
- ✓ Submit to alcohol testing, to include urinalysis, breathalyzer, or hand-held testing devices, as directed by Pretrial Services. You shall not use, consume, or possess alcohol or any product containing alcohol, including medication, unless prescribed to you by a physician and under the direction of Pretrial Services. Obtain an alcohol/substance abuse evaluation and follow any treatment recommendations as directed by Pretrial Services.
- ✓ Travel is restricted to <u>the Western District of Washington</u>, or as directed by Pretrial Services.
- ✓ Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.
- ✓ Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.
- ✓ Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.
- ✓ Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.
- ✓ You must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by Pretrial Services.
- ✓ Comply with all other court orders and terms of supervision.
- ✓ <u>No employment in any capacity of the Real Estate, loan brokerage, mortgage, lending or escrow fields. All employment shall be pre-approved by Pretrial Services.</u>

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____
(Signature of Defendant)

<u>Federal Way, WA</u>
(City and State)

June 4, 2009

**09-CR-00160-BOND**

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

<u>June 4, 2009</u>
(Dated)

_____
James P. Donohue
UNITED STATES MAGISTRATE JUDGE

cc: Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services



## United States District Court
### *Western District of Washington*

UNITED STATES OF AMERICA,

vs.

## MICAH BUITRON

# APPEARANCE BOND
## Case No. <u>CR09-133RAJ</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒   **Court Appearances.** I must appear in court at the U.S. Courthouse, 700 Stewart Street Seattle, Washington, RAJ COURTROOM, on JULY 20, 2009, at 9:00 AM and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒   **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒   **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒   **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must receive any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒   **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒   **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒   **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒   **Other Conditions:**
- ✓   Travel is restricted to the Western District of Washington, or as directed by Pretrial Services.
- ✓   Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.
- ✓   Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.
- ✓   Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.
- ✓   Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.
- ✓   No employment in any positions in which there is actual/potential access to cash or negotiable instruments unless the employer is notified and the employment has been approved by Pretrial Services. The employer shall sign a Third Party Disclosure Form as directed by Pretrial Services.
- ✓   You shall not possess any Social Security number, identification, or documents in any name other than your own.
- ✓   No employment with any business using the Internet. All employment is to be approved by Pretrial Services.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _(signature)_
*(Signature of Defendant)*

<u>Kent, WA</u>
*(City and State)*

May 11, 2009

**09-CR-00133-BOND**

---

### ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

May 11, 2009
*(Dated)*

_(signature)_
Brian A. Tsuchida
UNITED STATES MAGISTRATE JUDGE

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*

## United States District Court
### Western District of Washington

UNITED STATES OF AMERICA,

# APPEARANCE BOND
## Case No. CR09-84MJP

vs.

# ALLA SOBOL

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒    **Court Appearances.** I must appear in court at the U.S. Courthouse, 700 Stewart Street Seattle, Washington, 14206, Courtroom on November 2, 2009, at 9:00am and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒    **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒    **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒    **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒    **Restrictions on Travel.** I must not travel outside the Continental United States or as directed below under 'Other Conditions'.

☒    **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒    **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

## CASH or COLLATERAL:

Amount of bond: $470,000
If defendant violates any condition of the bond, the Court can enter judgement in this amount against defendant, and against any sureties.

Collateral to be posted before Defendant's release
REAL PROPERTY: The following proof of ownership of real property or other property must be posted with the Court before defendant release. (Title to property or other legal document that proves ownership.) If defendant violates any condition of this appearance bond, the Court can order forfeited all property or cash that was posted as security or identified in an Agreement to Forfeit.

☒    **Other Conditions:**

✓    Travel is restricted to the Western District of Washington, or as directed by Pretrial Services.

✓    Participate in the active Global Positioning Satellite program and abide by all requirements of the program, under the direction of Pretrial Services. **Pretrial Services will coordinate the defendant's release with the U.S. Marshals.**

✓    Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

✓    Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.

✓    Release on third-party custody to: Diana Pyatetskay and Alex Mager

✓    Do not use, possess or have access to a computer, nor can others access a computer on your behalf, without prior approval of Pretrial Services. Do not use, possess, or have access to electronic media, e.g. PDA (Personal Digital Assistant) and cellular phones, with internet access capabilities, nor can others, without prior approval of Pretrial Services. Do not access the internet, bulletin board systems, or private or public computer networks or have others do so on your behalf without prior approval of Pretrial Services.

✓    Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

✓    Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.

✓    You must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by Pretrial Services.

✓    You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case or as directed by Pretrial Services.

✓    No employment in any facet of the mortgage, loan, brokerage or real-estate business. All employment shall be pre-approved by Pretrial Services. Employer disclosure may be required

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____          Renton, WA
_(Signature of Defendant)_                          _(City and State)_

May 15, 2009

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

May 15, 2009
_(Dated)_                                      Brian A. Tsuchida
                                              _UNITED STATES MAGISTRATE JUDGE_

cc: _Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services_

**United States District Court**
*Western District of Washington*

UNITED STATES OF AMERICA,

vs.

# DAVID SOBOL

# APPEARANCE BOND
## Case No. <u>CR09-84 MJP</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒    **Court Appearances.** I must appear in court at the <u>United States Courthouse, 700 Stewart Street Seattle, Washington, Courtroom 14206</u> on <u>October 23, 2009</u>, at <u>1:30pm</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO <u>10</u> YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒    **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒    **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒    **DNA Testing.** You must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.

☒    **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒    **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒    **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒    **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

## CASH or COLLATERAL:

<u>Amount of bond:</u> $421,000 (two real estate properties: $171,000 and $250,000)
If defendant violates any condition of the bond, the Court can enter judgement in this amount against defendant, and against any sureties.

<u>Collateral to be posted before Defendant's release</u>
REAL PROPERTY: The following proof of ownership of real property or other property must be posted with the Court before defendant release. (Title to property or other legal document that proves ownership.) If defendant violates any condition of this appearance bond, the Court can order forfeited all property or cash that was posted as security or identified in an Agreement to Forfeit.

☒    **Other Conditions:**

✓    Travel is restricted to <u>the Western District of Washington</u>, or as directed by Pretrial Services.

✓    Participate in the active Global Positioning Satellite program and abide by all requirements of the program, under the direction of Pretrial Services. **Pretrial Services will coordinate the defendant's release with the U.S. Marshals.**

✓    Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

✓    Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.

✓    Release on third-party custody to: <u>Renata Sobol</u>

✓    Do not use, possess or have access to a computer, nor can others access a computer on your behalf, without prior approval of Pretrial Services. Do not use, possess, or have access to electronic media, e.g. PDA (Personal Digital Assistant) and cellular phones, with internet access capabilities, nor can others, without prior approval of Pretrial Services. Do not access the internet, bulletin board systems, or private or public computer networks or have others do so on your behalf without prior approval of Pretrial Services.

✓    Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

✓    Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.

✓    You must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by Pretrial Services.

✓    You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case. May have contact with Alla Sobol for purposes of parental care of their child.

✓    <u>No employment in any facet of the mortgage, loan, brokerage, or real-estate business. All employment shall be pre-approved by Pretrial Services. Employer disclosure may be required.</u>

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____          _____
*(Signature of Defendant)*                                    *(City and State)*

July 7, 2009
_____

Surety (if any): *Alla Katkov and Regina Grinberg*

X _____          *July 7, 2009*
*(Signature of Surety)*                        *(Date Signed)*
_____

## ORDER OF RELEASE

It is therefore ORDERED:
*(1) Defendant shall comply with all conditions of this appearance Bond;*
*(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.*

July 7, 2009                                    _____
(Dated)                                          Brian A. Tsuchida
                                                 UNITED STATES MAGISTRATE JUDGE

cc: Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services

## United States District Court
### *Western District of Washington*

UNITED STATES OF AMERICA,

vs.

# CAMIE BYRON

# APPEARANCE BOND
## Case No. <u>CR09-84MJP</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒　**Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington, MJP COURTROOM</u> <u>on JUNE 1, 2009</u>, at 9:00 AM and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒　**No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒　**No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒　**Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒　**Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed by Pretrial Services.</u>

☒　**Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒　**Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒　**Other Conditions:**

✓　　Submit to alcohol testing, to include urinalysis, breathalyzer, or hand-held testing devices, as directed by Pretrial Services. You shall not use, consume, or possess alcohol or any product containing alcohol, including medication, unless prescribed to you by a physician and under the direction of Pretrial Services. Obtain an alcohol/substance abuse evaluation and follow any treatment recommendations as directed by Pretrial Services.

✓　　Surrender all current and expired passports and travel documents to the Court by 4:30pm on Friday, March 27, 2009. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

✓　　Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

✓　　No employment in any positions in which there is actual/potential access to cash or negotiable instruments unless the employer is notified and the employment has been approved by Pretrial Services. The employer shall sign a Third Party Disclosure Form as directed by Pretrial Services.

✓　　You must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by Pretrial Services.

✓　　<u>The defendant shall not be employed in the mortgage industry in any capacity. All employment must be pre-approved by Pretrial Services.</u>

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X *(Signature of Defendant)*

Renton, WA
*(City and State)*

March 26, 2009

09-CR-00084-BOND

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

March 26, 2009
*(Dated)*

Brian A. Tsuchida
*UNITED STATES MAGISTRATE JUDGE*

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*



# United States District Court
### Western District of Washington

UNITED STATES OF AMERICA,

vs.

## ZACHARY JOSEPH NAMIE

# APPEARANCE BOND
## Case No. <u>CR08-212RAJ</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington, RAJ COURTROOM</u>, on <u>AUGUST 25, 2008</u>, at <u>9:00 AM</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO <u>10 YEARS IMPRISONMENT</u> AND A FINE OF $250,000.**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**
  ✓ Travel is restricted to <u>WESTERN DISTRICT OF WASHINGTON</u>, or as directed by Pretrial Services.
  ✓ Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.
  ✓ Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.
  ✓ <u>The defendant shall not be employed in any capacity in the real estate business, loan business, banking industry, mortgage industry or be self-employed in any capacity. All employment is to be pre-approved by Pretrial Services.</u>
  ✓ Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.
  ✓ Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.
  ✓ You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case.
  ✓ No employment in any positions in which there is actual/potential access to cash or negotiable instruments unless the employer is notified and the employment has been approved by Pretrial Services. The employer shall sign a Third Party Disclosure Form as directed by Pretrial Services.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____
(Signature of Defendant)

June 19, 2008

<u>SEATTLE, WA</u>
(City and State)

08-CR-00212-BOND

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

June 19, 2008
(Dated)

Brian A. Tsuchida    Mary Alice Theiler
UNITED STATES MAGISTRATE JUDGE

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*



# United States District Court
## Western District of Washington

UNITED STATES OF AMERICA,

vs.

# ROBERT ERNEST BRANDT

# APPEARANCE BOND
## Case No. <u>CR08-212RAJ</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒   **Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington, RAJ COURTROOM</u>, on <u>AUGUST 25, 2008</u>, at <u>9:00 AM</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO <u>10 YEARS</u> IMPRISONMENT AND A FINE OF $250,000.**

☒   **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences must be consecutive to all other applicable sentences.

☒   **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒   **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒   **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒   **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒   **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒   **Other Conditions:**

    ✓   Travel is restricted to WESTERN DISTRICT OF WASHINGTON, with the exception of travel arranged for late July as reported to the Court, or as directed by Pretrial Services.

    ✓   Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

    ✓   You are prohibited from possessing or having access to firearms and dangerous weapons. All firearms and dangerous weapons must be removed from your residence(s), vehicle(s), and place of employment. This condition operates in conjunction with any restrictions imposed under Title 18, USC 922, and the Washington State Revised Code, Chapter 9.41.

    ✓   Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

    ✓   Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.

    ✓   You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case.

    ✓   <u>The defendant shall not be employed in any capacity in the real estate business, loan business, banking industry, mortgage industry or be self-employed in any capacity. All employment is to be pre-approved by Pretrial Services.</u>

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____
*(Signature of Defendant)*

June 19, 2008

<u>BOTHELL, WA</u>
*(City and State)*

**08-CR-00212-APPR**

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

June 19, 2008
*(Dated)*

_____
~~Brian A. Tsuchida~~ *Mary Alice Theiler*
UNITED STATES MAGISTRATE JUDGE

*cc: Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*

  **United States District Court**
*Western District of Washington*  

UNITED STATES OF AMERICA,

vs.

## Marc Khosraw

**APPEARANCE BOND**
Case No. <u>CR08-212RAJ</u>

FILED LODGED ENTERED RECEIVED
APR 29 2009
BY AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington</u>, on <u>November 2, 2009</u>, at <u>9:00am</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO <u>10 YEARS</u> IMPRISONMENT AND A FINE OF <u>$250,000.</u>**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by the terms of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**

✓ Submit to alcohol testing, to include urinalysis, breathalyzer, or hand-held testing devices, as directed by Pretrial Services. You shall not use, consume, or possess alcohol or any product containing alcohol, including medication, unless prescribed to you by a physician and under the direction of Pretrial Services. Obtain an alcohol/substance abuse evaluation and follow any treatment recommendations as directed by Pretrial Services.

✓ Travel is restricted to <u>the Western District of Washington</u>, or as directed by Pretrial Services.

✓ Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

✓ Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.

✓ Undergo a mental health, psychiatric or psychological evaluation and follow all treatment recommendations in that evaluation, as directed by Pretrial Services. You shall take all medications as prescribed.

✓ Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

✓ Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.

✓ You must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by Pretrial Services.

✓ You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case.

✓ <u>You shall not be employed in any capacity in the real estate business, loan business, banking industry, mortgage industry, or be self-employed in any capacity. All employment is to be pre-approved by Pretrial Services.</u>

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____
*(Signature of Defendant)*

<u>Sammamish, WA</u>
*(City and State)*

<u>April 29, 2009</u>

08-CR-00212-CLM

**ORDER OF RELEASE**

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

<u>April 29, 2009</u>
*(Dated)*

_____
Mary Alice Theiler
UNITED STATES MAGISTRATE JUDGE

*cc: Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*



## United States District Court
### *Western District of Washington*

UNITED STATES OF AMERICA,

vs.

**Isaac Palmer**

# APPEARANCE BOND
## Case No. <u>CR08-212RAJ</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒     **Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington</u>, on <u>August 25, 2008</u>, at 9:00am and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒     **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒     **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved by the Pretrial Services Officer.

☒     **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒     **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed below under 'Other Conditions'.</u>

☒     **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒     **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒     **Other Conditions:**

✓     Travel is restricted to <u>the Western District of Washington</u>, or as directed by Pretrial Services.

✓     Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.

✓     Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

✓     Maintain employment, or, if unemployed, actively seek employment as directed by Pretrial Services.

✓     You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) or witnesses in this case.

✓     <u>You shall not be employed in any capacity in the real estate business, loan business, banking industry, mortgage industry, or be self-employed in any capacity. You are not to be involved in construction projects on homes that are on a list to be provided by the AUSA or as directed by Pretrial Services. All employment is to be pre-approved by Pretrial Services.</u>

✓     You shall not possess any Social Security number, identification, or documents in any name other than your own.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____
*(Signature of Defendant)*

North Bend, WA
*(City and State)*

June 23, 2008

08-CR-00212-RCPT

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

June 23, 2008
*(Dated)*

Mary Alice Theiler
*UNITED STATES MAGISTRATE JUDGE*

cc: Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services

**United States District Court**
*Western District of Washington*

UNITED STATES OF AMERICA,

vs.

# HARRY SKEINS, Jr

# APPEARANCE BOND
## Case No. 06-210M

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, 700 Stewart Street Seattle, Washington, Courtroom 12B, on 17 May 2006, at 11:00am and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** I must not travel outside the Continental United States or as directed by Pretrial Services.

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Other Conditions:**
   ✓ Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.
   ✓ You shall not have direct or indirect contact with any existing and/or future co-defendant(s) in this case or any related case.
   ✓ Refrain from any real estate transactions or practice of law that may have any relationships with the State of Washington or with the co-defendant.

**AGREEMENT BY DEFENDANT.** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X *Harry Skeins, Jr*
*(Signature of Defendant)*

Blanco, Texas
*(City and State)*

May 5, 2006

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

May 5, 2006
*(Dated)*

*James P. Donohue*
**James P. Donohue**
*UNITED STATES MAGISTRATE JUDGE*

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*

**06-MJ-00210-BOND**



**United States District Court**
*Western District of Washington*

UNITED STATES OF AMERICA,

vs.

# DAVID ALAN HAWKINS

# APPEARANCE BOND
## Case No. 06-120M
## 210

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, 700 Stewart Street Seattle, Washington, Courtroom 12B, on 17 May 2006, at 11:00am and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** I must not travel outside the Continental United States or as directed by Pretrial Services.

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**
   ✓   Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.
   ✓   You shall not have direct or indirect contact with any existing and/or future co-defendant(s) in this case or any related case.
   ✓   Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.
   ✓   Comply with all other court orders and terms of supervision.
   ✓   The defendant is prohibited from engaging in or initiating any real estate transactions. Documentation of any pending real estate transactions must be provided to Pretrial Services within 72 hours of the defendant's release from custody.

   £   Defendant is not to violate any valid injunctions or court orders that are in place.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _(Signature of Defendant)_

Bellevue, Washington
_(City and State)_

May 5, 2006

06-MJ-00210-APPR

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

May 5, 2006
_(Dated)_

James P. Donohue
_UNITED STATES MAGISTRATE JUDGE_

cc: Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services



**United States District Court**
*Western District of Washington*

UNITED STATES OF AMERICA,

vs.

# TUAN DUNG TRAN

# APPEARANCE BOND
## Case No. <u>06-128M</u>

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington</u>, on <u>AS DIRECTED</u>, at <u>AS DIRECTED</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO <u>10 YEARS IMPRISONMENT AND A FINE OF $250,000</u>.**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed by Pretrial Services.</u>

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**
✓ Travel is restricted to <u>the Western District of Washington</u>, or as directed by Pretrial Services.
✓ **Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.**
✓ Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.
✓ <u>Defendant shall be prohibited from working in any capacity preparing tax documents or performing bookkeeping services for any individuals, businesses, or other entities other than himself, his spouse, and T&A Bookkeeping.</u>
✓ Comply with the Electronic Monitoring program under the direction of Pretrial Services. **Pretrial Services will coordinate the defendant's release with the U.S. Marshals.**
✓ Participate in the active Global Positioning Satellite program and abide by all requirements of the program, under the direction of Pretrial Services.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _(signature)_
**(Signature of Defendant)**

<u>Renton, WA</u>
*(City and State)*

<u>March 29, 2006</u>

**06-MJ-00128-BOND**

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

<u>March 29, 2006</u>
*(Dated)*

_(signature)_
*Monica J. Benton*
UNITED STATES MAGISTRATE JUDGE

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*

 **United States District Court** 
*Western District of Washington*

*Amended on April 28, 2006*

# APPEARANCE BOND
## Case No. 06-128M

UNITED STATES OF AMERICA,

vs.

# TUAN DUNG TRAN
AKA   DUNG TUAN TRAN

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒    **Court Appearances.** I must appear in court at the U.S. Courthouse, <u>700 Stewart Street Seattle, Washington</u>, on <u>AS DIRECTED</u>, at <u>AS DIRECTED</u> and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO <u>10 YEARS IMPRISONMENT AND A FINE OF $250,000.</u>**

☒    **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒    **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒    **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒    **Restrictions on Travel.** <u>I must not travel outside the Continental United States or as directed by Pretrial Services.</u>

☒    **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒    **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, United States Courthouse, 700 Stewart Street, Suite 10101 Seattle, (206) 370-8950, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒    **Other Conditions:**

     ✓   Travel is restricted to the <u>Western District of Washington</u>, or as directed by Pretrial Services.

     ✓   Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

     ✓   Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

     ✓   <u>Defendant shall be prohibited from working in any capacity preparing tax documents or performing bookkeeping services for any individuals, businesses, or other entities other than himself, his spouse, and TBS Bookkeeping. *Defendant may otherwise work at TBS Book keeping for the limited purpose of preparing the business for sale and selling the business, for a period up to May 22, 2006.*</u>

     ✓   Comply with the Electronic Monitoring program under the direction of Pretrial Services. **Pretrial Services will** coordinate the defendant's release with the U.S. Marshals.

     ✓   Participate in the active Global Positioning Satellite program and abide by all requirements of the program, under the direction of Pretrial Services.

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

x _(signature)_
*(Signature of Defendant)*

<u>Renton, WA</u>
*(City and State)*

<u>April 28, 2006</u>

06-MJ-00128-BOND

---

## ORDER OF RELEASE

It is therefore ORDERED:

(1) Defendant shall comply with all conditions of this appearance Bond;

(2) Defendant shall be released from custody, and shall remain at liberty so long as (s)he complies with the provisions of this Appearance Bond, or until further order of the Court.

<u>April 28, 2006</u>
*(Dated)*

_(signature)_
Monica J. Benton
UNITED STATES MAGISTRATE JUDGE

cc: *Defendant, Defense Counsel, U.S. Attorney, Marshal, Pretrial Services*

# United States District Court
## Western District of Washington

FILED
RECEIVED

DEC 2 1 2006

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

UNITED STATES OF AMERICA,

vs.

# GEORGE ELIOTT KABACY

# APPEARANCE BOND
## Case No. 06-5244M

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

☒ **Court Appearances.** I must appear in court at the U.S. Courthouse, 1717 Pacific Avenue Tacoma, Washington, COURTROOM D (OR AS DIRECTED), on JANUARY 3, 2007, at 10:30 A.M. and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**

☒ **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.

☒ **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.

☒ **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day..

☒ **Restrictions on Travel.** I must not travel outside the Continental United States or as directed by Pretrial Services.

☒ **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. §§ 1503, 1512, and 1513.

☒ **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, Union Station Courthouse, 1717 Pacific Avenue, Room 1152 Tacoma, (253) 882-3705, within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

☒ **Other Conditions:**

✓ Travel is restricted to WESTERN DISTRICT OF WASHINGTON AND THE DISTRICT OF OREGON, or as directed by Pretrial Services.

✓ Comply with the Electronic Monitoring program under the direction of Pretrial Services. **Pretrial Services will coordinate the defendant's release with the U.S. Marshals. THE DEFENDANT WILL BE RELEASED FROM CUSTODY TODAY. ELECTRONIC HOME MONITORING WILL BE ESTABLISHED BY PRETRIAL SERVICES ON TUESDAY, DECEMBER 26, 2006.**

✓ Surrender all current and expired passports and travel documents to the Court. Do not apply for/obtain a new passport or travel document from any country without the permission of the Court.

✓ Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.

✓ Abide by specific restrictions on places of association. You must not go, at any time, to: - AS DIRECTED BY PRETRIAL SERVICES

✓ Do not peruse or possess sexually explicit material as defined in Title 18, USC, Section 2256(2)(A-E).

✓ Do not use or possess a computer or electronic media, e.g. PDA (Personal Digital Assistant) and cellular phones, with internet access capabilities, or have anyone else on your behalf use or access a computer or electronic media, without prior approval of Pretrial Services. Do not access the internet, bulletin board systems, or private or public computer networks. Do not have others access, on your behalf, the internet, bulletin board systems, or private or public computer networks without prior approval of Pretrial Services.

✓ Do not frequent places primarily used by persons under the age of 18 without prior approval of Pretrial Services.

✓ The defendant shall not affiliate with, own, control, and/or be employed in any capacity by a business, organization, and/or volunteer activity that causes him/her to regularly contact persons under the age of 18.

✓ You shall not have contact with any person under the age of 18 without the permission of the Pretrial Services Office. You may be required to be chaperoned by an adult, pre-approved by Pretrial Services, when in the presence of minors.

✓ You must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by Pretrial Services.

✓ IMMEDIATELY CEASE CURRENT EMPLOYMENT AS PHYSICIAN AT SOUND CHOICE HEALTH CENTER P.S., AND DO NOT PRACTICE MEDICINE IN THE FUTURE WITHOUT PRIOR APPROVAL OF PRETRIAL SERVICES

✓ MEET WITH PRETRIAL SERVICES ON DECEMBER 22, 2006 AT 9:00 A.M.

✓ DO NOT POSSESS AND/OR USE ANY DANGEROUS WEAPONS OR FIREARMS.

Dated December 21, 2006

George E Kabacy
George Kabacy



06-MJ-05244-BOND

# U.S. District Court
## United States District Court for the Western District of Washington (Seattle)
## CRIMINAL DOCKET FOR CASE #: 2:03-cr-00074-RSL All Defendants

Case title: USA v. Le

Magistrate judge case numbers: 2:03-mj-00065
 2:03-mj-00070

Date Filed: 02/19/2003

---

Assigned to: Judge Robert S. Lasnik

**Defendant (1)**

**Tuan Anh Le**
*TERMINATED: 10/10/2003*
*also known as*
Brother Tuan
*TERMINATED: 10/10/2003*

represented by **Robert Harris Gombiner**
FEDERAL PUBLIC DEFENDER'S OFFICE
(SEA)
1601 5TH AVE
STE 700 WESTLAKE CENTER OFFICE
TOWER
SEATTLE , WA 98101
206-553-1100
Fax: FAX 553-0120
Email: robert_gombiner@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*

**Pending Counts**

18:1955 & 2 CONDUCTING AN ILLEGAL
GAMBLING BUSINESS
(1)

**Disposition**

12 months and one day imprisonment; 3 years
supervised release; fine waived; $100 special
assessment

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:1952 & 2 INTERSTATE
COMMUNICATION IN AID OF
RACKETEERING ACTIVITY
(2-10)

18:1084 & 2 INTERSTATE TRANSMISSION
OF WAGERING INFORMATION
(11-19)

**Disposition**

Dismissed

Dismissed

Fax: 206-553-6934
Email: Richard.E.Cohen@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/04/2003 | 1 | COMPLAINT Magistrate Judge John L. Weinberg [ 2:03-m -65 ] (HAZ) (Entered: 02/05/2003) |
| 02/05/2003 | 2 | FINANCIAL AFFIDAVIT as to Quang Thanh Bui Jr [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | | DEFENDANT Tuan Anh Le, Phuong T Truong, Hung Ngoc Nguyen, Chien Ngoc Duong, Quang Thanh Bui Jr, Mon Mao, Nhan Huu La, Jannie Mai Truong, Lanh T Hoang, Hien Thi Tran arrested [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 3 | FINANCIAL AFFIDAVIT as to Chien Ngoc Duong [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 4 | FINANCIAL AFFIDAVIT as to Lanh T Hoang [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 5 | FINANCIAL AFFIDAVIT as to Mon Mao [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 6 | FINANCIAL AFFIDAVIT as to Hung Ngoc Nguyen [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 7 | FINANCIAL AFFIDAVIT as to Hien Thi Tran [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 8 | FINANCIAL AFFIDAVIT as to Phuong T Truong [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 9 | FINANCIAL AFFIDAVIT as to Jannie Mai Truong [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 10 | FINANCIAL AFFIDAVIT as to Nhan Huu La [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 11 | FILED UNDER SEAL - FINANCIAL AFFIDAVIT as to Tuan Anh Le [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 12 | ORDER by Magistrate Judge John L. Weinberg appointing Robert Harris Gombiner as the Federal Public Defender for defendant Tuan Anh Le (cc: counsel) [ 2:03-m -65 ] (HAZ) (Entered: 02/06/2003) |
| 02/05/2003 | 13 | Arrest Warrant returned executed as to Lanh T Hoang 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 14 | Arrest Warrant returned executed as to Hung Ngoc Nguyen 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 15 | Arrest Warrant returned executed as to Chien Ngoc Duong 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 16 | Arrest Warrant returned executed as to Nhan Huu La 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 17 | Arrest Warrant returned executed as to Hien Thi Tran 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |

| 02/05/2003 | 18 | Arrest Warrant returned executed as to Phuong T Truong 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
|---|---|---|
| 02/05/2003 | 19 | Arrest Warrant returned executed as to Tuan Anh Le 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 20 | Arrest Warrant returned executed as to Quang Thanh Bui Jr 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 21 | Arrest Warrant returned executed as to Mon Mao 2/5/03 [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 22 | MOTION to detain by USA as to Tuan Anh Le [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 23 | MOTION to detain by USA as to Mon Mao [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 24 | MINUTES of INITIAL : JLW, Dep Clerk HAZ, AUSA T GREENBERG/J LORD, Def Counsel R GOMBINER(TL), M NANCE(PT), W PALMER(HN-needs interpreter) J VONASCH(CD-needs interperter), S RILEY(QB), B ERICKSON(MM), J GROSS FOR A CALFO(NL-needs interpreter), B FLEGENHEIMER(HT-needs interpreter), L COVELL(LH), C CHANEY(JT), Tape # A-1322/1323, USPT C SMITH/S MOORE/B AMUNDSON et al, Intpr Paul Tu & Nova Phung/Vietnamese, All defendants advised of rights/charges, Govt to have complaint translated into Vietnamese asap and provide to defense counsel; CT reviews all financial affidavits and appoints counsel, Mr Nance moves to seal financial affidavit of Mr Truong - DENIED - Mr Gombiner moves to seal Mr Le's financial affidavit - GRANTED; Govt moves for detention as to Tuan Le and withdraws motion for detention for Mon Mao; Govt proffers, Defense proffers, Counsel argue, CT rules DENYING motion to detain by USA as to Tuan Anh Le [22-1], Govt withdraws motion to detain by USA as to Mon Mao [23-1] first appearance of Tuan Anh Le, Phuong T Truong, Hung Ngoc Nguyen, Chien Ngoc Duong, Quang Thanh Bui Jr, Mon Mao, Nhan Huu La, Jannie Mai Truong, Lanh T Hoang, Hien Thi Tran , Attorneys present; $30,000 secured bond w/PTS supervision and special conditions set for Tuan Anh Le, $20,000 secured bond w/PTS supervision and special conditions set for Nhan Huu La; PR bond w/PTS supervision and special conditions set for Hung Ngoc Nguyen, Chien Ngoc Duong, Jannie Mai Tuong, Mon Mao, Lanh T. Hoang, Phuong T. Truong; PR bond set for Hien Thi Tran and Quang Thanh Bui, Jr; All defts release except Tuan Anh Le and Nhan Huu La who remain in custody pending posting of collateral required by CT; preliminary exam set for 9:30 2/24/03 for Tuan Anh Le, for Phuong T Truong, for Hung Ngoc Nguyen, for Chien Ngoc Duong, for Quang Thanh Bui Jr, for Mon Mao, for Nhan Huu La, for Jannie Mai Truong, for Lanh T Hoang, for Hien Thi Tran [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 25 | APPEARANCE BOND ( PR) by Mon Mao w/PTS supervision, surrender passport, no firearms, maintain/find employment, do not enter establishments known for gambling, report to PTS asap after release [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 26 | APPEARANCE BOND ( PR) by Hung Ngoc Nguyen w/PTS supervision, surrender passport, report to PTS asap after release, do not enter establishments known for gambling(oral amendment on the record) [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 27 | APPEARANCE BOND ( PR) by Hien Thi Tran [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 28 | APPEARANCE BOND ( PR) by Quang Thanh Bui Jr [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 29 | APPEARANCE BOND ( PR) by Lanh T Hoang w/PTS supervision, report to PTS asap after |

| | | |
|---|---|---|
| | | release, do not enter establishments known for gambling [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 30 | APPEARANCE BOND ( PR) by Chien Ngoc Duong w/PTS supervision, surrender passport w/in 48 hours, report to PTS asap after release, do not enter establishments known for gambling (oral amendment on the record) [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 31 | APPEARANCE BOND ( PR) by Jannie Mai Truong w/PTS supervision, surrender passport w/in 48 hours, do not enter establishments known for gambling (oral amendment on the record) [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 32 | APPEARANCE BOND ( PR) by Phuong T Truong w/PTS supervision, maintain/find employment, surrender passport, do not enter establishments known for gambling [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/05/2003 | 33 | APPEARANCE BOND ( $30,000/cash) by Tuan Anh Le w/PTS supervision, electronic monitoring, surrender passport, no firearms, provide financial info to PTS and sign a credit bureau verification release form, contribute toward costs of bond, employment subject to PTS approval, travel restricted to WD-WA, do not enter establishments know for gambling (receipt # 235 850347) [ 2:03-m -65 ] (HAZ) (Entered: 02/07/2003) |
| 02/07/2003 | 34 | CJA Form 20 (Appointment of Counsel)for Lanh T Hoang ; appointing Lee A Covell; [ 2:03-m -65 ] (HAZ) (Entered: 02/10/2003) |
| 02/07/2003 | 35 | CJA Form 20 (Appointment of Counsel)for Hien Thi Tran ; appointing Barry L Flegenheimer; [ 2:03-m -65 ] (HAZ) (Entered: 02/10/2003) |
| 02/07/2003 | 36 | CJA Form 20 (Appointment of Counsel)for Phuong T Truong ; appointing Michael Craig Nance; [ 2:03-m -65 ] (HAZ) (Entered: 02/10/2003) |
| 02/07/2003 | 37 | CJA Form 20 (Appointment of Counsel)for Hung Ngoc Nguyen ; appointing Walter George Palmer; [ 2:03-m -65 ] (HAZ) (Entered: 02/10/2003) |
| 02/07/2003 | 38 | CJA Form 20 (Appointment of Counsel)for Mon Mao; appointing Bruce D Erickson [ 2:03-m -65 ] (LW) (Entered: 02/10/2003) |
| 02/07/2003 | 39 | CJA Form 20 (Appointment of Counsel)for Quang Thanh Bui Jr; appointing Stewart P Riley [ 2:03-m -65 ] (LW) (Entered: 02/10/2003) |
| 02/07/2003 | 40 | CJA Form 20 (Appointment of Counsel)for Chien Ngoc Duong; appointing James L Vonasch [ 2:03-m -65 ] (LW) (Entered: 02/10/2003) |
| 02/07/2003 | 41 | CJA Form 20 (Appointment of Counsel)for Nhan Huu La; appointing Angelo J Calfo [ 2:03-m -65 ] (LW) (Entered: 02/10/2003) |
| 02/07/2003 | 42 | CJA Form 20 (Appointment of Counsel)for Jannie Mai Truong; appointing Catherine A Chaney [ 2:03-m -65 ] (LW) (Entered: 02/10/2003) |
| 02/07/2003 | 1 | COMPLAINT Magistrate Judge John L. Weinberg [ 2:03-m -70 ] (HAZ) (Entered: 02/12/2003) |
| 02/10/2003 | 43 | APPEARANCE BOND ( $20,000/Cash) by Nhan Huu La w/PTS supervision, must surrender passport, maintain employment and (oral amendment on record) do not enter establishments known for gambling [ 2:03-m -65 ] (dktclk) (Entered: 02/11/2003) |
| 02/11/2003 | | DEFENDANT Tan Minh Tran arrested [ 2:03-m -70 ] (HAZ) (Entered: 02/12/2003) |

| 02/11/2003 | 2 | Arrest Warrant returned executed as to Tan Minh Tran 2/11/03 [ 2:03-m -70 ] (HAZ) (Entered: 02/12/2003) |
|---|---|---|
| 02/11/2003 | 3 | MINUTES of INITIAL : JLW, Dep Clerk HAZ, AUSA T GREENBERG, Def Counsel R LEEN (RETAINED), Tape # A-1327, USPT J HALVORSON, Intpr Paul Tu/Vietnamese first appearance of Tan Minh Tran , Attorney Robert M Leen present; Deft advised of rights/charges, preliminary exam set for 9:30 2/24/03 for Tan Minh Tran , PR Bond w/PTS supervision and conditions set for Tan Minh Tran; Mr Leen asks that the deft's passport be sealed - DENIED; passport is surrendered in court to clerk [ 2:03-m -70 ] (HAZ) (Entered: 02/12/2003) |
| 02/11/2003 | 4 | APPEARANCE BOND ( PR) by Tan Minh Tran w/PTS supervision, surrender passport, maintain residence, maintain/find employment, do not enter establishments known for gambling [ 2:03-m -70 ] (HAZ) (Entered: 02/12/2003) |
| 02/11/2003 | 5 | RECEIPT #731774 for US Passport of Tan Tran re: bond [4-1] [ 2:03-m -70 ] (HAZ) (Entered: 02/12/2003) |
| 02/13/2003 | 44 | RECEIPT (#731775)- Received U.S. Passport from Lanh Hoang [ 2:03-m -65 ] (LC) (Entered: 02/13/2003) |
| 02/13/2003 | 45 | LETTER by plaintiff USA re: the translation of the complaint to Vietnamese [ 2:03-m -65 ] (HAZ) (Entered: 02/14/2003) |
| 02/17/2003 | 46 | PRETRIAL PETITION/ORDER by Magistrate Judge John L. Weinberg as to Lanh T Hoang directing that the following conditions be added: submit to drug testing, to include urinalysis, sweat patch or hand-held testing devices as directed by PTS. You shall not use consume or possess alcholo or any product containing alcohol, including medication, unless prescribed by a physician and under the direction of PTS. Obtain an evaluation for substance use/abuse and participate in substance abuse counseling as directed by PTS; surrender passport and travel documents to the court, do not apply for/obtain a new passport or travel document without permission of the Court; Maintain employment, or, if unemployed, actively seek employment as directed by PTS; you must contribute towards the costs of the services required by this bond, to the extent you are financially able to do so, as determined by PTS; no direct or indirect contact w/co-defendants (cc: counsel, Judge, USPO, PTS) [ 2:03-m -65 ] (HAZ) (Entered: 02/18/2003) |
| 02/19/2003 | 47 | INDICTMENT by USA Todd Greenberg. Counts filed against Tuan Anh Le (1) count(s) 1, 2-10, 11-19, Nhan Huu La (2) count(s) 1, Chien Ngoc Duong (3) count(s) 1, 2-10, 11-19, Lanh T Hoang (4) count(s) 1, Tan Minh Tran (5) count(s) 1, Phuong T Truong (6) count(s) 1, 2-10, 11-19, Hung Ngoc Nguyen (7) count(s) 1, Mon Mao (8) count(s) 1, Quang Thanh Bui (9) count(s) 1, Jannie Mai Truong (10) count(s) 1, Hien Thi Tran (11) count(s) 1 (JK) (Entered: 02/20/2003) |
| 02/19/2003 | 48 | ORDER CONTINUING CONDITIONS of RELEASE by Magistrate Judge Philip K. Sweigert as to Tuan Anh Le (JK) (Entered: 02/20/2003) |
| 02/19/2003 | 49 | ORDER CONTINUING CONDITIONS of RELEASE by Magistrate Judge Philip K. Sweigert as to Nhan Huu La (JK) (Entered: 02/20/2003) |
| 02/19/2003 | 50 | ORDER CONTINUING CONDITIONS of RELEASE by Magistrate Judge Philip K. Sweigert as to Chien Ngoc Duong (JK) (Entered: 02/20/2003) |
| 02/19/2003 | 51 | ORDER CONTINUING CONDITIONS of RELEASE by Magistrate Judge Philip K. Sweigert as to Lanh T Hoang (JK) (Entered: 02/20/2003) |
| 02/19/2003 | 52 | ORDER CONTINUING CONDITIONS of RELEASE by Magistrate Judge Philip K. Sweigert |